Baker & Hostetler LLP
Joseph F. Hutchinson, Jr. (Pro Hac Vice)
jhutchinson@bakerlaw.com
Eric R. Goodman (Pro Hac Vice)
egoodman@bakerlaw.com
Adam L. Fletcher (Pro Hac Vice)
afletcher@bakerlaw.com
PNC Center
1900 East 9th Street, Suite 3200
Cleveland, Ohio 44114-3482
Telephone: 216.621.0200
Facsimile: 216.696.0740

[ADDITIONAL COUNSEL LISTED ON NEXT PAGE]

Attorneys for the Federal Deposit Insurance Corporation, in its capacity as Receiver of IndyMac Bank, F.S.B. and in its capacity as Receiver of IndyMac Federal Bank, F.S.B.[1]

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA — LOS ANGELES DIVISION

In re

INDYMAC BANCORP, INC.

Debtor

ALFRED H. SIEGEL, solely as Chapter 7 Trustee of the estate of IndyMac Bancorp, Inc.,

Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as Receiver of IndyMac Bank, F.S.B. and as Conservator of IndyMac Federal Bank, F.S.B.,

Defendant.

Case No. 2:08-bk-21752-BB

Chapter 7

Adversary Proc. No. 2:09-ap-01698-BB

District Ct. No. 2:12-cv-02967-RGK

**FDIC'S OBJECTION TO BANKRUPTCY COURT'S REPORT AND RECOMMENDATION**

[1] FDIC in its capacity as Receiver of IndyMac Federal Bank, F.S.B., is the successor to the FDIC in its capacity as Conservator of IndyMac Federal Bank, F.S.B.



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

[CAPTION PAGE CONTINUED]

Nossaman LLP
Allan H. Ickowitz (SBN 80994)
aickowitz@nossaman.com
John W. Kim (SBN 216251)
jkim@nossaman.com
Harleen Kaur (SBN 260229)
hkaur@nossaman.com
777 S. Figueroa Street, 34th Floor
Los Angeles, CA 90017
Telephone: 213.612.7800
Facsimile: 213.612.7801

Kathryn R. Norcross, Senior Counsel
B. Amon James, Counsel
Federal Deposit Insurance Corporation
Legal Division
3501 Fairfax Drive, VS-D-7120
Arlington, Virginia 22226
Telephone: (703) 562-2631

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1
- A. Standard of Review ..... 7
- B. The Parties ..... 8
- C. Factual Background ..... 8
  - 1. Economic Reality of the Tax Refunds Subject to this Dispute ..... 8
    - a. Tax Payments Made by the Bank on Its Own Income ..... 9
    - b. The Bank Ceases to Be Profitable ..... 9
    - c. The Bank Fails and Bancorp Files for Bankruptcy ..... 10
    - d. Post-Bankruptcy Applications for the Refund of Taxes the Bank Paid Based on the Bank's NOLs ..... 11
  - 2. The 2003 Tax Sharing Agreement ..... 13
    - a. Preparation of the Tax Sharing Agreement ..... 13
    - b. The TSA Was Never Approved by the Bank's Board ..... 17

II. SPECIFIC OBJECTIONS ..... 18
- A. The Bankruptcy Court Erred in Disregarding the Ninth Circuit's Decision in *Bob Richards* ..... 18
- B. The Bankruptcy Court Erred in Finding that the TSA Is a "Differing Agreement" that Overrides the Default Property Rule in *Bob Richards* ..... 25
- C. The Bankruptcy Court Erred in Suggesting that *Bob Richards* Is Not Binding Precedent ..... 46
- D. The Bankruptcy Court Erred in Finding that the TSA, as Interpreted by the Bankruptcy Court, Is Enforceable Against the FDIC-R as a Matter of Law ..... 48
  - 1. The Bankruptcy Court Erred in Finding that the TSA, as Interpreted by the Bankruptcy Court, Is Enforceable Under 12 U.S.C. § 1823(e) ..... 48
  - 2. The Bankruptcy Court Erred in Finding that the TSA, as Interpreted by the Bankruptcy Court, Is Enforceable Under 12 U.S.C. § 371c(c) and 12 U.S.C. § 371c-1 ..... 58
    - a. The Bankruptcy Court Erred in Finding that Unsecured Extensions of Credit Between Banks and Affiliates Are Legal Under 12 U.S.C. § 371c(c) and 12 U.S.C. § 371c-1 ..... 58
    - b. The Bankruptcy Court Erred in Finding that the Interagency Policy Statement Is Irrelevant in this Case ..... 64
    - c. The Bankruptcy Court Erred in Finding that If the TSA Creates an Illegal Debtor/Creditor Relationship, It Is Still Enforceable Against the FDIC-R ..... 67


BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

3. The Bankruptcy Court Erred in Finding that the Trustee Can Enforce the Terms of the Rejected TSA Under 11 U.S.C. § 365(g) .......... 70

4. The Bankruptcy Court Erred in Finding that the TSA, as Interpreted by the Bankruptcy Court, Is Enforceable Under California Law .......... 79

5. The Bankruptcy Court Erred in Finding that the TSA, as Interpreted by the Bankruptcy Court, Does Not Constitute Gross Overreaching and Is Enforceable .......... 83

6. The Bankruptcy Court Erred in Adopting a Commercially Unreasonable Construction of the TSA .......... 86

7. The Bankruptcy Court Erred in Adopting a Construction of the TSA that Renders the TSA Illegal .......... 87

E. The Bankruptcy Court Erred in Finding that the TSA Is Inconsistent with an Agency Relationship .......... 88

F. The Bankruptcy Court Erred in Failing to Recognize a Resulting Trust in Favor of the Bank's Receivership Estate .......... 92

G. The Bankruptcy Court Erred in Applying the Parol Evidence Rule to Exclude the Consideration of Extrinsic Evidence .......... 97

H. The Bankruptcy Court Erred in Excluding Evidence Regarding the Economic Reality of the Tax Refunds on Relevance Grounds .......... 103

III. CONCLUSION .......... 106

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

# TABLE OF AUTHORITIES

Page(s)

**CASES**


*Adobe Sys. Inc. v. One Stop Micro, Inc.*, 84 F. Supp. 2d 1086 (N.D. Cal. 2000) ..... 102

*Aikin v. Neilson (In re Cedar Funding, Inc.)*, No. 09-4311 RMW (N.D. Cal. Mar. 31, 2012) ..... 93, 94, 96

*Alvord v. Ryan*, 212 F. 83 (8th Cir. 1914) ..... 21, 24, 29

*Am. Healthcare Corp. v. Beiersdorf, Inc.*, No. 05-1735, 2006 WL 753001 (D.P.R. Mar. 23, 2006) ..... 78

*Anderson v. The Int'l Union, United Plant Guard Workers of Am.*, 370 F.3d 542 (6th Cir. 2004) ..... 69

*Archiega v. Dolores Press, Inc.*, 121 Cal. Rptr. 3d 654, 192 Cal. App. 4th 567 (Cal. Ct. App. 2011) ..... 99, 100

*Atherton v. FDIC*, 519 U.S. 213 (1997) ..... 46

*Auer v. Robbins*, 519 U.S. 452 (1997) ..... 64, 66

*Aurora Shores Homeowners Ass'n v. FDIC*, 2 F. Supp. 2d 975 (N.D. Ohio 1998) ..... 50

*Avirez v. RTC*, 876 F. Supp. 1135 (C.D. Cal. 1995) ..... 49, 54, 55, 57

*Baker v. City of Pomona*, No. CV-92-5649, 1993 U.S. Dist. LEXIS 19548 (C.D. Cal. Aug. 4, 1993) ..... 80

*Barnes v. Indep. Auto. Dealers Ass'n of California Health & Welfare Benefit Plan*, 64 F.3d 1389 (9th Cir. 1995) ..... 36, 37

*Bassett v. Bassett*, 798 P.2d 160 (N.M. 1990) ..... 96

*Bassidji v. Goe*, 413 F.3d 928 (9th Cir. 2005) ..... 67, 69, 70

*Beneficial Fire & Cas. Ins. Co. v. Kurt Hitke & Co.*, 46 Cal. 2d 517, 297 P.2d 428 (Cal. 1956) ..... 99, 100, 102

*Beynon v. Garden Grove Med. Group*, 161 Cal. Rptr. 146, 100 Cal. App. 3d 698 (Cal. Ct. App. 1980) ..... 57

*Bldg. Maint. Serv. Co. v. AIL Sys., Inc.*, 64 Cal. Rptr. 2d 353, 55 Cal. App. 4th 1014 (Cal. Ct. App. 1997) ..... 36

*Borders Online, LLC v. State Bd. of Equalization*, 29 Cal. Rptr. 3d 176, 129 Cal. App. 4th 1179 (Cal. Ct. App. 2005) ..... 89, 90, 91

*Brandt v. Fleet Capital Corp. (In re TMCI Elecs.)*, 279 B.R. 552 (Bankr. N.D. Cal. 2000) ..... 19, 74

*BSD Bancorp., Inc. v. FDIC*, No. 93-12207-A11 (S.D. Cal. Feb. 28, 1995) ..... passim

*Butner v. U.S.*, 440 U.S. 48 (1979) ..... 26

*Calistoga Civic Club v. City of Calistoga*, 191 Cal. Rptr. 517, 143 Cal. App. 3d 111 (Cal. Ct. App. 1983) ..... 93

*Capital Bancshares, Inc. v. FDIC*, 957 F.2d 203 (5th Cir. 1992) ..... 19, 34

*Carolco Television Inc. v. Nat'l Broad. Co. (In re Del Laurentiis Entm't Group, Inc.)*, 963 F.2d 1269 (9th Cir. 1992) ..... 25

*Castro v. Perez (In re Castro)*, 919 F.2d 107 (9th Cir. 1990) ..... 1, 7






BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

*Cavanaugh ex rel. Cavanaugh v. Providence Health Plan,*
699 F. Supp. 2d 1209 (D. Or. 2010) .... 36
*Cent. Oil Co. of Los Angeles v. S. Ref. Co.,*
97 P. 177 (Cal. 1908) .... 72
*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,*
467 U.S. 837 (1984) .... 63, 65
*Citizens for Goleta Valley v. HT Santa Barbara,*
12 Cal. Rptr. 3d 249, 117 Cal. App. 4th 1073 (Cal. Ct. App. 2004) .... 86
*City Lincoln-Mercury Co. v. Lindsey,*
52 Cal. 2d 267, 339 P.2d 851 (Cal. 1959) .... 57
*Claybrook v. United States,*
No. 10-734T (Fed. Cl. Apr. 18, 2012) .... passim
*Cobb v. S.F. Residential Rent Stabilization & Arbitration Bd.,*
119 Cal. Rptr. 2d 741, 98 Cal. App. 4th 345 (Cal. Ct. App. 2002) .... 79, 80
*Cockerell v. Title Ins. & Trust Co.,*
42 Cal. 2d 284, 267 P.2d 16 (Cal. 1954) .... 79, 80
*Coeur Alaska, Inc. v. Se. Alaska Conservation Council,*
557 U.S. 261, 129 S.Ct. 2458 (2009) .... 64, 65, 66
*Cohen v. Un-Ltd. Holdings, Inc. (In re Nelco, Ltd.),*
264 B.R. 790 (Bankr. E.D. Va. 1999) .... 19, 34, 35
*Comedy Club, Inc. v. Improv West Assocs.,*
553 F.3d 1277 (9th Cir. 2009) .... 72
*Consol. Rock Prods. Co. v. Du Bois,*
312 U.S. 510 (1941) .... 83
*Costello v. Grundon,*
651 F.3d 614 (7th Cir. 2011) .... 69
*Cottman Transmissions, Inc. v. Holland Enters., Inc. (In re Holland Enters., Inc.),*
25 B.R. 301 (E.D.N.C. 1982) .... 72
*County of Amador v. City of Plymouth,*
57 Cal. Rptr. 3d 704, 149 Cal. App. 4th 1089 (Cal. Ct. App. 2007) .... 81
*Danning v. Brunswick Corp.,*
466 F.2d 1010 (9th Cir. 1972) .... 72
*Danning v. Mintz,*
367 F.2d 304-05 (9th Cir. 1966) .... 73
*Delta Dynamics, Inc. v. Arioto,*
69 Cal. 2d 525, 446 P.2d 785 (Cal. 1968) .... 99, 100
*Delta Sav. & Loan Ass'n, Inc. v. A.C.V., Inc.,*
750 F. Supp. 759 (M.D. La. 1990) .... 49, 57
*E.I. du Pont de Nemours & Co. v. FDIC,*
32 F.3d 592 (D.C. Cir. 1994) .... 55
*Edwards II v. Arthur Anderson LLP,*
44 Cal. 4th 937, 189 P.3d 285 (Cal. 2008) .... 87
*Ehrenberg v. Visconti (In re Axium Int'l, Inc.),*
No. 2:08-bk-10277-BB (Bankr. C.D. Cal. Feb. 16, 2012) .... 46
*Entremont v. Whitsell,*
13 Cal. 2d 290, 89 P.2d 392 (Cal. 1939) .... 87
*Ermolieff v. R.K.O. Radio Pictures,*
19 Cal. 2d 543, 122 P.2d 3 (Cal. 1942) .... 102
*FDIC v. Brandt (In re Florida Park Banks, Inc.),*
110 B.R. 986 (Bankr. M.D. Fla. 1990) .... 19, 34
*FDIC v. Eagle Prop., Ltd.,*
664 F. Supp. 1027 (W.D. Tex. 1985) .... 51, 52
*FDIC v. Gardner,*
606 F. Supp. 1484 (S.D. Miss. 1985) .... 51





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

*FDIC v. Great Am. Ins. Co.*,
607 F.3d 288 (2nd Cir. 2010) .................... 54, 55
*FDIC v. Gulf Life Ins. Co.*,
737 F.2d 1513 (11th Cir.1984) .................... 49, 57
*FDIC v. Longley I Realty Trust*,
988 F.2d 270 (1st Cir. 1993) .................... 54
*FDIC v. McFarland*,
33 F.3d 532 (5th Cir. 1994) .................... 54
*FDIC v. Mercer Bancorp., Inc.*,
No. 89-0849, 1990 WL 515173 (W.D. Mo. Dec. 5, 1990) .................... 19
*FDIC v. Oldenburg*,
34 F.3d 1529 (10th Cir. 1994) .................... 49, 54, 55, 57
*FDIC v. Powers*,
576 F. Supp. 1167 (N.D. Ill. 1983) .................... 49, 57
*FDIC v. Sahni*,
107 F.3d 15, 1997 WL 51454 (9th Cir. Feb. 5, 1997) .................... 49, 57
*FDIC v. Tarkanian*,
No. 10cv980, 2012 WL 1327849 (S.D. Cal. Apr. 17, 2012) .................... 49, 57
*Fed. Trade Comm'n v. Enforma Natural Prods., Inc.*,
362 F.3d 1204 (9th Cir. 2004) .................... 8
*Ferrell v. S. Nevada Off-Road Enthusiasts, Ltd.*,
195 Cal. Rptr. 90, 147 Cal. App. 3d 309 (Cal. Ct. App. 1983) .................... 36
*Fidelity Nat'l Title Ins. Co. v. Schroeder*,
101 Cal. Rptr. 3d 854, 179 Cal. App. 4th 834 (Cal. Ct. App. 2009) .................... 93
*Filet Menu, Inc. v. C.C.L. & G., Inc.*,
94 Cal. Rptr. 2d 438, 79 Cal. App. 4th 852 (Cal. Ct. App. 2000) .................... 72
*Flores v. Arizona*,
516 F.3d 1140 (9th Cir. 2008) .................... 106
*Foothill Capital Corp. v. Clare's Food Mkt., Inc. (In re Coupon Clearing Serv., Inc.)*,
113 F.3d 1091 (9th Cir. 1997) .................... passim
*G. W. Andersen Constr. Co. v. Mars Sales*,
210 Cal. Rptr. 409, 164 Cal. App. 3d 326 (Cal. Ct. App. 1985) .................... 72
*Garcia v. Truck Ins. Exch.*,
36 Cal. 3d 426, 682 P.2d 1100 (Cal. 1984) .................... 98, 99, 100
*Garcia v. World Sav., FSB*,
107 Cal. Rprt. 3d 683, 183 Cal. App. 4th 1031 (Cal. Ct. App. 2010) .................... 80
*Gary v. Califano*,
448 F. Supp. 1142 (S.D. Cal. 1978) .................... 7
*Geffen v. Moss*,
125 Cal. Rptr. 687, 53 Cal. App. 3d 215 (Cal. Ct. App. 1975) .................... 99, 101
*Golden Mortg. Fund #14 v. Kennedy (In re Golden Triangle Capital, Inc.)*,
171 B.R. 79 (B.A.P. 9th Cir. 1994) .................... 93, 94, 95
*Grace Line, Inc. v. Todd Shipyards Corp.*,
500 F.2d 361 (9th Cir. 1974) .................... 88
*Grant v. Aerodraulics Co.*,
91 Cal. App.2d 68, 204 P.2d 683 (Cal. Ct. App. 1949) .................... 80
*Green v. Finnigan Realty Co.*,
70 F.2d 465 (5th Cir. 1934) .................... 78
*H. S. Mann Corp. v. Moody*,
144 Cal. App. 2d 310, 301 P.2d 28 (Cal. Ct. App. 1956) .................... 74
*Halicki Films, LLC v. Sanderson Sales & Mktg.*,
547 F.3d 1213 (9th Cir. 2008) .................... 99, 100
*Hall v. Perry (In re Cochise College Park, Inc.)*,
703 F.2d 1339 (9th Cir. 1983) .................... 72, 78

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

*Hangarter v. Provident Life & Acc. Ins. Co.*,
373 F.3d 998 (9th Cir. 2004) .................... 105
*Hansen v. Bear Film Co.*,
28 Cal. 2d 154, 168 P.2d 946 (Cal. 1946) .................... 93, 96
*Harris v. Klure*,
23 Cal. Rptr. 313, 205 Cal. App. 2d 574 (Cal. Ct. App. 1962) .................... 86
*Hayter Trucking, Inc. v. Shell W. E&P, Inc.*,
22 Cal. Rptr. 2d 229, 18 Cal. App. 4th 1 (Cal. Ct. App. 4d 1993) .................... 99, 101
*Hedging Concepts, Inc. v. First Alliance Mortgage Co.*,
49 Cal. Rptr. 2d 191, 41 Cal. App. 4th 1410 (Cal Ct. App. 1996) .................... 84
*Hernandez v. Ruelas (In re Marriage of Ruelas)*,
64 Cal. Rptr. 3d 600, 154 Cal. App. 4th 339 (Cal. Ct. App. 2007) .................... 93, 96
*Heston v. Farmers Ins. Group*,
206 Cal. Rptr. 585, 160 Cal. App. 3d 402 (Cal. Ct. App. 1984) .................... 99, 101
*Homami v. Iranzadi*,
260 Cal. Rptr. 6, 211 Cal. App. 3d 1104 (Cal. Ct. App. 1989) .................... 65
*Home Mortg. Bank v. Ryan*,
986 F.2d 372 (10th Cir. 1993) .................... 63
*Howe v. Amer. Baptist Homes of the West, Inc.*,
169 Cal. Rptr. 418, 112 Cal. App. 3d 622 (Cal. Ct. App. 1980) .................... 86
*Hyon v. Selten*,
60 Cal. Rptr. 896, 152 Cal. App. 4th 463 (Cal. Ct. App. 2007) .................... 81
*In re BankUnited Fin. Corp.*,
462 B.R. 885 (Bankr. S.D. Fla. 2011) .................... 45, 103
*In re Beaucage*,
334 B.R. 353 (Bankr. D. Mass. 2005) .................... 74
*In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*,
896 F.2d 54 (3d Cir. 1990) .................... 22
*In re Comdisco, Inc.*,
270 B.R. 909 (Bankr. N.D. Ill. 2001) .................... 72
*In re Conti*,
50 B.R. 142 (Bankr. E.D. Va. 1985) .................... 74
*In re Coupon Clearing Serv., Inc.*,
113 F.3d 1091 (9th Cir. 1997) .................... 88
*In re Crippin*,
877 F.2d 594 (7th Cir. 1989) .................... 72
*In re First Cent. Fin. Corp.*,
377 F.3d 209 (2d Cir. 2004) .................... 43, 84, 103
*In re First Cent. Fin. Corp.*,
269 B.R. 481 (Bankr. E.D.N.Y. 2001) .................... passim
*In re Flying J, Inc.*,
No. 08-13384, 2009 WL 5215000 (Bankr. D. Del. Dec. 28, 2009) .................... 76, 77, 78
*In re Franklin Sav. Corp.*,
159 B.R. 9 (Bankr. D. Kan. 1993) .................... 42, 43, 103
*In re Freeman*,
489 F.2d 431 (9th Cir. 1973) .................... 73
*In re Frontier Props., Inc.*,
979 F.2d 1358 (9th Cir. 1992) .................... 71
*In re Glenn*,
207 B.R. 418 (E.D. Pa.1997) .................... 74
*In re Gravure Paper & Bd. Corp.*,
234 F.2d 928 (3d Cir. 1956) .................... 78
*In re Interborough Consol. Corp.*,
288 F. 334 (2d Cir. 1923) .................... 21

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

*In re MCorp Fin., Inc.*,
170 B.R. 899 (S.D. Tex. 1994) .......... 42, 45
*In re NetBank, Inc.*,
459 B.R. 801 (Bankr. M.D. Fla. 2010) .......... 42, 44
*In re Newlin*,
370 B.R. 870 (M.D. Ga. 2007) .......... 72
*In re Ortiz*,
400 B.R. 755 (C.D. Cal. 2009) .......... 78
*In re Rega Props., Ltd.*,
894 F.2d 1136 (9th Cir. 1990) .......... 71
*In re Revco D.S., Inc.*,
111 B.R. 631 (Bankr. N.D. Ohio 1990) .......... 19
*In re Stienes*,
285 B.R. 360 (Bankr. D.N.J. 2002) .......... 74
*Indep. Bankgroup, Inc. v. FDIC*,
217 B.R. 442 (Bankr. D. Vt. 1998) .......... 54, 55
*John v. RTC*,
39 F.3d 773 (7th Cir.1994) .......... 55
*Jones v. Gore*,
141 Cal. App. 2d 667, 297 P.2d 474 (Cal. Ct. App. 1956) .......... 96, 97
*Jump v. Manchester Life & Cas. Mgmt. Corp.*,
438 F. Supp. 185 (E.D. Mo. 1977) .......... 19
*Jump v. Manchester Life & Cas. Mgmt. Corp.*,
579 F.2d 449 (8th Cir. 1978) .......... 89
*Kaiser Steel Corp. v. Mullins*,
455 U.S. 72 (1982) .......... 67, 68, 69, 70
*Kaneda v. Kaneda*,
45 Cal. Rptr. 437, 235 Cal. App. 2d 404 (Cal. Ct. App. 1965) .......... 96
*Kuchta v. Allied Builders Corp.*,
98 Cal. Rptr. 588, 21 Cal. App. 3d 541 (Cal. Ct. App. 1971) .......... 92
*Kupetz v. United States (In re California Trade Technical School, Inc.)*,
923 F.2d 641 (9th Cir. 1991) .......... 2, 18
*Las Vegas Sands, LLC v. Nehme*,
632 F.3d 526 (9th Cir. 2011) .......... 72
*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995) .......... 58
*Lehigh Valley Coal Sales Co. v. Maguire (In re Gilmore-Thayer Co.)*,
251 F. 581 (7th Cir. 1918) .......... 21, 22, 24, 29
*Libby v. Hopkins*,
104 U.S. 303 (1881) .......... passim
*Lincoln Sav. & Loan Ass'n v. Wall*,
743 F. Supp. 901 (D.D.C. 1990) .......... 83
*Lonely Maiden Prods, LLC v. GoldenTree Asset Mgmt., LP*,
135 Cal. Rptr. 3d 69, 201 Cal. App. 4th 368 (Cal. Ct. App. 2011) .......... passim
*Lubin v. FDIC*,
No. 1:10-CV-00874-RWS, 2011 WL 825751 (N.D. Ga. Mar. 2, 2011) .......... passim
*Malloy v. Fong*,
37 Cal. 2d 356, 232 P.2d 241 (Cal. 1951) .......... 88
*Mancuso v. United Bank of Pueblo*,
818 P.2d 732 (Colo. 1991) .......... 96
*Martin v. Kehl*,
193 Cal. Rptr. 312, 145 Cal. App. 3d 228 (Cal. Ct. App. 1983) .......... 96
*Martin v. Nat'l Surety Co.*,
300 U.S. 588 (1937) .......... 73

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

*Mazirow v. Grigsby (In re White Motor Corp.)*,
44 B.R. 563 (N.D. Ohio 1984) ........................................ 72
*McDougald v. FDIC*,
848 F. Supp. 1073 (D. Mass. 1994)........................................ 49, 57
*McKee v. Lamon*,
159 U.S. 317 (1895) ........................................ 21
*McMullen v. Hoffman*,
174 U.S. 639 (1899) ........................................ 68
*McWhorter v. First Interstate Bank of Oregon, N.A.*,
81 Or. App. 132 (Or. Ct. App. 1986) ........................................ 52
*Meyerson v. El Paso Natural Gas Co.*,
246 A.2d 789 (Del Ch. 1967) ........................................ 83
*Michelson, M.D. v. Hamada, M.D.*,
36 Cal. Rptr. 2d 343, 29 Cal. App. 4th 1566 (Cal. Ct. App. 1994)........................................ 88
*Morey v. Vannucci*,
75 Cal. Rptr. 2d 573, 64 Cal. App. 4th 904 (Cal. Ct. App. 1998)........ 98, 99, 101
*N. Ind. Pub. Serv. Co. v. Carbon County Coal Co.*,
799 F.2d 272-73 (7th Cir. 1986)........................................ 70
*Nagrampa v. MailCoups, Inc.*,
469 F.3d 1257 (9th Cir. 2006)........................................ 65
*Nat'l Auto. & Cas. Ins. Co. v. Payne*,
67 Cal. Rptr., 261 Cal. App. 2d 403........................................ 52
*Nathanson v. N. L. R. B.*,
344 U.S. 25 (1952) ........................................ 25
*Ne. Cmty. Dev. Group v. FDIC*,
948 F. Supp. 1140 (D.N.H. 1995) ........................................ 49, 57
*Neptune Soc'y Corp. v. Longanecker*,
240 Cal. Rptr. 117, 194 Cal. App. 3d 1233 (Cal. Ct. App. 1987)................ 79, 80
*New Bank of New England v. Baker*,
No. 91-100094, 1993 WL 343671 (D. Mass. Aug. 26, 1993) ................. 8, 49, 57
*Nichols v. Arthur Murray, Inc.*,
56 Cal. Rptr. 728, 248 Cal. App. 2d 610 (Cal. Ct. App. 1967)........................................ 92
*Nisselson v. Drew Indus., Inc. (In re White Metal Rolling & Stamping Corp.)*,
222 B.R. 417 (Bankr. S.D.N.Y. 1998) ........................................ 19
*O'Byrne v. Santa Monica-UCLA Med. Ctr.*,
114 Cal. Rptr. 2d 575, 94 Cal. App. 4th 797 (Cal. Ct. App. 2001)........................................ 80
*O'Melveny & Myers v. FDIC*,
512 U.S. 79 (1994) ........................................ 46
*Official Comm. of Unsecured Creditors of Tousa, Inc. v. Citigroup N. Am., Inc. (In re TOUSA, Inc.)*,
406 B.R. 421 (Bankr. S.D. Fla. 2009) ........................................ 74
*Oh v. RTC*,
26 F.3d 131, 1994 WL 249988 (9th Cir. June 9, 1994) ........................................ 49, 57
*Pac. Express, Inc. v. Teknekron Infoswitch Corp. (In re Pac. Express, Inc.)*,
780 F.2d 1482 (9th Cir. 1986)........................................ 72, 78
*Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*,
69 Cal. 2d 33, 442 P.2d 641 (Cal. 1968)........................................ 98, 99, 100
*Palmer v. Palmer*,
104 F.2d 161 (2d Cir. 1939)........................................ 78
*Pentron Indus., Inc. v. Capital Dredge & Dock Corp.*,
Nos. 3140, 3142, 1981 WL 3984 (Ohio Ct. App. May 20, 1981) ........................................ 19
*Petrol Corp. v. Chartrand*,
93 Cal. App. 2d 635, 209 P.2d 674 (Cal. Ct. App. 1949) ........................................ 92
*Pierce v. Robinson*,
13 Cal. 116 (Cal. 1859) ........................................ 74

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

*Providence Health Plan of Oregon v. Simnitt*,
No. 08-44-HA, 2009 WL 700873 (D. Or. Mar. 13, 2009) .................................. 36
*Rainier Credit Co. v. W. Alliance Corp.*,
217 Cal. Rptr. 291, 171 Cal. App. 3d 255 (Cal. Ct. App. 1985) ....................... 102
*Rancho Santa Fe Pharmacy, Inc. v. Seyfert*,
268 Cal. Rptr. 505, 219 Cal. App. 3d 875 (Cal. Ct. App. 1990) ......................... 82
*Rossman v. Blunt*,
104 F.2d 877 (6th Cir. 1939) ........................................................ 21, 22, 24, 29
*RTC v. Land Acquisitions, Inc.*,
No. 90-1147, 1993 WL 444318 (D. Kan. Oct. 7, 1993) ............................... 49, 57
*RTC v. Townsend Assocs. Ltd. P'ship*,
840 F. Supp. 1127 (E.D. Mich. 1993) ................................................................ 51
*Russell v. Soldinger*,
131 Cal. Rptr. 145, 59 Cal. App. 3d 633 (Cal. Ct. App. 1976) ........................... 81
*S. Pac. Transp. Co. v. Santa Fe Pac. Pipelines, Inc.*,
88 Cal. Rptr. 2d 777, 74 Cal. App. 4th 1232 (Cal. Ct. App. 1999) 98, 99, 100, 102
*Sargent v. Cent. Nat'l Bank & Trust Co.*,
809 P.2d 1298 (Okla. 1991) .............................................................................. 52
*Segal v. Rochelle*,
382 U.S. 375 (1966) ....................................................................... 76, 77, 78
*Simmons Capital Advisors, Ltd. v. Bachinski (In re Bachinski)*,
393 B.R. 522 (Bankr. S.D. Ohio 2008) ......................................................... 71, 75
*Smith v. Shewry*,
93 Cal. Rptr. 3d 436, 173 Cal. App. 4th 1163 (Cal. Ct. App. 2009) .................. 88
*Spears v. FDIC (In re First Penn Corp.)*,
No. 84-0509 (Bankr. W.D. Okla. July 18, 1986) ............................................... 83
*Star Pac. Inv., Inc. v. Oro Hills Ranch, Inc.*,
176 Cal. Rptr. 546, 121 Cal. App. 3d 447 (Cal. Ct. App. 1981) ......................... 82
*Starita v. Yool (In re Estate of Yool)*,
60 Cal. Rptr. 3d 526, 151 Cal. App. 4th 867 (Cal. Ct. App. 2007) .................... 93
*Steiner v. Thexton*,
48 Cal. 4th 411, 226 P.3d 359 (Cal. 2010) ........................................................ 79
*Strong v. Theis*,
232 Cal. Rptr. 272, 187 Cal. App. 3d 913 (Cal. Ct. App. 1986) ......................... 87
*Taylor v. Benham*,
46 U.S. 233 (1847) ........................................................................... passim
*Team Fin. Inc. v. FDIC (In re Team Fin. Inc.)*,
Adv. No. 09-5084, D.I. #65 (Bankr. D. Kan. June 11, 2010) ............................ 44
*Team Fin. Inc. v. FDIC (In re Team Fin. Inc.)*,
No. 09-5084, 2010 WL 1730681 (Bankr. D. Kan. Apr. 27, 2010) .............. 42, 44
*Teamsters Local Union 682 v. KCI Constr. Co., Inc.*,
384 F.3d 532 (8th Cir. 2004) ............................................................................. 69
*Thompkins v. Lil' Joe Records, Inc.*,
476 F.3d 1294 (11th Cir. 2007) ................................................................... 71, 75
*Thompson-Mendez v. St. Charles at Olde Court P'ship, LLC (In re Thompson-Mendez)*,
321 B.R. 814 (Bankr. D. Md. 2005) ................................................................... 71
*Torrence v. Workers' Comp. Appeals Bd.*,
32 Cal. 3d 371, 650 P.2d 1162 (Cal. 1982) ....................................................... 87
*Total Coverage, Inc. v. Cendant Settlement Servs. Group, Inc.*,
252 Fed. Appx. 123 (9th Cir. July 3, 2007) ....................................................... 84
*United Dominion Indus. v. United States*,
532 U.S. 822 (2001) ........................................................................................ 47
*United States v. El Paso Nat'l Gas Co.*,
376 U.S. 651 (1964) .......................................................................................... 8





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

*United States v. Galindo*,
871 F.2d 99 (9th Cir. 1989) ........ 88
*United States v. Mississippi Valley Generating Co.*,
364 U.S. 520 (1961) ........ 67
*United States v. State of Wash.*,
641 F.2d 1368 (9th Cir. 1981) ........ 8
*United States v. White*,
365 B.R. 457 (M.D. Pa. 2007) ........ 74
*Univ. State Bank v. Blevins, Jr.*
605 P.2d 91 (Kan. 1980) ........ 97
*Vineland Homes v. Barish*,
138 Cal. App. 2d 747, 292 P.2d 941 (Cal. Ct. App. 1956) ........ 72
*W. Pac. R.R. Corp. v. W. Pac. R. Co.*,
197 F.2d 994 (9th Cir. 1952) ........ 83
*W.T. Langley v. FDIC*,
484 U.S. 86 (1987) ........ 50, 52, 54, 56
*Wells Fargo Bank v. Superior Court*,
53 Cal. 3d 1082, 811 P.2d 1025 (Cal. 1991) ........ 51, 52
*Western Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp., Inc.)*,
473 F.2d 262 (9th Cir. 1973) ........ passim
*Western Tie & Timber Co. v. Brown*,
196 U.S. 502 (1905) ........ passim
*Wiz Tech., Inc. v. Coopers & Lybrand*,
130 Cal. Rptr. 2d 263, 106 Cal. App. 4th 1 (Cal. Ct. App. 2003) ........ 72
*Wolf v. Superior Court*,
8 Cal. Rptr. 3d 649, 114 Cal. App. 4th 1343 (Cal. Ct. App. 2004) 99, 100, 101, 102

**STATUTES**

11 U.S.C. § 365 ........ passim
11 U.S.C. § 541 ........ 2, 18, 40, 88
11 U.S.C. § 553 ........ 77
12 U.S.C. § 371c(c) ........ passim
12 U.S.C. § 371c-1 ........ passim
12 U.S.C. § 504 ........ 86
12 U.S.C. § 1462 ........ 63
12 U.S.C. § 1462a ........ 63
12 U.S.C. § 1463 ........ 63
12 U.S.C. § 1464 ........ 63
12 U.S.C. § 1467a ........ 63
12 U.S.C. § 1468(a) ........ 15, 59, 63
12 U.S.C. § 1813(u) ........ 86
12 U.S.C. § 1818(i) ........ 86
12 U.S.C. § 1821(d)(2) ........ 8, 85
12 U.S.C. § 1823(e) ........ passim
26 U.S.C. § 172(b) ........ 10, 12
26 U.S.C. § 1502 ........ 28
26 U.S.C. § 6402(a) ........ 28
28 U.S.C. § 1367 ........ 47
31 U.S.C. § 3727(b) ........ 73
Cal. Civ. Code § 1439 (West 2012) ........ 72
Cal. Civ. Code § 1550 ........ 79
Cal. Civ. Code § 1607 ........ 81
Cal. Civ. Code § 1608 ........ 81
Cal. Civ. Code § 1614 ........ 82
Cal. Civ. Code § 1615 ........ 82



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

Cal. Civ. Code § 1636 .......... 98
Cal. Civ. Code § 1643 .......... 86, 87
Cal. Civ. Code § 1647 .......... 98
Cal. Civ. Code § 1667 .......... 81
Cal. Civ. Code § 2295 .......... 88
Cal. Civ. Code § 3541 .......... 87
Cal. Civ. Pro. Code § 1856 .......... 65, 98, 102, 105
Cal. Civ. Pro. Code § 1860 .......... 98

**OTHER AUTHORITIES**

3 AM. JUR. 2d *Agency* § 243 (2012) .......... 34
76 AM. JUR. 2d *Trusts* § 638 .......... 97
76 AM. JUR. 2d *Trusts* § 564 .......... 34
76 AM. JUR. 2d *Trusts* § 417 .......... 34
76 AM. JUR. 2d *Trusts* § 555 .......... 33
76 AM. JUR. 2d *Trusts* § 553 .......... 33
76 AM. JUR. 2d *Trusts* § 551 .......... 33
12 C.F.R. § 223.3(o) .......... passim
12 C.F.R. § 223.3(o), and .......... 63, 64
12 C.F.R. § 563.4 .......... 63
12 C.F.R. § 563.41(b) .......... 15, 59, 63
12 C.F.R. § 563.41(c) .......... 69
26 C.F.R. § 1.1502-21 .......... 10, 12, 13
26 C.F.R. § 1.1502-77 .......... passim
26 C.F.R. § 301.6402-7(g)(2)(iii) .......... 11, 13
31 CAL. JUR. 3d *Evidence* § 381 .......... 82
31 CAL. JUR. 3d *Evidence* § 144 .......... 82
60 CAL. JUR. 3d *Trusts* § 408 .......... 97
2 Witkin, CAL. EVID. 4th (2000) *Docu Evid*, § 109, p. 227 .......... 93
1 Witkin, SUMMARY 10th (2005) *Contracts* § 206, p. 241 .......... 82
1 Witkin, SUMMARY 10th (2005) *Contracts*, § 218, p. 251 .......... 81
1 Witkin, SUMMARY 10th (2005) *Contracts*, § 419, p. 460 .......... 81
13 Witkin, SUMMARY 10th (2005), *Trusts*, § 311, p. 885 .......... 93
*Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure*, 63 FR 64757-01, 1998 WL 804364 (1998) .......... passim
Horace Edwin Smith & George Lawyer, *A Treatise on the Law of Personal Property* § 38 (2d ed. 1908) .......... 48
James Schouler, *A Treatise on the Law of Personal Property* § 30 (2d ed. 1884) .......... 48
John Locke, THE SECOND TREATISE OF CIVIL GOVERNMENT, Chpt. V: *Of Property* (1690) .......... 48
Magee, *A Treatise on the Law of Nat'l and State Banks* § 89 (3rd ed. 1921) .......... 52
RESTATEMENT (THIRD) OF TRUST § 7 cmt. A .......... 97
RESTATEMENT (THIRD) OF TRUST § 49 illus. d .......... 33
RESTATEMENT (THIRD) OF TRUST § 50 cmt. A .......... 33
RESTATEMENT (SECOND) OF AGENCY § 1 (1957) .......... 88
RESTATEMENT (SECOND) OF AGENCY § 14M, cmt. a. .......... 88
RESTATEMENT (SECOND) OF AGENCY § 427, cmt. b. .......... 33
RESTATEMENT (SECOND) OF CONTRACTS § 237 (1981) .......... 72
RESTATEMENT (THIRD) OF AGENCY § 1.02 .......... 92

**RULES**

Fed. R. Bankr. P. 9033 .......... 1, 7, 58
Fed. R. Evid. 704(a) .......... 105

## STATEMENT OF ISSUES

The FDIC-R **OBJECTS** to the following findings and conclusions reached by the Bankruptcy Court:

| **Incorrect Findings and Conclusions** | **Report** | **Objection** |
|---|---|---|
| 1. The Bankruptcy Court Erred in Disregarding the Ninth Circuit's Decision in *Bob Richards* | 18:25-28:4, 39:22-43:2 | II.A |
| 2. The Bankruptcy Court Erred in Finding that the TSA Is a "Differing Agreement" that Overrides the Default Property Rule in *Bob Richards* | 18:25-28:4, 39:22-43:2 | II.B |
| 3. The Bankruptcy Court Erred in Finding that *Bob Richards* Is Not Applicable to the Issues in this Case Based Solely on the Existence of the TSA | 42:4-43:2 | II.B.1 |
| 4. The Bankruptcy Court Erred in Finding that *Bob Richards* Only Applies in Favor of a Debtor in Bankruptcy | 41:18-42:3 | II.B.2 |
| 5. The Bankruptcy Court Erred in Finding that the TSA Is a Differing Agreement Because It Requires Bancorp to Pay the Bank's Tax Refunds to the Bank within Fifteen (15) Business Days | 20:1-22:6 | II.B.3 |
| 6. The Bankruptcy Court Erred in Finding that the TSA Is a Differing Agreement Because It Does Not Contain Use Restrictions | 22:7-24:2 | II.B.4 |
| 7. The Bankruptcy Court Erred in Finding that the TSA Gives Bancorp the Unfettered Use of the Bank's Tax Refunds | 24:3-25:21 | II.B.5 |
| 8. The Bankruptcy Court Erred in Finding that the TSA Creates Intercompany Obligations that Are Materially Different from Amounts Due Absent a Tax Sharing Agreement | 20:1-22:6 | II.B.6 |
| 9. The Bankruptcy Court Erred in Finding that the Words "Payment" and "Reimbursement" Are Only Consistent with a Debtor/Creditor Relationship | 19:6-22:6 | II.B.7 |
| 10. The Bankruptcy Court Erred in Finding that a Tax Sharing Agreement that Is Silent on the Question of Ownership Is a Differing Agreement | 19:8-28:4, 39:22-43:2 | II.B.8 |
| 11. The Bankruptcy Court Erred in Finding that *BSD Bancorp* and *Lubin* Are Distinguishable from this Case | 26:1-28:4 | II.B.9 |
| 12. The Bankruptcy Court Erred in Finding that *Coupon Clearing* and *Lonely Maiden* Support Its Decision to Disregard *Bob Richards* | 18:25-25:21 | II.B.10 |





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

| Incorrect Findings and Conclusions | Report | Objection |
|---|---|---|
| 13. The Bankruptcy Court Erred by Misconstruing the Case Law of Other Circuits | 19:8-25:28, 41:1-42:3, 60:1-2 | II.B.11 |
| 14. The Bankruptcy Court Erred in Following the *BankUnited* Decision that Disregarded *Bob Richards* and California Law | 18:19-19:10, 23:23-30:23, 41:1, 60:1 | II.B.12 |
| 15. The Bankruptcy Court Erred in Suggesting that *Bob Richards* Is Not Binding Precedent | 40:17-28 | II.C |
| 16. The Bankruptcy Court Erred in Finding that the TSA, as Interpreted by the Bankruptcy Court, Is Enforceable Against the FDIC-R as a Matter of Law | 52:20-65:28 | II.D |
| 17. The Bankruptcy Court Erred in Finding that the TSA, as Interpreted by the Bankruptcy Court, Is Enforceable Under 12 U.S.C. § 1823(e) | 61:3-63:19 | II.D.1 |
| 18. The Bankruptcy Court Erred in Finding that the TSA Complies with 12 U.S.C. § 1823(e) Because the Bank's Board Approved a Policy Statement Governing Transactions with Affiliates | 62:8-25 | II.D.1.a |
| 19. The Bankruptcy Court Erred in Finding that 12 U.S.C. § 1823(e) Does Not Apply to the Trustee's Attempt to Defeat the FDIC-R's Interests in the Bank's Tax Refunds | 63:1-6 | II.D.1.b |
| 20. The Bankruptcy Court Erred in Finding that 12 U.S.C. § 1823(e) Does Not Apply to Tax Sharing Agreements | 63:6-11 | II.D.1.c |
| 21. The Bankruptcy Court Erred in Finding that the TSA Complies with 12 U.S.C. § 1823(e) Because It Was Submitted to the Bank's Regulators | 63:11-14 | II.D.1.d |
| 22. The Bankruptcy Court Erred in Finding that the FDIC-R Waived the Right to Assert 12 U.S.C. § 1823(e) as a Defense | 61:7-62:1, 63:15-19 | II.D.1.e |
| 23. The Bankruptcy Court Erred in Finding that the TSA, as Interpreted by the Bankruptcy Court, Is Enforceable Under 12 U.S.C. § 371c(c) and 12 U.S.C. § 371c-1 | 54:11-58:9 | II.D.2 |
| 24. The Bankruptcy Court Erred in Finding that Unsecured Extensions of Credit Between Banks and Affiliates Are Legal Under 12 U.S.C. § 371c(c) and 12 U.S.C. § 371c-1 | 54:11-58:9 | II.D.2.a |





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

| Incorrect Findings and Conclusions | Report | Objection |
|---|---|---|
| 25. The Bankruptcy Court Erred in Finding that Its Report Is Consistent with *BSD Bancorp*. | 55:5-7 | II.D.2.a.1 |
| 26. The Bankruptcy Court Erred in Finding that the Bank Has No Property Interest in Its Tax Refunds | 55:8-20 | II.D.2.a.2 |
| 27. The Bankruptcy Court Erred in Finding that the TSA Complies with 12 U.S.C. § 371c(c) Because It Does Not State that the Parties Would Not Comply with the Statute | 57:4-58:8 | II.D.2.a.3 |
| 28. The Bankruptcy Court Erred in Rejecting the Definition of "Extension of Credit" Set Forth in 12 C.F.R. § 223.3(o) | 55:21-57:3 | II.D.2.a.4 |
| 29. The Bankruptcy Court Erred in Finding that the Interagency Policy Statement Is Irrelevant in this Case | 59:11-61:2 | II.D.2.b |
| 30. The Bankruptcy Court Erred in Finding the Interagency Policy Statement Is Impermissible Parol Evidence | 59:17-23 | II.D.2.b.1 |
| 31. The Bankruptcy Court Erred in Finding the Interagency Policy Statement Is Not Material to this Dispute | 59:23-60:6 | II.D.2.b.2 |
| 32. The Bankruptcy Court Erred in Finding that the TSA Does Not Incorporate the Interagency Policy Statement | 60:7-19 | II.D.2.b.3 |
| 33. The Bankruptcy Court Erred in Finding that the TSA, as Interpreted by the Bankruptcy Court, Does Not Violate the Interagency Policy Statement | 60:20-61:2 | II.D.2.b.4 |
| 34. The Bankruptcy Court Erred in Finding that If the TSA Creates an Illegal Debtor/Creditor Relationship, It Is Still Enforceable Against the FDIC | 58:9-59:10 | II.D.2.c |
| 35. The Bankruptcy Court Erred in Finding that the TSA Is Enforceable Even If It Violates 12 U.S.C. § 371c(c) Because Contract Avoidance Is Not Listed as a Specific Remedy in the Statute | 58:9-25 | II.D.2.c.1 |
| 36. The Bankruptcy Court Erred in Finding that the TSA Is Enforceable Even If It Violates 12 U.S.C. § 371c(c) Because the Bankruptcy Code Prevents the FDIC-R from Improving Its Rights | 59:1-10 | II.D.2.c.2 |
| 37. The Bankruptcy Court Erred in Finding that the Trustee Can Enforce the Terms of the Rejected TSA Under 11 U.S.C. § 365(g) | 28:5-39:21, 45:9-52:19 | II.D.3 |

| Incorrect Findings and Conclusions | Report | Objection |
|---|---|---|
| 38. The Bankruptcy Court Erred by Finding That the Only Effect of the Trustee's Rejection Was That It Gave the Bank a Prepetition Claim for Breach of Contract | 45:9-47:13 | II.D.3.a |
| 39. The Bankruptcy Court Erred by Finding That the Bank Never Had Any Interest in Its Own Tax Refunds | 39:22-43:2 | II.D.3.b |
| 40. The Bankruptcy Court Erred by Finding That Bancorp Had a Vested Interest in the Bank's Tax Refunds on the Petition Date | 28:5-36:19, 46:24-47:3, 47:14-18 | II.D.3.c |
| 41. The Bankruptcy Court Erred by Finding That the Trustee Was Not Seeking to Obtain Further Benefits under the Rejected TSA | 47:14-48:28 | II.D.3.d |
| 42. The Bankruptcy Court Erred in Finding that the TSA, as Interpreted by the Bankruptcy Court, Is Enforceable Under California Law | 64:3-65:5 | II.D.4 |
| 43. The Bankruptcy Court Erred in Finding that the Absence of Express Language Creating an Assignment Is Irrelevant Under California Law | 64:17-65:5 | II.D.4.a |
| 44. The Bankruptcy Court Erred in Finding that the Alleged Assignment of All of the Bank's Future Tax Refunds Was Supported by Valid Consideration under California Law | 64:12-16 | II.D.4.b |
| 45. The Bankruptcy Court Erred in Finding that the TSA Provides Material Benefits to the Bank | 64:3-12 | II.D.4.c |
| 46. The Bankruptcy Court Erred in Finding that the TSA, as Interpreted by the Bankruptcy Court, Does Not Constitute Gross Overreaching and Is Enforceable | 65:6-28 | II.D.5 |
| 47. The Bankruptcy Court Erred in Relying on *First Central* | 65:6-15 | II.D.5.a |
| 48. The Bankruptcy Court Erred in Finding that the FDIC-R Is Asserting a Claim for Unjust Enrichment | 65:15-19 | II.D.5.b |
| 49. The Bankruptcy Court Erred by Adding Terms to the TSA that the TSA Does Not Contain | 65:19-23 | II.D.5.c |
| 50. The Bankruptcy Court Erred in Finding that the Bankruptcy Process Permits Bancorp to Take the Bank's Tax Refunds | 65:23-28 | II.D.5.d |
| 51. The Bankruptcy Court Erred in Adopting a Commercially Unreasonable Construction of the TSA | 18:14-25:28 | II.D.6 |
| 52. The Bankruptcy Court Erred in Adopting a | 18:14-25:28 | II.D.7 |





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

| Incorrect Findings and Conclusions | Report | Objection |
|---|---|---|
| Construction of the TSA that Renders the TSA Illegal | | |
| 53. The Bankruptcy Court Erred in Finding that the TSA Is Inconsistent with an Agency Relationship | 19:6-22:6 | II.E |
| 54. The Bankruptcy Court Erred in Finding that the Words "Payment" and "Reimbursement" Are Legally Inconsistent with an Agency Relationship | 19:6-22:6 | II.E.1 |
| 55. The Bankruptcy Court Erred in Refusing to Consider Extrinsic Evidence on the Question of Agency | 11:1-14:8 | II.E.2 |
| 56. The Bankruptcy Court Erred in Failing to Recognize a Resulting Trust in Favor of the Bank's Receivership Estate | 43:23-45:8 | II.F |
| 57. The Bankruptcy Court Erred in Finding that the FDIC-R Did Not Submit Any Evidence Supporting a Resulting Trust | 44:15-22 | II.F.1 |
| 58. The Bankruptcy Court Erred in Finding that the FDIC-R Failed to Submit Clear and Convincing Evidence to Support a Resulting Trust | 45:5-8 | II.F.2 |
| 59. The Bankruptcy Court Erred in Applying the Parol Evidence Rule to Exclude the Consideration of Extrinsic Evidence | 11:1-13:6, 59:17-22 | II.G |
| 60. The Bankruptcy Court Erred in Finding that the Parol Evidence Rule Excludes Evidence of Contract Formation | 11:1-13:6 | II.G.1 |
| 61. The Bankruptcy Court Erred in Finding that the Parol Evidence Rule Excludes Evidence that Is Consistent with the TSA | 11:1-13:6 | II.G.2 |
| 62. The Bankruptcy Court Erred in Finding that the Parol Evidence Rule Applies Even Though the TSA Is Reasonably Susceptible to the FDIC-R's Construction on Its Face | 11:1-13:6 | II.G.3 |
| 63. The Bankruptcy Court Erred in Finding that the Parol Evidence Rule Applies Even Though the Evidence Shows that the TSA is Reasonably Susceptible to the FDIC-R's Construction | 11:1-13:6 | II.G.4 |
| 64. The Bankruptcy Court Erred in Finding that the Parol Evidence Rule Excludes Evidence of Trade Usage | 11:1-13:6 | II.G.5 |
| 65. The Bankruptcy Court Erred in Excluding | 11:4-14:20 | II.H |


BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

| **Incorrect Findings and Conclusions** | **Report** | **Objection** |
|---|---|---|
| Evidence Regarding the Economic Reality of the Tax Refunds on Relevance Grounds | | |
| 66. The Bankruptcy Court Erred in Refusing to Admit the Evidence Offered by the FDIC-R Regarding the Bank's Earnings and Loss History | 14:9-20 | II.H.1 |
| 67. The Bankruptcy Court Erred in Finding the Castleberry Declaration to be Impermissible Parol Evidence and Improper Expert Testimony | 13:26-14:8 | II.H.2 |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

The Federal Deposit Insurance Corporation, in its capacity as the Receiver for IndyMac Bank, F.S.B. and IndyMac Federal Bank, F.S.B. (the "**FDIC-R**"), hereby objects, pursuant to Rule 9033 of the Federal Rules of Bankruptcy Procedure, to the Report and Recommendation (Dkt. No. 115) (the "**Report**") of the Honorable Sheri Bluebond, United States Bankruptcy Judge for the Central District of California (the "**Bankruptcy Court**"), dated March 29, 2012, regarding competing motions for summary judgment with respect to the refund of certain taxes paid by the Bank.

In accordance with Bankruptcy Rule 9033(b) and the Bankruptcy Court's Stipulated Order Approving Briefing Schedule (Dkt. No. 99), this objection "identif[ies] the specific proposed findings or conclusions objected to and state[s] the grounds for such objection" (the "**Objection**"). Fed. R. Bankr. P. 9033(b) (emphasis added).[2]

## I. INTRODUCTION

The Report, which adopts nearly verbatim the proposed report written by the Trustee, is inconsistent with federal and state law and should be rejected in its entirety by this Court. Summary judgment should be granted in favor of the FDIC-R, in its capacity as the Receiver for IndyMac Bank, F.S.B. and IndyMac Federal Bank, F.S.B. (the "**Bank**").[3]

The issue in this case is whether the debtor bank holding company, IndyMac Bancorp, Inc. ("**Bancorp**"), or the FDIC, as receiver of the subsidiary Bank, owns

---

[2] Bankruptcy Rule 9033(b) includes no page limit and does not limit the number of objections that can be made to the Report. *See Castro v. Perez (In re Castro)*, 919 F.2d 107, 109 (9th Cir. 1990). Practically, the length of this Objection, much like an answer to a complaint, is the product of the length of the Report. Because the Bankruptcy Court omits nearly all of the facts that are unfavorable to the Trustee, this Objection includes a detailed fact section. Factoring this into account, this Objection is approximately the same length as the Report prepared by the Trustee to which the FDIC-R is required to make specific objections under Bankruptcy Rule 9033(b).

[3] All references herein to "Bank" shall include the "Bank Group," which includes the Bank and its subsidiaries, as appropriate.

tax refunds attributable to the Bank's losses incurred in the 2007 and 2008 tax years. Every penny at issue in this case is a refund of taxes that were paid by the Bank, and which would have been paid to the Bank if it had filed separate tax returns. Not a single penny in dispute is a refund of taxes paid by Bancorp, the Bank's former parent. The $55 million refund is attributable to offsetting the Bank's losses in the 2007 and 2008 tax years against the Bank's income earned in prior tax years. Bancorp paid no taxes in the prior tax years at issue because it earned no income. Bancorp has no right to a refund of taxes it did not pay.

However, according to the Bankruptcy Court, Bancorp owns the entire tax refund under 11 U.S.C. § 541. The FDIC-R respectfully submits that the Bankruptcy Court is wrong. The Bankruptcy Code does not give Bancorp the right to take the Bank's property. 11 U.S.C. § 541(b)(1) & (d); *Kupetz v. United States (In re California Trade Technical School, Inc.)*, 923 F.2d 641, 645-46 (9th Cir. 1991). Tellingly, one question the Report is unable to address is, why the tax sharing agreement (Dkt. No. 32, Tomlinson Decl. at Ex. 4) (the "**TSA**") requires Bancorp to give the tax refunds to the Bank if the refunds are Bancorp's property?

The Ninth Circuit ruled on this exact issue in *Western Dealer Management, Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp., Inc.)*, 473 F.2d 262, 265 (9th Cir. 1973), *cert. denied*, 412 U.S. 919 (1973). In *Bob Richards*, the Ninth Circuit held that a subsidiary's share of a consolidated tax refund — *i.e.*, the portion attributable to "offsetting" the subsidiary's own loss against its own income to generate a refund of taxes it had paid in prior tax years — is the property of the subsidiary and not its parent. *Id.* at 265. The Ninth Circuit explained that adopting a contrary property rule in this context would "unjustly enrich the parent," since the refund "was due entirely to the earnings history of the bankrupt [subsidiary]." *Id.*

The Bankruptcy Court, however, found that *Bob Richards* does not apply in this case. In order to reach this conclusion, the Bankruptcy Court failed to properly apply Ninth Circuit and Supreme Court precedent and California law on nearly





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

every legal issue in this case. The FDIC-R respectfully submits that the Report is entirely founded upon a profoundly incorrect interpretation of the *Bob Richards* decision and must be rejected by this Court.

The Bankruptcy Court erroneously found that *Bob Richards* is based on a "quasi-contract" theory. The unstated and false premise in the Report is that among members of a consolidated tax group, property rights in consolidated tax refunds are always determined on a contractual (or quasi-contractual) basis. The Bankruptcy Court based its proposed findings and conclusions on the premise that no member owns any share or portion of a consolidated tax refund based on the member's earnings history — *i.e.*, which member earned the income, paid the taxes, and suffered the loss. Under this theory, tax refunds are only owned and distributed pursuant to an express contract among the members of the consolidated tax group or pursuant to a court-imposed quasi-contract.

Thus, according to the Bankruptcy Court, because there was no written contract in *Bob Richards*, the Ninth Circuit implied a quasi-contract among the members that established which members owned the refund in that case. According to the Bankruptcy Court, the ruling in *Bob Richards* means that if there is a written contract, then no "quasi-contract" applies; rather, the written contract is the sole method of determining ownership of the consolidated tax refunds among the group's members. Since the parties in this case executed the TSA, the Bankruptcy Court found that it could ignore the ruling in *Bob Richards* in which the Ninth Circuit, according to the Bankruptcy Court, imposed a quasi-contract that determined ownership.

This is a fundamental misinterpretation of the holding in *Bob Richards*. In *Bob Richards*, the Ninth Circuit applied basic principles of property law to decide ownership of tax refunds among consolidated group members. 473 F.2d at 264-65. The Ninth Circuit did not hold that the subsidiary in *Bob Richards* had a quasi-contract *claim* against its parent *for* unjust enrichment. On the contrary, the Ninth

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

Circuit found that the tax refund was the subsidiary's property because the subsidiary's earnings history had created it. *Id.* at 265. The Ninth Circuit held that when the IRS paid the subsidiary's tax refund to the parent, acting as the agent of the consolidated group under the tax regulations, the parent held the subsidiary's property (*i.e.*, the refund) in a "specific trust." *Id.* Thus, the parent could not set off its claims against the subsidiary against the subsidiary's tax refund because claims can only be set off against other claims and cannot be set off against an ownership interest. *Id.*

In *Bob Richards*, the Ninth Circuit recognized an exception to the general rule that a parent corporation holds its subsidiary's refund in specific trust. The Ninth Circuit held that ownership of the tax refund can be transferred from one member of a consolidated group to the parent if they have entered into a "differing agreement." A "differing agreement" is an "express or implied agreement" that gives the parent the "**right to keep** [its subsidiary's tax] refund." *Id.* (emphasis added). The Ninth Circuit held that there was no evidence in *Bob Richards* that the subsidiary had "voluntarily assigned its rights in the refund" to the parent. *Id.* The subsidiary's consent to the parent receiving the refund from the IRS as its agent could not "be construed to include the transfer of a valuable asset without further consideration." *Id.* at 264-65. "Since there [was] no express or implied agreement that the agent [parent] had any right to keep the refund," the Ninth Circuit held that the parent "was acting as a trustee of a specific trust." *Id.* at 265.

The TSA in this case does not give Bancorp the "**right to keep**" the Bank's property — *i.e.*, the Bank's tax refunds. To the contrary, the TSA requires Bancorp to pay the Banks' tax refunds to the Bank. TSA at § 4(a). The stated purpose of the TSA:

> is for the Bank Group . . . to determine its tax liability and to make and receive payments as if it were filing income tax returns separate from and excluding Parent [Bancorp]. All of

> the following provisions should be interpreted in light of this general intent.

TSA at p. 1. Since there is no language in the TSA that "voluntarily assign[s]" the Bank's rights in the refunds to Bancorp, the TSA cannot be construed, even without extrinsic evidence, to be a "differing agreement" under *Bob Richards*.

The Bankruptcy Court, however, found that the TSA is a differing agreement ***because*** it requires Bancorp to "pay[]" the Bank's tax refunds (or their equivalent) to the Bank. The Bankruptcy Court's incorrect interpretation of the *Bob Richards* case led to the incorrect finding that the TSA created a debtor/creditor relationship. Under the "specific trust" doctrine, as discussed below, every person who receives money to be paid to another, or to be applied for a specific purpose, is a trustee of a specific trust, and not a debtor. That is the holding of *Bob Richards*. Since the TSA does not contain any language that in any way alters the trust relationship regarding the rights to the Bank's tax refunds, the TSA is not a "differing agreement." The ruling in *Bob Richards* that the subsidiary owns the refund of taxes it paid, and would have received if a consolidated return had not been filed, applies in this case. The TSA does not transfer the ownership of the Bank's tax refunds from the Bank to Bancorp.

The FDIC-R respectfully submits that the Bankruptcy Court's failure to properly discern the basic holding in *Bob Richards* is the reason why the Report is wrong on nearly every legal issue in this case.

The Report, however, goes beyond misinterpreting *Bob Richards*. The Bankruptcy Court also improperly ignored extrinsic evidence dispositively demonstrating that the parties to the TSA never intended the TSA to cause the Bank's tax refunds to become Bancorp's property.

The former Senior Vice President and Tax Director of both the Bank and Bancorp testified that neither the Bank nor Bancorp ever intended for the TSA to transfer the Bank's tax refunds to Bancorp. This testimony is corroborated by the

outside legal counsel on bank regulatory matters for both the Bank and Bancorp. And, there is no contrary testimony from any other witness on this issue. Instead of adopting the intent of the parties to the TSA, the Report recommends that this Court adopt the construction given to the TSA by a complete stranger to the TSA — the Trustee, who now stands in the shoes of Bancorp.

Because the Bankruptcy Court found that the TSA is unambiguous, the Bankruptcy Court refused to admit the evidence proffered by the FDIC-R which addresses the intent of the parties to the TSA. According to the Bankruptcy Court, the TSA creates a debtor/creditor relationship because it uses the words "payment" and "reimburse" which, notwithstanding the statement of intent expressed in the second paragraph of the TSA, have a fixed and absolute meaning that can only apply to a debtor/creditor relationship.

The words "payment" and "reimbursement," however, are not magical words that have a fixed and absolute meaning. They are commonly used to describe the act of a trustee or agent "paying" funds held in trust to a beneficiary or principal, or a trustee's or agent's right to "reimbursement" for payments made by the trustee or agent on behalf of a beneficiary or principal. These words do not convert a trustee or agent into a debtor and a beneficiary or principal into a creditor.

The undisputed testimony shows that the parties to the TSA used the words "payment" and "reimbursement" in the trustee/beneficiary sense. This evidence must be considered so that the Court can understand the meaning given to these words by the actual parties to the TSA. The Bankruptcy Court's refusal to heed the California Supreme Court's warnings against excluding such evidence has led to a Report that interprets the TSA in a manner directly contrary to the meanings given to the TSA by both the Bank and Bancorp.

Moreover, the Bankruptcy Court's profound misinterpretation of *Bob Richards* and the meaning of the TSA are not the only reasons why this Court should reject the Report in its entirety. This Court should not adopt the Report



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

because even assuming, *arguendo*, that the TSA did effect an assignment of the Bank's tax refunds to Bancorp, the TSA is not enforceable against the FDIC-R as a matter of law.

First, the TSA is unenforceable against the FDIC-R because the Bank's board neither saw it nor approved it. Under Supreme Court precedent interpreting federal banking law (12 U.S.C. § 1823(e)), the Trustee's entire case fails for this reason alone. The Supreme Court held that if an agreement is not explicitly approved by a bank's board, it is not valid against the FDIC under 12 U.S.C. § 1823(e) if it tends to diminish or defeat the FDIC's interest in bank assets.

Second, the Report must be rejected in its entirety because the TSA is unenforceable against the FDIC-R under another important federal banking statute that prohibits the Bank from making an unsecured loan or extension of credit to its parent. *See* 12 U.S.C. § 371c(c); 12 C.F.R. § 223.3(o). The TSA, as interpreted by the Bankruptcy Court to create an unsecured debtor/creditor relationship, violates federal law and, therefore, is illegal and unenforceable against the FDIC-R under well-settled Supreme Court and Ninth Circuit precedent. Because a party to an illegal contract cannot ask a court of law to have its illegal object carried out, the Report must be rejected.

Accordingly, the FDIC-R respectfully requests that the Court reject the Report in its entirety and enter summary judgment in favor of the FDIC-R.

### A. Standard of Review

The Court is charged with conducting a *de novo* review of any portion of the Report to which the FDIC-R objects. Fed. R. Bankr. P. 9033(d). The Bankruptcy Court's proposed findings have "no presumptive weight." *Gary v. Califano*, 448 F. Supp. 1142, 1146 (S.D. Cal. 1978); *see Castro v. Perez (In re Castro)*, 919 F.2d 107, 108-09 (9th Cir. 1990) (holding that in non-core bankruptcy proceedings, the district court must exercise its "non-delegable" duty to "consider the actual testimony" and that the court's failure to do so is sufficient grounds to vacate the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

court's judgment).

"[C]lose scrutiny" is also merited by the fact that the Report adopts, nearly verbatim, the proposed report written by the Trustee. *United States v. State of Wash.*, 641 F.2d 1368, 1371 (9th Cir. 1981); *see United States v. El Paso Nat'l Gas Co.*, 376 U.S. 651, 656 n.4 (1964) (disapproving of practice of permitting the victorious party to write the court's findings and conclusions); *Fed. Trade Comm'n v. Enforma Natural Prods., Inc.*, 362 F.3d 1204, 1215 (9th Cir. 2004) (same).[4]

**B. <u>The Parties</u>**

The Federal Deposit Insurance Corporation is the Receiver for IndyMac Bank, F.S.B. and IndyMac Federal Bank, F.S.B. As receiver and/or conservator of the Bank, the FDIC-R succeeds to "all rights, titles, powers, and privileges of the insured depository institution . . . and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A)(i).

The Trustee, Alfred H. Siegel, is the Chapter 7 Trustee for the Bank's former parent, IndyMac Bancorp, Inc. The Bank and Bancorp were members of a consolidated group of taxpayers (the "**Group**") that filed joint tax refunds with the Internal Revenue Service (the "**IRS**") and various state taxing authorities.

**C. <u>Factual Background</u>**

The Report omits many relevant facts. For this reason, the FDIC-R not only objects to certain of the Bankruptcy Court's factual determinations, but also must provide a complete recitation of the relevant facts in this case.

1. <u>Economic Reality of the Tax Refunds Subject to this Dispute</u>

The Report omits nearly all facts that pertain to the economic reality of this case. Every penny at issue in this case is a refund of taxes paid by the <u>Bank</u>. And, since Bancorp paid no taxes, not a single penny at issue in this case is a refund of

[4] A redline of the proposed report drafted by the Trustee against the Bankruptcy Court's Report is attached to the Kim Declaration, filed contemporaneously with this Objection, as **Exhibit A**.





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

taxes paid by Bancorp.

a. *Tax Payments Made by the Bank on Its Own Income*

Bancorp had no taxable income during the 2003 through 2005 tax years.[5] *See* Dkt. No. 43, Frost Decl. at ¶ 11; Dkt. No. 44, Thormahlen Decl. at ¶ 4. Bancorp never made any tax payments to the IRS on behalf of itself or the Bank during this time, even though the 2003 tax sharing agreement between the parties required Bancorp to make estimated tax payments for the Group. Dkt. No. 43, Frost Decl. at ¶ 13.

During these tax years, the Bank generated considerable taxable income. Dkt. No. 43, Frost Decl. at ¶ 12. On a consolidated basis, the Group's taxable income for 2003 through 2005 was approximately $248 million, resulting in a tax liability of approximately $86.8 million. *See* Dkt. No. 32, Tomlinson Decl. at Ex. 21; Dkt. No. 74, Wasserman Decl. at p. 7. The Group's tax liability during these years was based on the Bank's income, and was paid entirely by the Bank via check or wire transfers made directly by the Bank to the IRS. *See* Dkt. No. 43, Frost Decl. at ¶¶ 11-13; Dkt. No. 44, Thormahlen Decl. at ¶ 4; Dkt. No. 74, Wasserman Decl. at p. 9, Ex. C.

b. *The Bank Ceases to Be Profitable*

In 2006, the Bank ceased to be profitable. In the 2006 tax year, the Bank sustained a net operating loss ("**NOL**") of approximately $25.6 million. *See* Dkt. No. 74, Wasserman Decl. at p. 7. On a consolidated basis, the Group had a NOL of approximately $45.9 million. *See* Dkt. No. 32, Tomlinson Decl. at Ex. 13. The Group elected to carry back this NOL to offset income earned by the Bank in prior tax years.

Under the tax regulations, a NOL is carried back to the earliest tax year in which the NOL may be carried back, and then applied to each successive tax year

---

[5] The Group was a calendar year taxpayer. For example, the 2003 tax year began on January 1, 2003 and ended on December 31, 2003.



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

until all taxable income is completely absorbed. *See* 26 C.F.R. § 1.1502-21. In 2006, the Group's NOL could only be carried back two (2) years. *See* 26 U.S.C. § 172(b). Thus, the 2006 NOL was applied first against the Bank's 2004 income.

After taking the 2006 NOL carry-back into account (and certain credits and adjustments), the Group's taxable income for 2003 through 2005 was approximately $197.2 million. *See* Dkt. No. 32, Tomlinson Decl. at Exs. 15, 21, 22, & 23; Dkt. No. 74, Wasserman Decl. at p. 7. Taking out 50% of the 2003 taxable income, the Group's taxable income for half of 2003 through 2005 was approximately $135.3 million. *Id.* The Group's tax liability on this income was approximately $47.3 million. Again, the Bank paid every penny of this tax liability directly to the IRS. *See* Dkt. No. 43, Frost Decl. at ¶¶ 11-13; Dkt. No. 74, Wasserman Decl. at p. 9, Ex. C.

In the 2007 tax year (January 1, 2007 to December 31, 2007), the Bank sustained a $1.398 billion loss. *See* Dkt. No. 74, Wasserman Decl. at p. 7. On a consolidated basis, the Group had a NOL of approximately $1.433 billion. *See* Dkt. No. 32, Tomlinson Decl. at Ex. 16; *see* Dkt. No. 74, Wasserman Decl. at p. 7.

c. *The Bank Fails and Bancorp Files for Bankruptcy*

Prior to the Bank's receivership and Bancorp's bankruptcy, the Bank and Bancorp were controlled by the same individuals. *See* Adv. No. 09-2645-B, Dkt. No. 8 at ¶ 4. All of Bancorp's ten directors (and officers) also served as directors or officers of the Bank. *Id.* The Bank had three more directors who served on the Bank's board, but who did not serve on Bancorp's board (Gabrielle E. Green, since 2007; Stuart A. Gabriel, since 2004; and Richard H. Wohl, since 2005). *Id.* The same people who controlled Bancorp comprised a majority of the Bank's board and, thus, controlled the Bank. *Id.*

Control over both the Bank and Bancorp ceased to reside with the same individuals in July of 2008. On July 11, 2008 (the "**Receivership Date**"), the Office of Thrift Supervision (the "**OTS**"), which regulated both the Bank and





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

Bancorp, appointed the FDIC as receiver for IndyMac, F.S.B., and conservator of IndyMac Federal Bank, F.S.B., a bridge bank which continued the banking operations[6] started by IndyMac Bank, F.S.B. The FDIC was subsequently appointed receiver of IndyMac Federal Bank, F.S.B. when it ceased operating in March 2009. For tax purposes, IndyMac Bank, F.S.B. and IndyMac Federal Bank F.S.B. are considered one entity.

On July 31, 2008 (the "**Petition Date**"), Bancorp filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. On August 4, 2008, the Office of the United States Trustee appointed Alfred H. Siegel as the interim Chapter 7 Trustee, whose appointment was made permanent on December 4, 2008 by order of the Bankruptcy Court.

The Trustee caused Bancorp to reject the TSA. *See* 11 U.S.C. § 365(d)(1). Pursuant to section 365(g) of the Bankruptcy Code, such rejection is deemed effective "immediately before the date of the filing of the petition" — July 31, 2008. 11 U.S.C. § 365(g).

d. *Post-Bankruptcy Applications for the Refund of Taxes the Bank Paid Based on the Bank's NOLs*

On September 15, 2008, after the Petition Date, the Group filed an application for a tentative refund seeking a refund of taxes paid by the Bank attributable to the carry-back of the Bank's 2007 NOL. *See* Dkt. No. 32, Tomlinson Decl. at Ex. 17. Bancorp's loss was not used because the Bank's loss alone was sufficient to generate this refund (*see* Dkt. No. 44, Thormahlen Decl. at ¶ 4), and because the Bank was an "insolvent financial institution" — meaning that the Bank's loss must be fully exhausted before Bancorp's loss is used. *See* 26 C.F.R. § 301.6402-7(g)(2)(iii).

Under the tax regulations, the Bank's 2007 NOL was applied first against the

[6] Subsidiaries of IndyMac Bank, F.S.B. also continued operating after July 11, 2008.





BAKER & HOSTETLER LLP ATTORNEYS AT LAW CLEVELAND

Bank's taxable income in the 2005 tax year. *See* 26 C.F.R. § 1.1502-21. Because of the two (2) year limitation, the Bank's 2007 NOL was carried back to the 2005 and 2006 tax years. *See* 26 U.S.C. § 172(b). The refund attributable to the carry-back of the Bank's 2007 NOL, after making adjustments per IRS audits and the filing of amended returns, is **$11,475,520.16**. *See* Dkt. No. 32, Tomlinson Decl. at ¶ 9, Ex. 17; Dkt. No. 74, Wasserman Decl. at p. 11. This refund, which is attributable entirely to taxes paid by the Bank on the Bank's own income and the carry-back of the Bank's NOL in the 2007 tax year, is one of the refunds that is the subject of the instant dispute.

The 2008 Tax Year ended on December 31, 2008. By this time, the FDIC was acting as the receiver/conservator of the Bank and Bancorp had been in bankruptcy for five (5) months. In the 2008 tax year (January 1, 2008 to December 31, 2008), the Bank sustained an additional loss — $572 million. *See* Dkt. No. 74, Wasserman Decl. at p. 7. As of December 31, 2008, however, the Bank's NOL in the 2008 tax year could not be used to generate a tax refund of taxes paid by the Bank in the 2003, 2004, and 2005 tax years because of the two (2) year limitation on NOL carry-backs.

In November 2009, however, President Obama signed H.R. 3548 — the *Worker, Homeownership, and Business Assistance Act of 2009*. This act permits a NOL sustained in 2008 to be carried back to 2003 (50% of taxable income for 2003), 2004, 2005, and 2006. Accordingly, the Group now could seek a refund of the taxes paid by the Bank in 2003 and 2004 (and certain amounts attributable to the 2005, 2006, and 2007 tax years) using the Bank's NOL in the 2008 tax year.

After the Petition Date, on September 15, 2009, September 13, 2010 and January 27, 2011, the Group filed a tax return, an amended tax return, and claims for refund, respectively, seeking the refund of taxes paid by the Bank attributable to the carry back of the Bank's 2008 NOL. *See* Dkt. No. 32, Tomlinson Decl. at ¶¶ 10-11. Again, the Bank's NOL in the 2008 tax year alone was sufficient to

generate this refund. *See* Dkt. No. 44, Thormahlen Decl. at ¶ 4. Thus, Bancorp's loss was not needed and was not used. *See* 26 C.F.R. § 301.6402-7(g)(2)(iii).

The Bank's 2008 NOL was applied first against 50% of the Bank's 2003 income, and then to the Bank's 2004 income, and then to the Bank's 2005 income. *See* 26 C.F.R. § 1.1502-21. The refund attributable to the carry-back of the Bank's 2008 NOL, after making adjustments per IRS audits and the filing of amended returns, is approximately **$40,695,713**. *See* Dkt. No. 74, Wasserman Decl. at p. 11. This refund, which is also attributable to taxes incurred and paid by the Bank on its own income and the carry-back of the Bank's 2008 NOL, is one of the refunds that is the subject of the instant dispute.

Combined with the refund of certain taxes the Bank paid to state taxing authorities ($74,312.51), interest and other adjustments ($2,860,109.53), the total amount of the tax refunds at issue is approximately **$55,105,654.27**.[7]

2. The 2003 Tax Sharing Agreement

The Report is predicated upon a false construction of the TSA. The Report ignores the parties' statement of intent found in the second paragraph of the TSA and omits nearly all facts related to the formation of the TSA and the meaning given to the words in the TSA by an outside counsel and an officer of both Bancorp and the Bank. Thus, the Bankruptcy Court ignored the actual intent of both parties to the TSA. Instead of adopting the intent of the parties to the TSA, the Report recommends that this Court adopt the construction given to the TSA by a complete stranger to the TSA — the Trustee, who now stands in the shoes of Bancorp.

a. *Preparation of the Tax Sharing Agreement*

The TSA was prepared by Mr. Dwight Smith, a bank regulatory attorney — formerly a partner with Alston & Bird LLP (1999-2011), and currently a partner with Morrison Foerster in Washington, D.C. *See* Dkt. No. 61 at Ex. C, Smith Tr.

7 $55,105,654.27 = $11,475,520.16 (2007) + $40,695,712.07 (2008) + $74,312.51 (state) + $2,860,109.53 (interest and other adjustments).



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

16:5-22:17, 112:15-116:8; Dkt. No. 43, Frost Decl. at ¶ 5. During his time at Alston & Bird, Mr. Smith simultaneously was outside counsel for both the Bank and Bancorp. *See* Dkt. No. 61 at Ex. C, Smith Tr. 18:6-11. Before joining Alston & Bird, Mr. Smith was a Deputy Chief Counsel with the OTS — the federal regulator for both the Bank and Bancorp. *Id.* at 16:7-20.

In preparing the TSA, Mr. Smith consulted with Mr. Brent H. Frost, the former Senior Vice President and Tax Director of both the Bank and Bancorp. *See* Dkt. No. 61 at Ex. C, Smith Tr. 112:18-116:8; Dkt. No. 43, Frost Decl. at ¶ 2; Dkt. No. 61 at Ex. A, Frost Tr. 43:16-44:19. Mr. Frost occupied this position at both the Bank and Bancorp from January of 2001 until the Bank closed in July of 2008. *See* Dkt. No. 43, Frost Decl. at ¶ 2. Mr. Frost's responsibilities included supervising and managing the tax reporting of the Bank and Bancorp, including preparing the federal and state income tax returns for 2001 through 2008,[8] supervising and managing the payment of taxes and the handling of tax refunds, receiving tax refunds, paying tax refunds to the proper party,[9] and ensuring compliance with the TSA.[10]

The stated purpose of the TSA is "for the Bank Group . . . to determine its tax liability and to make and receive payments as if it were filing income tax returns separate from and excluding Parent [Bancorp]." TSA at p. 1. The TSA goes on to state: "All of the following provisions should be interpreted in light of this general intent." *Id.* Thus, the TSA expressly states that the Bank should be treated the same under the TSA as if it were filing income tax returns on a separate basis and Bancorp were not acting as the Bank's agent. Mr. Smith's and Mr. Frost's testimony confirms this and that the intent of the TSA was not to cause a transfer of

---

[8] *See* Dkt. No. 43, Frost Decl. at ¶ 2.

[9] *See* Dkt. No. 43, Frost Decl. at ¶ 2; Dkt. No. 61 at Ex. A, Frost Tr. 79:24-81:24.

[10] *See* Dkt. No. 61 at Ex. A, Frost Tr. 86:14-23.





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

the Bank's tax refunds to Bancorp.

It is undisputed that neither the Bank nor Bancorp ever intended for the TSA to cause the Bank's tax refunds to become Bancorp's property. *See* Dkt. No. 61 at Ex. C, Smith Tr. 173:3-190:5; Dkt. No. 43, Frost Decl. at ¶¶ 6, 8. When the TSA was prepared, Mr. Smith and Mr. Frost were aware of banking regulations (as explained in detail below (Objection at § II.D.2)) prohibiting the Bank and Bancorp from entering into a tax sharing agreement that would cause the Bank's tax refunds to be owned by Bancorp and owed, on an unsecured basis, to the Bank. *See* Dkt. No. 61 at Ex. C, Smith Tr. 34:18-37:13, 66:16-21, 96:10-12, & 176:9-18; Dkt. No. 43, Frost Decl. at ¶¶ 6-8; Dkt. No. 61 at Ex. A, Frost Tr. 193:19-22.[11] In preparing the TSA, both Mr. Smith and Mr. Frost sought to fully comply with these rules and regulations. *See* Dkt. No. 61 at Ex. C, Smith Tr. 34:18-37:13, 66:16-21, 96:10-12, & 176:9-18; Dkt. No. 43, Frost Decl. at ¶¶ 6-8; Dkt. No. 61 at Ex. A, Frost Tr. 193:19-22.

The TSA, as interpreted by the former outside counsel of the Bank and Bancorp, the former Senior Vice President of the Bank and Bancorp, and the FDIC-R, is consistent with the banking statutes and regulations governing affiliate transactions. It was the understanding of the parties that the TSA was consistent with the existence of an agency relationship between the Bank and Bancorp. *See* Dkt. No. 61 at Ex. C, Smith Tr. 189-90.

[11] *See* 12 U.S.C. § 371c(c) (prohibiting federally insured banks from making an unsecured "loan" or "extension of credit" to their affiliates); 12 U.S.C. § 1468(a) (making 12 U.S.C. § 371c applicable to savings associations); 12 C.F.R. § 223.3(o) (defining term "extension of credit" broadly to include any transaction "as a result of which an affiliate becomes obligated to pay money (or its equivalent)" to a bank); 12 C.F.R. § 563.41(b) (making 12 C.F.R. § 223.3(o) applicable to savings associations); *Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure*, 63 FR 64757-01, 1998 WL 804364 (1998) (prohibiting subsidiary depository institutions from entering into tax sharing agreements that create unsecured extensions of credit and "purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent"). These regulations are discussed in detail in Section of II.D.2 this Objection, *infra*.

Under Section 5 of the TSA, the Bank expressly appointed Bancorp to act "as its agent and attorney-in-fact" to take actions to effectuate the terms of the TSA. TSA at § 5(d). Bancorp is further given "sole discretion" to take actions consistent with the scope of this agency. *Id.* at § 5. As discussed below, this "sole discretion" is illusory because Bancorp and the Bank were controlled by the same people who had fiduciary duties to both entities. Thus, the management and the board members could never decide in their "sole discretion" whether to file or not file a claim for a refund, for example, without taking into account the best interests of the Bank.

Section 4 of the TSA directs Bancorp to "pay[]" to the Bank the Bank's tax refunds within fifteen (15) business days after receiving them from the IRS or a State Authority. TSA at § 4(a). This section guarantees that the Bank will always receive its separate basis tax refund — *i.e.*, the portion of the Group's consolidated refund attributable to "offsetting" the Bank's loss against the Bank's income to generate a refund of taxes the Bank paid in prior tax years. *Accord* Dkt. No. 73, Castleberry Decl. at ¶¶ 32-33, 37. This is consistent with the stated purpose of the TSA, which is that the Bank be treated the same "as if it were filing income tax returns separate from and excluding Parent [Bancorp]." TSA at p. 1.

The TSA includes a fifteen (15) business day settlement period for Bancorp to pay the Bank's tax refunds to the Bank. This provision "was intended only as an accounting and administrative convenience in order to provide Bancorp the time to process the transfer of [the] refunds to the Bank." Dkt. No. 43, Frost Decl. at ¶ 8; *see* Dkt. No. 61 at Ex. C, Smith Tr. 193-94. By including this time period, the parties "did not intend to give Bancorp the use of the [Bank's] refund[s] for the specified period of time. Dkt. No. 43, Frost Decl. at ¶ 8; *see* Dkt. No. 61 at Ex. C, Smith Tr. 180:6-188:21.

In fact, the parties "understood that allowing Bancorp to use or retain the refunds subject to a promise to pay the amount to the Bank within the specified time period would constitute an extension of credit or a loan from the Bank to its



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

holding company that would be subject to certain strict statutory rules." Dkt. No. 43, Frost Decl. at ¶ 8; *see* Dkt. No. 61 at Ex. C, Smith Tr. 87:5-93:14, 180:6-188:21. The Bankruptcy Court refused to admit any of these undisputed facts.

b. *The TSA Was Never Approved by the Bank's Board*

A fundamental dispute in this case is whether the TSA is enforceable against the FDIC-R if it is interpreted to effect the assignment of the Bank's tax refunds to Bancorp. The TSA, however, is not enforceable against the FDIC-R because it was never approved by the Bank's board as required by 12 U.S.C. § 1823(e). In fact, there is no evidence that the TSA was ever presented to the Bank's board. *See* Dkt. No. 79 at p. 1.

On or about February 6, 2003, the Chief Financial Officer of the Bank and Bancorp executed the TSA. The Bank's board minutes for January and February of 2003 do not include any references at all to the TSA.

In reaching its conclusion, the Bankruptcy Court relied upon evidence that in July 2003, approximately five and a half months *after* the Bank's CFO signed the TSA, the Bank's board adopted a resolution approving a written Policy regarding Transactions with Affiliates (the "**IndyMac Policy**"). *See* Dkt. No. 81 at Ex. Y, p. 34. The Bank's board further "ratified" and "approved" all prior actions taken by the Bank's officers within the scope of the "resolutions" approving this Policy. *Id.* The TSA is specifically referenced as a type of "Transaction" — *i.e.*, a "transaction in which [Bancorp] acts as an ***agent*** . . . to the Bank" — within the scope of the IndyMac Policy. *Id.* at p. 36 (emphasis added).

The IndyMac Policy directs the Bank's officers to conduct all "Transactions" in accordance with the affiliate transaction rules set forth in 12 U.S.C. § 371c (section 23A of the Federal Reserve Act), 12 U.S.C. § 371c-1 (section 23B of the Federal Reserve Act), 12 C.F.R. § 223.3(o) (the implementing regulations), and "other guidance" promulgated by the federal banking agencies. *Id.* at 36-37. The IndyMac Policy further provides that any "Covered Transaction" involving a "loan





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

or extension of credit" by the Bank "shall be secured at the time of the Transaction . . ." *Id.* at 38.

In sum, approximately five and a half months after the Bank's CFO signed the TSA, the Bank's board directed management not to enter into agreements that violate 12 U.S.C. § 371c(c), 12 U.S.C. § 371c-1, 12 C.F.R. § 223.3(o), and the *Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure*, 63 FR 64757-01, 1998 WL 804364 (1998) (the "**Interagency Policy Statement**"). The Bankruptcy Court found this evidence shows that the Bank's board approved the TSA in July 2003. As explained in Section II.D.1.a below, the Bankruptcy Court is wrong. To the contrary, this evidence shows that the Bank's board intended to comply with federal banking laws, which prohibit the Bank from entering into an unsecured debtor/creditor relationship with Bancorp.

## II. SPECIFIC OBJECTIONS

### A. The Bankruptcy Court Erred in Disregarding the Ninth Circuit's Decision in *Bob Richards*

The Bankruptcy Court erred in finding that the TSA defeats the Bank's ownership of its own tax refunds. [**Report at pp. 18:25-28:4, 39:22-43:2**]. The fact that Bancorp is in bankruptcy does not give Bancorp the right to take the Bank's property. 11 U.S.C. § 541(b)(1) & (d) (property of the estate does not include property in which the debtor holds "only legal title and not an equitable interest"); *Kupetz v. United States (In re California Trade Technical School, Inc.),* 923 F.2d 641, 645-46 (9th Cir. 1991) ("Bankruptcy law does not view property held in trust by the debtor as property of the estate available for general creditors.").

The Report is fundamentally incompatible with the Ninth Circuit's decision in *Bob Richards*. Even though the TSA does not contain any specific language that could possibly be construed as giving Bancorp the right to keep the Bank's tax refunds, the Bankruptcy Court nevertheless recommends that this Court find that the TSA is a "differing agreement" under *Bob Richards* that has the legal effect of

divesting a federally insured bank of $55 million in tax refunds.

The TSA is not a "differing agreement" under *Bob Richards*. In fact, the TSA specifically requires Bancorp to pay the Bank's tax refunds to the Bank. TSA at § 4(a). This is entirely consistent with the doctrine of specific trust applied to consolidated tax refunds by the Ninth Circuit in *Bob Richards*. The Bankruptcy Court's assignment of "magical" significance to the words "payment" and "reimbursement" in the TSA does not withstand minimal scrutiny. On this basis alone, the Report must be rejected.

It is well-settled that a subsidiary's share of a consolidated tax refund paid by the IRS to its parent is the subsidiary's property. This rule was first set out in the Ninth Circuit's seminal decision in *Bob Richards*, 473 F.2d 262, which has since been widely followed for many years by federal and state courts.[12]

In *Bob Richards*, the parent of a bankrupt subsidiary claimed to own the subsidiary's share of a consolidated tax refund paid to the parent. 473 F.2d at 263. The parent argued that because the IRS paid the refund to the parent, the parent could set off a debt owed by the subsidiary to the parent against the parent's obligation to pay the subsidiary's share of the refund to the subsidiary. *Id.* Thus, the parent claimed that its obligation to pay the subsidiary's refund was a debt obligation, making setoff appropriate. *Id.* The Ninth Circuit rejected the parent's position. *Id.* at 265.

---

[12] *See Capital Bancshares, Inc. v. FDIC*, 957 F.2d 203, 208 (5th Cir. 1992); *Lubin v. FDIC*, No. 1:10-CV-00874-RWS, 2011 WL 825751, at *5 (N.D. Ga. Mar. 2, 2011); *BSD Bancorp., Inc. v. FDIC*, No. 93-12207-A11, at 10-11 (S.D. Cal. Feb. 28, 1995); *FDIC v. Mercer Bancorp., Inc.*, No. 89-0849, 1990 WL 515173, at *2 (W.D. Mo. Dec. 5, 1990); *Jump v. Manchester Life & Cas. Mgmt. Corp.*, 438 F. Supp. 185, 189 (E.D. Mo. 1977), *aff'd*, 579 F.2d 449 (8th Cir. 1978); *Brandt v. Fleet Capital Corp. (In re TMCI Elecs.)*, 279 B.R. 552, 556 (Bankr. N.D. Cal. 2000); *Cohen v. Un-Ltd. Holdings, Inc. (In re Nelco, Ltd.)*, 264 B.R. 790, 809-10 (Bankr. E.D. Va. 1999); *Nisselson v. Drew Indus., Inc. (In re White Metal Rolling & Stamping Corp.)*, 222 B.R. 417, 424 (Bankr. S.D.N.Y. 1998); *In re Revco D.S., Inc.*, 111 B.R. 631, 637 (Bankr. N.D. Ohio 1990); *FDIC v. Brandt (In re Florida Park Banks, Inc.)*, 110 B.R. 986, 987 (Bankr. M.D. Fla. 1990); *Pentron Indus., Inc. v. Capital Dredge & Dock Corp.*, Nos. 3140, 3142, 1981 WL 3984, at *7 (Ohio Ct. App. May 20, 1981). Copies of all unreported decisions cited herein are attached to the Kim Declaration, filed contemporaneously with this Objection, as **Exhibit B**.





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

The Ninth Circuit based its decision on common law property rights. The Ninth Circuit held that the subsidiary's share of the consolidated tax refund was the subsidiary's property because the subsidiary had created it and would have received it if it had filed separate returns. *Id.* Specifically, the subsidiary's share of the refund was attributable to offsetting the subsidiary's loss against its own income to generate a refund of taxes it had paid in prior tax years. *Id.*

The Ninth Circuit further explained that adopting a contrary property rule in this context would "unjustly enrich the parent," since the refund "was due entirely to the earnings history of the bankrupt [subsidiary]." *Bob Richards*, 473 F.2d at 265. The Ninth Circuit did <u>not</u> hold that the subsidiary had a claim *for* unjust enrichment (*i.e.*, a quasi-contractual claim) against its parent that could be set off by the parent against its claims against the subsidiary. The Ninth Circuit reached the opposite conclusion and held that the refund was the subsidiary's property. *Id.*

Here, as in *Bob Richards*, the $55 million tax refund in dispute is attributable entirely to the "earnings history" of the Bank. The refund is attributable to offsetting the Bank's losses in the 2007 and 2008 tax years against the Bank's own income to generate a refund of taxes paid by the Bank in prior tax years, mainly 2003 through 2005. Thus, under the property rule recognized in *Bob Richards* (as followed by state and federal courts for over thirty-eight (38) years) the Bank is the owner of this $55 million tax refund. The TSA expressly acknowledges this by requiring Bancorp to pay the Bank's tax refunds to the Bank. TSA at § 4(a).

Although the Ninth Circuit held that the insolvent subsidiary in *Bob Richards* owned the tax refund, the refund was in the parent's possession. Therefore, the second step in the Ninth Circuit's analysis was to determine the capacity in which the parent held the subsidiary's tax refund. The Ninth Circuit answered this question by holding that the IRS's payment of the refund to the parent did not affect the subsidiary's property interest in its tax refund. *Bob Richards*, 473 F.2d at 265. The parent did not owe the refund as a debt to the subsidiary which could be set off;





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

instead, the parent held the subsidiary's share of the consolidated tax refund "as a trustee of a ***specific trust*** and was under a duty to return the tax refund to the estate of the bankrupt [subsidiary]." *Id.* (citing *Western Tie & Timber Co. v. Brown*, 196 U.S. 502 (1905)) (emphasis added).

The doctrine of "specific trust" was well-established long before the Ninth Circuit decided *Bob Richards*. Since 1847, the Supreme Court and various federal circuit courts consistently have held that "every person who receives money to be paid to another, or to be applied to a particular purpose . . . is a trustee" and, therefore, not a debtor. *Taylor v. Benham*, 46 U.S. 233, 274 (1847); *see Western Tie & Timber Co.*, 196 U.S. 502; *Libby v. Hopkins*, 104 U.S. 303 (1881); *McKee v. Lamon*, 159 U.S. 317, 322 (1895); *Rossman v. Blunt*, 104 F.2d 877, 879 (6th Cir. 1939); *In re Interborough Consol. Corp.*, 288 F. 334, 347 (2d Cir. 1923); *Lehigh Valley Coal Sales Co. v. Maguire (In re Gilmore-Thayer Co.)*, 251 F. 581, 582 (7th Cir. 1918); *Alvord v. Ryan*, 212 F. 83, 86-87 (8th Cir. 1914).

For example, in *Western Tie & Timber*, the Supreme Court decision cited in *Bob Richards*, the funds at issue were deducted by an employer from employees' paychecks for the purpose of paying the employee's debts to a local store pursuant to an agreement between the employer and the store owner. 196 U.S. at 505. After the owner of the local store became insolvent, the employer attempted to set off the funds it had withheld from its employees' pay against a debt owed by the store owner to the employer. *Id.*

The Supreme Court held that there could be no setoff under this arrangement. *Id.* at 509. Rather, the employer held the employees' funds in "trust" for the store owner because, under the agreement between the store owner and the employer, the funds were deducted from the employees' paychecks for the specific purpose of satisfying the employees' debts to the local store. *Id.* at 509-10 (citing *Libby v. Hopkins*, 104 U.S. 303).

The Supreme Court reached the same conclusion in *Libby v. Hopkins*, which





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

was relied upon by the Supreme Court in *Western Tie & Timber*. In *Libby*, a borrower paid money to a bank, with instructions that the funds be applied to pay off the borrower's secured mortgage debt to the bank. 104 U.S. at 303-04. When the borrower later went bankrupt, the bank ignored the instructions and instead applied the payment against a different, unsecured debt owed by the borrower to the bank. *Id.* The Supreme Court held that the funds could not be set off in such a manner. *Id.*

The Supreme Court found that because the bank received possession of the money for the particular purpose of paying the secured mortgage debt, the bank was obligated to use the funds for the intended purpose and could not use the funds for any other purpose. *Id.* at 308-09. The Court held that this meant that the bank held possession of the funds in "trust" and, thus, the bank could not set off against the funds because there was no debtor/creditor relationship as to those funds. *Id.* at 309.

Circuit courts following *Western Tie* and *Libby* refer to the trust recognized by the Supreme Court as a "specific trust." *See, e.g.*, *Bob Richards*, 473 F.2d at 265 (citing *Western Tie & Timber*, 196 U.S. at 502); *Lehigh*, 251 F. at 582; *Rossman*, 104 F.2d at 879-80. *Bob Richards* simply applied this same concept of "specific trust" to the issue of consolidated tax refunds. *See Bob Richards*, 473 F.2d at 265; *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 896 F.2d 54, 57 (3d Cir. 1990) (noting that *Bob Richards* is consistent with established Supreme Court precedent going back to *Libby*).

The Ninth Circuit determined that the "only reason" the parent in *Bob Richards* had possession of the subsidiary's tax refund was because the IRS paid the refund to the parent under the tax regulations. 473 F.2d at 265. Specifically, under the tax regulations, the subsidiary had "authorized" the parent to "act as the sole agent" and "handle all tax matters relating to the tax return," including the receipt of tax refunds. *Id.* The tax regulations, however, are "procedural" and have

nothing to do with the "subsequent disposition of tax refunds." *Id.* The Ninth Circuit explained that the subsidiary's "consent[]" to the parent acting as its "agent" or "representative" in dealings with the IRS could not "be construed to include the *transfer* of a valuable asset without further consideration." *Id.* at 264 (emphasis added).

Rather, as the Ninth Circuit explained in *Bob Richards*, the subsidiary's authorization for the parent to "act as the sole agent" under the tax regulations for tax matters meant that the parent received the subsidiary's tax refund from the IRS for a specific purpose — *i.e.*, to receive the refund "as agent" on the subsidiary's behalf and pay it to the subsidiary. *Id.* at 265.[13] Thus, the Ninth Circuit found that the parent, as agent for its subsidiary under the tax regulations, received the refund "as a trustee of a specific trust." *Bob Richards*, 473 F.2d at 265. Following Supreme Court precedent, the Ninth Circuit held that since the parent "was acting as a trustee of a specific trust," it "was under a duty to return the tax refund to the estate of the bankrupt [subsidiary]." *Id.* And, as in *Western Tie & Timber* and *Libby*, the parent in *Bob Richards* could not treat such "duty" as a debt obligation that would permit a setoff of mutual debts. *Id.*

In *Bob Richards*, the Ninth Circuit recognized a possible exception to the specific trust relationship. 473 F.2d at 265. Specifically, the Ninth Circuit stated that the relationship between the parent and subsidiary could be something other than a trust or agency relationship if the parties entered into a "differing agreement." *Id.* The Ninth Circuit further specified what the agreement must provide in order to constitute a "differing agreement."

---

13 The recent decision by the Court of Federal Claims in *Claybrook v. United States*, No. 10-734T, at p. 17 (Fed. Cl. Apr. 18, 2012) further supports this point. In *Claybrook*, the court held that once the parties agree among themselves for the common parent to act as agent for the group in their dealings with the IRS, the "basic principles of agency" under the common law govern the actions of the parent, including the principle that "when acting for a principal, an agent does 'not use property of the principal *for the agent's own purposes*.'" *Id.* (citing RESTATEMENT (THIRD) OF AGENCY § 8.05, Rep. Note 6 (2006)) (emphasis in original).





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

According to the Ninth Circuit, a "differing agreement" must be an "express or implied agreement" that gives the parent the "**right to keep** [its subsidiary's tax] refund." *Id.* (emphasis added). The subsidiary in *Bob Richards* had not "voluntarily assigned its rights in the refund" to the parent. *Id.* And, the subsidiary's consent to the parent receiving possession of the refund from the IRS could not "be construed to include the transfer of a valuable asset without further consideration." *Id.* at 264-65. Thus, the subsidiary's tax refunds remained the subsidiary's property. *Id.* at 265.

The Ninth Circuit's definition of a "differing agreement" is consistent with the specific trust precedent that preceded *Bob Richards*. When funds are received in order for them to be paid over to another, there is a necessary implication that the funds cannot be used for any other purpose. *See, e.g.*, *Western Tie & Timber*, 196 U.S. at 509; *Libby*, 104 U.S. at 308-09; *Taylor*, 46 U.S. at 274; *Rossman*, 104 F.2d at 879; *Lehigh*, 251 F. at 582; *Alvord*, 212 F. at 86-87. In each of these cases the agreement created a specific trust *because* the agreement lacked any provisions that gave the recipient of the money any right to keep or use the funds for its own purposes.

In *Bob Richards*, there was no expressed restriction on the parent's ability to use the subsidiary's tax refund for a general purpose. The Court found this to be irrelevant because the parent's inability to use the funds for a general purpose was necessarily implied from its obligation to receive the funds for the specified purpose. *See, e.g.*, *Western Tie & Timber*, 196 U.S. at 509; *Libby*, 104 U.S. at 308-09; *Taylor*, 46 U.S. at 274; *Rossman*, 104 F.2d at 879; *Lehigh*, 251 F. at 582; *Alvord*, 212 F. at 86-87.

However, under *Bob Richards*, *Western Tie & Timber*, and *Libby*, if a hypothetical tax sharing agreement actually were to give the parent the "right to keep [its subsidiary's tax] refund" or specifically provided that the tax refund was transferred, assigned, or loaned to the parent, then it would be a "differing





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

agreement." *Bob Richards*, 473 F.2d at 264-65.

The TSA in this case does not contain any provisions that expressly or impliedly permit Bancorp to "keep" the Bank's tax refunds, or provide that the Bank's tax refunds are "transfer[red]" or "assigned" to Bancorp. [**Report at pp. 18:25-25:28**]. In fact, the TSA requires Bancorp to pay the tax refunds to the Bank. Thus, the Bankruptcy Court's finding that the TSA satisfies the Ninth Circuit's definition of a "differing agreement" is clearly wrong.

### B. The Bankruptcy Court Erred in Finding that the TSA Is a "Differing Agreement" that Overrides the Default Property Rule in *Bob Richards*

The Bankruptcy Court goes to great lengths to find the TSA is a "differing agreement" and to justify a result that is incompatible with binding Ninth Circuit precedent. None of the Bankruptcy Court's findings withstand minimal scrutiny on this issue.

1. The Bankruptcy Court erred in finding that *Bob Richards* has no application to this case because the parties executed a tax sharing agreement. [**Report at pp. 42:4-43:2**]. The Bankruptcy Court wrongfully found that *Bob Richards* is predicated on a "quasi-contract" theory and, therefore, has no application when there is a written contract.

The Ninth Circuit did not hold in *Bob Richards* that the subsidiary had a quasi-contract *claim* against its parent *for* unjust enrichment. Rather, it held that, as a matter of property law, the Bank owned its share of the consolidated tax refund and that to decide otherwise *would* unjustly enrich the parent. *Bob Richards*, 473 F.2d at 265. If the Ninth Circuit had found that the subsidiary had a *claim for* unjust enrichment, then there would have been mutual claims making the parent's attempt to set off the debts owed by the debtor appropriate. *See, e.g., Nathanson v. N. L. R. B.*, 344 U.S. 25 (1952) (quasi-contract liability based on implied contract is a debt); *Carolco Television Inc. v. Nat'l Broad. Co. (In re Del Laurentiis Entm't*





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

*Group, Inc.)*, 963 F.2d 1269, 1273-74, 1278 (9th Cir. 1992) (quasi-contract liability based on implied contract is a debt subject to setoff).

In fact, district courts deciding cases involving tax sharing agreements have followed and applied *Bob Richards*. *See, e.g.*, *Lubin v. FDIC*, No. 1:10-CV-00874-RWS, 2011 WL 825751, at *5 (N.D. Ga. Mar. 2, 2011); *BSD Bancorp., Inc. v. FDIC*, No. 93-12207-A11, at 10-11 (S.D. Cal. Feb. 28, 1995). Thus, the Bankruptcy Court's finding that *Bob Richards* is a quasi-contract case that has no application when there is a tax sharing agreement is plainly wrong.

2. The Bankruptcy Court erred in finding that the *Bob Richards'* rule does not apply to a parent corporation that is a debtor under the Bankruptcy Code. [**Report at pp. 41:18-42:3**]. The Bankruptcy Court essentially determined that the property rule applied in *Bob Richards* is not based on which entity's "earnings history" is the basis for the tax refund, but is based on an erroneous presumption that the debtor in bankruptcy always gets to keep the refund paid to it by the IRS. Such an interpretation of *Bob Richards* not only violates basic principles of justice and fairness, it also violates Supreme Court precedent holding that property rights are not analyzed differently simply because one party happens to be in bankruptcy. *See Butner v. U.S.*, 440 U.S. 48, 55 (1979). Counterparties to agreements with debtors are entitled to fair treatment from the Court.

3. The Bankruptcy Court erred in finding that the TSA is a "differing agreement" because it specifically requires Bancorp to pay the Bank's tax refund to the Bank fifteen (15) business days after receiving it from the IRS. [**Report at pp. 20:1-22:6**]. The FDIC-R respectfully submits that the Report is wrong.

Section 4 of the TSA deals with carry back refunds, *i.e.*, refunds attributable to carrying back a NOL in the current tax year to offset income in prior tax years. This section guarantees that the Bank will always receive its separate basis tax refund — *i.e.*, the portion of the Group's consolidated refund attributable to "offsetting" the Bank's own loss against the Bank's own income. TSA at § 4(a).

The "reduction in the Bank's Separate Tax Liability" referenced in Section 4 of the TSA is the tax refund that the Bank would have received "if it had filed a separate Federal or State tax return for the applicable taxable year." TSA at §§ 4(a) & 1(j).

Thus, the portion of the refund that Bancorp is required to "pay[]" to the Bank is mathematically the same as the amount the Bank would have received if it had filed separate tax returns and no tax sharing agreement was in place. TSA at §§ 4(a) & 1(j); *accord* Dkt. No. 73, Castleberry Decl. at ¶¶ 32-33, 37. This is consistent with the stated purpose of the TSA, which is that the Bank be treated the same "as if it were filing income tax returns separate from and excluding Parent [Bancorp]." TSA at p. 1.

Section 4 of the TSA requires Bancorp to pay the Bank's tax refunds to the Bank "not later than fifteen (15) business days after . . . such refund is received" from the IRS." TSA at § 4. This fifteen (15) day period "was intended only as an accounting and administrative convenience in order to provide Bancorp the time to process the transfer of [the] refunds to the Bank." Dkt. No. 43, Frost Decl. at ¶ 8; *see* Dkt. No. 61 at Ex. C, Smith Tr. 193:17-194:6. By including it, the parties "did not intend to give Bancorp the use of the [Bank's] refund[s] for the specified period of time." Dkt. No. 43, Frost Decl. at ¶ 8; *see* Dkt. No. 61 at Ex. C, Smith Tr. 181:4-188:21.

Section 4 of the TSA does not make the TSA a 'differing agreement." Rather, Section 4 of the TSA makes this case legally indistinguishable from *Bob Richards*. Like *Bob Richards*, this case also involves specific instructions for funds received for a specific purpose. The only difference between this case and *Bob Richards* is that the TSA expressly states that Bancorp must pay the tax refund to the Bank.

Under Section 5 of the TSA, the Bank expressly appointed Bancorp to act "as its agent and attorney-in-fact" to take actions to effectuate the terms of the TSA. TSA at § 5(d). And, under the TSA, Bancorp is required to "pay[]" the Bank's





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

refund to the Bank after receiving it from the IRS. TSA at § 4. This is consistent with the same "specific trust" recognized in *Bob Richards* as making the set off of mutual "debts" improper. *Bob Richards*, 473 F.2d at 265; *accord Taylor v. Benham*, 46 U.S. 233, 274 (1847) ("every person who receives money to be paid to another, or to be applied to a particular purpose . . . is a trustee").

The TSA is also consistent with the provisions of the Internal Revenue Code and regulations promulgated by the Treasury Department. As explained by the Court of Federal Claims in *Claybrook v. United States*, No. 10-734T, at p. 17 (Fed. Cl. Apr. 18, 2012), Treasury Regulation § 1.1502-77(a)(1)(i)(A) promulgated to implement 26 U.S.C. § 1502 authorizes "the common parent . . . for a consolidated return year [as] the *sole agent (agent for the group)* . . . to act in its own name with respect to all matters relating to the tax liability for that consolidated return year for [e]ach member in the group. *Id.* (emphasis added).

Like this case, the parties in *Claybrook* (a bank and its holding company) entered into a tax sharing agreement which provided that the holding company, as common parent, would act as agent for the consolidated group. In an attempt to preclude the FDIC's intervention in his Federal Claims Court litigation against the United States to recover the disputed tax refund, the trustee argued that the holding company was the "person" under 26 U.S.C. § 6402(a) that made the tax overpayment and, therefore, was the only entity authorized to bring suit to recover the tax refund. The Court of Federal Claims rejected this argument explaining that the consolidated group, not the holding company, was the "person" that made the overpayment. Treasury Regulation § 1.1502-77 allowed the holding company to remit tax payments to the IRS, but only "as agent *for the [consolidated] group*." *Id.* (emphasis in original). Therefore, the overpayment was "made" by the consolidated group, not by the holding company, "under basic principles of agency" because "when acting for a principal, an agent does 'not use property of the principal *for the agent's own purposes*.'" *Id.* (citing RESTATEMENT (THIRD) OF

AGENCY § 8.05, Rep. Note 6 (2006)) (emphasis in original).

Although ownership of the tax refund is not before the Court of Federal Claims in *Claybrook*, the court's ruling clarifies that the consolidated group is the "person" under the Internal Revenue Code that makes the payment of taxes on behalf of the group and that the common parent acts as the agent for the "person" making the payment. The TSA is in accord.

But, the Internal Revenue Code does not provide how a refund must be distributed among the members of the consolidated group. The property rule applied by the Ninth Circuit in *Bob Richards*, however, provides that each member of the group owns the share of the refund that is attributable to its earnings history — *i.e.*, the refund that the member would have received if it had filed on a separate return basis. 473 F.2d at 264-65. In order for a "differing agreement" to provide otherwise, it must do something more than just reiterate 26 C.F.R. § 1.1502-77's requirement that the common parent act as agent to receive the refund from the IRS and that the common parent must pay each member its share of the refund. The agreement must allow the parent to "keep" the entire refund. *Id*. Since Section 4 of the TSA does not permit Bancorp to "keep" the Bank's tax refund, the TSA is not a "differing agreement" under *Bob Richards*.

4. The Bankruptcy Court erred in finding that the TSA is a "differing agreement" because it does not contain any escrow, segregation requirements, or use restrictions. [**Report at pp. 22:7-24:2**].

The Bankruptcy Court's analysis is inconsistent with Supreme Court and Ninth Circuit precedent. As in *Western Tie & Timber*, *Libby*, *Bob Richards*, and every other specific trust case, the inability to use funds for a general purpose is necessarily implied from the obligation to use funds for the specific purpose. *See, e.g.*, *Western Tie & Timber*, 196 U.S. at 509; *Libby*, 104 U.S. at 308-09; *Taylor*, 46 U.S. at 274; *Bob Richards*, 473 F.2d at 265; *Rossman*, 104 F.2d at 879; *Lehigh*, 251 F. at 582; *Alvord*, 212 F. at 86-87.

The TSA specifically provides that Bancorp acts as the Bank's "agent "and must "pay[]" or remit the Bank's tax refunds to the Bank. The obligation to use the Bank's tax refunds for the purpose specified in the TSA necessarily implies that Bancorp cannot use the Bank's tax refunds for other purposes. *See also Claybrook*, No. 10-734T, at p. 17.

If Bancorp used the Bank's tax refunds for its own purposes, then it could not meet its specific obligation to pay the Bank's tax refunds to the Bank. Accordingly, the absence of escrow, segregation requirements, or use restrictions in the TSA is irrelevant. The restrictions are found in the TSA's instructions that the refunds be applied for a particular purpose. *See Taylor*, 46 U.S. at 274 ("every person who receives money to be paid to another, or to be applied to a particular purpose . . . is a trustee"). In addition, the Bank's ownership of its own tax refunds is found in binding precedent in this Circuit and is reflected in the TSA's own Statement of Intent. TSA at p. 1.

As in *Western Tie & Timber*, *Libby*, and *Bob Richards*, once a party has agreed to receive funds subject to specific instructions, it cannot change the relationship to that of debtor/creditor by refusing to execute the terms of the trust. *See, e.g.*, *Western Tie & Timber*, 196 U.S. at 509; *Libby*, 104 U.S. at 308; *Taylor*, 46 U.S. at 274; *Bob Richards*, 473 F.2d at 265. To hold otherwise "would be to permit a trustee to better his condition by a refusal to execute a trust which he had assumed." *Libby*, 104 U.S. at 308.

5. The Bankruptcy Court erred in finding that the TSA gives Bancorp the unfettered use of the Bank's tax refunds. [**Report at pp. 24:3-25:21**]. There is no provision in the TSA that expressly or impliedly gives Bancorp the right to keep or use the Bank's tax refunds. The Bankruptcy Court's reliance on Section 5 of the TSA is misplaced.

First, the fact that Section 5, which mirrors 26 C.F.R. § 1.1502-77's designation of the common parent as the "sole agent" for the group, gives Bancorp





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

"sole discretion" over various tax-related matters, it does not give Bancorp the right to breach its specific obligations to act as the Bank's "agent" and "pay[]" or remit the Bank's tax refunds to the Bank. If the Group applies for and obtains a tax refund, the parent receives it as a trustee of a specific trust for the Bank. *Bob Richards*, 473 F.2d at 265. Bancorp cannot better its obligations by refusing to execute the trust that it assumed when it agreed to act as agent for the Group. *See Libby*, 104 U.S. at 308.

Second, the Bankruptcy Court's finding that because the parent had "sole discretion" under the TSA whether to file a claim for a refund, the TSA is inconsistent with a trust or agency relationship is wrong. This finding by the Bankruptcy Court utterly ignores the economic and practical reality of the relationship of parties filing a consolidated tax return. The benefits derived from filing a consolidated return might never be obtained if an individual member of a consolidated group were to retain authority over whether or when it wanted to file a return. Moreover, with respect to the actual relationship between Bancorp and the Bank, the same people in management and on the boards of both entities (with a few non-substantive exceptions) controlled both Bancorp and the Bank. These people were fiduciaries of both entities when they were interpreting the TSA and, thus, were required to act in the best interests of both entities. They could never decide to favor Bancorp at the expense of the Bank without breaching their fiduciary duties to the Bank. Thus, the "sole discretion" language in Section 5 of the TSA must be viewed in context since management and the board members could never decide in their "sole discretion" whether to file or not file a claim for a refund without taking into account the best interests of the Bank. Plus, agents usually are provided discretion. The issue is not who decides whether and when to file a claim for a refund, but who owns the refund.

6. The Bankruptcy Court erred in finding that Sections 2, 3, and 4 of the TSA create intercompany obligations that differ materially from the amounts due





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

absent a tax sharing agreement. [**Report at pp. 20:1-22:6**]. The FDIC-R respectfully submits that the Bankruptcy Court's discussion of Sections 2, 3, and 4 of the TSA demonstrates that the Bankruptcy Court misunderstands how the TSA works.

Section 2 of the TSA deals with the payment of taxes to the IRS. The TSA directs the Bank to pay its share of the tax liability, as computed from the "Bank Group's Separate Tax Liability" — *i.e.*, the "tax liability of the Bank Group computed as if it had filed a separate Federal or State income tax return for the applicable taxable year" — to Bancorp the day before it was due. TSA at §§ 2(b) & 1(j); *accord* Dkt. No. 73, Castleberry Decl. at ¶¶ 24-29. While the TSA says that Bancorp is to make these payments, the Group never followed this section of the TSA. Rather, the Bank made all tax payments directly to the IRS. *See* Dkt. No., 43, Frost Decl. at ¶ 13; Dkt. No. 74, Wasserman Decl. at p. 9, Ex. C.

Section 3 of the TSA addresses the situation when the Bank's losses in any given year are used to offset the income of non-bank members of the Group so as to reduce the Group's tax liability in the current tax year. TSA at § 3; *accord* Castleberry Decl. at ¶¶ 30-31. If the Bank could have used its loss to obtain a refund of taxes paid by the Bank in "prior years," but the loss is instead offset against the income of other non-bank members so as to reduce the Group's total tax liability, then the non-bank members must "reimburse" the Bank for the use of the Bank's losses. TSA at § 3. Otherwise, there is no reimbursement. Section 3 of the TSA does not apply when the Group carries back an NOL attributable to the Bank in the current tax year to offset the Bank's income in *prior* tax years. Thus, Section 3 does not apply to the facts before this Court.

Section 4 of the TSA guarantees that the Bank will always receive its separate basis tax refund — *i.e.*, the portion of the consolidated refund attributable to offsetting the Bank's losses against the Bank's income to generate a refund of taxes the Bank paid in prior tax years. TSA at § 4(a); *accord* Dkt. No. 73,

Castleberry Decl. at ¶¶ 32-33, 37. A subsidiary's attempt to recover its separate basis tax refund was also the issue in *Bob Richards*. According to the Bankruptcy Court, however, even though the TSA here specifically provides that Bancorp must "pay[]" the Bank its separate basis refund upon receipt from the IRS, the TSA is a "differing agreement" that fundamentally changes the parties' property rights. This directly conflicts with *Bob Richards*. The TSA is not a differing agreement. The Bankruptcy Court clearly erred.

7. The Bankruptcy Court erred in finding that the TSA is a "differing agreement" because it uses words like "reimbursement" and "payment." [**Report at pp. 19:6-22:6**]. Specifically, the Bankruptcy Court wrongfully found that the terms "reimbursement" and "payment" are words that are unique to a debtor/creditor relationship and are inconsistent with the existence of a trust or agency. *Id.* at 63.[14]

The word "payment," however, is commonly used to describe the act of a trustee paying funds held in trust to a beneficiary. *See, e.g.*, RESTATEMENT (THIRD) OF TRUST § 49 illus. d; RESTATEMENT (THIRD) OF TRUST § 50 cmt. A; 76 AM. JUR. 2d *Trusts* §§ 551, 553-555 (2012); *accord Lubin v. FDIC*, No. 1:10-CV-00874-RWS, 2011 WL 825751, at *6 (N.D. Ga. Mar. 2, 2011) (holding use of the word "pay" in a tax sharing agreement does not prove the existence of a debtor/creditor relationship). And, the word "payment" is commonly used to describe the duty of an agent to "pay money collected [by the agent] to the principal upon demand by him." RESTATEMENT (SECOND) OF AGENCY § 427, cmt. b.

The word "reimburse" is commonly used to describe a principal's obligation to "reimburse" its agent for payments made by the agent "on behalf of the

---

[14] While the Bankruptcy Court assigned magical debtor/creditor significance to the words "reimbursement" and "payment," the Bankruptcy Court did not clearly state which of these two words and which section of the TSA specifically applies. The FDIC-R presumes that the Bankruptcy Court relied on Section 4(a) of the TSA, or some combination of Sections 3 and 4(a) of the TSA.





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

principal" or a trustee's right to "reimburse" himself out of the trust corpus for amounts expended by the trustee out of his own funds to preserve the trust corpus, including, among other things, payment of "taxes." 3 AM. JUR. 2d *Agency* § 243 (2012); 76 AM. JUR. 2d *Trusts* §§ 417 & 564 (2012); *see BSD Bancorp., Inc. v. FDIC*, No. 93-12207-A11, at pp. 10-11 (S.D. Cal. Feb. 28, 1995) (holding the use of the word "reimbursed" in a tax sharing agreement does not prove the existence of a debtor/creditor relationship).

Thus, the words "payment" and "reimbursement" plainly do not have a fixed and unambiguous debtor/creditor meaning, as the Bankruptcy Court found. [**Report at p. 20:22-24**]. As discussed below, the Bankruptcy Court used this finding to justify the exclusion of nearly all the extrinsic evidence offered by the FDIC-R. [**Report at p. 11:1-14:8**]. The words "payment" and "reimbursement" in this case are fully consistent with the existence of both a trust and an agency relationship.

8. The Bankruptcy Court erroneously found that the TSA overrides *Bob Richards* even though the TSA does not address the issue of ownership or provide that Bancorp has the right to keep the Bank's tax refunds. [**Report at pp. 19:8-28:4, 39:22-43:2**]. The fact that the TSA does not contain any language that addresses property or ownership issues should be dispositive in this case. The default property rule recognized by the Ninth Circuit in *Bob Richards*, which is binding precedent, cannot be displaced by an agreement that is entirely silent on the question of ownership. If a tax sharing agreement is going to divest a federally regulated bank of millions of dollars in tax refunds, it must plainly say so.

Default rules like the *Bob Richards*' rule are not supplanted by the mere existence of a contract. *Capital Bancshares, Inc. v. FDIC*, 957 F.2d 203, 208 (5th Cir. 1992); *Lubin*, 2011 WL 825751, at *5-6; *BSD Bancorp.*, No. 93-12207-A11, at p. 9; *Cohen v. Un-Ltd. Holdings, Inc. (In re Nelco, Ltd.)*, 264 B.R. 790, 809 (Bankr. E.D. Va. 1999); *FDIC v. Brandt (In re Florida Park Banks, Inc.)*, 110 B.R. 986,





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

987-89 (Bankr. M.D. Fla. 1990).

In order for a tax sharing agreement to override the *Bob Richards'* rule, the agreement must actually contain provisions permitting the parent to keep the affiliate's refund to make it a "differing agreement." *See Bob Richards*, 473 F.2d at 264-65 (holding that in order to be a "differing agreement" the agreement must give the parent the "right to keep [its subsidiary's tax] refund"); *Lubin*, 2011 WL 825751, at *5-6; *BSD Bancorp*, Slip. Op. at pp. 9-10; *Nelco*, 264 B.R. at 809-10 (holding "clear and explicit agreement" required to override *Bob Richards*' rule).

The United States District Court for the Southern District of California addressed this issue in *BSD Bancorp*. Slip. Op. at pp. 9-10. As in the case at bar, *BSD Bancorp* involved a tax sharing agreement between a bank holding company and a federally insured bank. *Id.* at 2. And, as in the case at bar, the parent holding company claimed that "the very existence of a tax allocation agreement" destroys the trust relationship recognized in *Bob Richards*. *Id.* at 9. The parent also claimed that the tax sharing agreement created a debtor/creditor relationship because it used the word "reimburse[]" to describe the obligation to compensate the subsidiary bank for the use of its loss, and because it included provisions that permitted the parent to "borrow" the subsidiary's refund in certain circumstances. *Id.* at pp. 10-11. The district court rejected both of these arguments.

The district court held that the mere existence of a tax sharing agreement could not, as a matter of law, supplant the *Bob Richards*' rule. *Id.* at 9-10. The district court explained that "[p]arties to a contract do not override a gap-filling rule simply by reaching explicit agreement on some other matter. Rather, the terms of their agreement must expressly or impliedly override the gap-filling rule itself." *Id.* at pp. 9-10.

The district court also held that the use of certain magic words, like "reimburse[]," did not create a debtor/creditor relationship; rather, the court was required to "examine the economic reality of the transaction rather than the words





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

used." *Id.* at 10-11. After examining 12 U.S.C. § 371c(c)(1), the district court also held that the tax sharing agreement could not be reasonably interpreted to create "a debtor-creditor relationship" because the collateral requirements were not met. *Id.* at 11-12.

The district court in *Lubin* reached the same conclusion. 2011 WL 825751, at *5-6. *Lubin* also involved a tax sharing agreement between a bank holding company and a federally insured bank. *Id.* The parent argued that the tax sharing agreement "created a debtor-creditor relationship" that overrode "the presumptive principal-agent relationship" because it used words like "pay" to describe the obligation to compensate the subsidiary bank for the use of its loss, and because it included expressed provisions requiring the parent to remit the refund to the Bank. *Id.* at *5. The district court rejected the parent's position.

The district court held that the use of certain magic words like "pay" did not create a debtor/creditor relationship. *Id.* at 6. Rather, the district court determined that it had to consider the "economic reality of the arrangement between [the parent holding company] and the Bank" as well as other sections of the tax sharing agreement that were consistent with an agency relationship. *Id.* The district court held that the bank's tax refunds were the "property of the FDIC-R per the terms of the Tax Agreement" because they were "attributable to losses sustained by the Bank." *Id.*

Ninth Circuit and California case law involving other default rules is wholly consistent with *Bob Richards*, *BSD Bancorp*, and *Lubin* on this point. *See, e.g.*, *Barnes v. Indep. Auto. Dealers Ass'n of California Health & Welfare Benefit Plan*, 64 F.3d 1389, 1395 (9th Cir. 1995); *Cavanaugh ex rel. Cavanaugh v. Providence Health Plan*, 699 F. Supp. 2d 1209, 1225 (D. Or. 2010); *Providence Health Plan of Oregon v. Simnitt*, No. 08-44-HA, 2009 WL 700873, at *9 (D. Or. Mar. 13, 2009); *Bldg. Maint. Serv. Co. v. AIL Sys., Inc.*, 64 Cal. Rptr. 2d 353, 55 Cal. App. 4th 1014, 1021-1022 (Cal. Ct. App. 1997); *Ferrell v. S. Nevada Off-Road Enthusiasts*,





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

*Ltd.*, 195 Cal. Rptr. 90, 147 Cal. App. 3d 309, 316-319 (Cal. Ct. App. 1983).

For example, in *Barnes*, the Ninth Circuit held that a "gap-filler" default rule supplied by common law applies absent "clear contract provisions to the contrary," which means the contract must contain language that "specifically" disavows the default rule. 64 F.3d at 1395. There is no rational basis to find that the default rule established by the Ninth Circuit in *Bob Richards* and universally followed by federal and state courts for many years should be treated any differently.

The Bankruptcy Court, however, wrongfully found that the TSA overrides the *Bob Richards*' default rule even though the TSA does not address the issue of ownership or provide that Bancorp has the right to keep the Bank's tax refunds. The Bankruptcy Court erred in rejecting Ninth Circuit law requiring "clear" and "specific[]" language to override a default rule. *See Barnes*, 64 F.3d at 1395. [**Report at pp. 39:22-41:17**]. There is no language in the TSA that provides that Bancorp can keep the Bank's tax refunds or that addresses the ownership of tax refunds. As in *Barnes*, there are no provisions in the TSA that "specifically" override the *Bob Richards*' rule. 64 F.3d at 1395. Thus, the Bankruptcy Court's analysis on this issue must be rejected.

9. The Bankruptcy Court erred in finding that the district courts' decisions in *BSD Bancorp* and *Lubin* are distinguishable from this case. [**Report at pp. 26:1-28:4**].

The Bankruptcy Court found that *BSD Bancorp* is materially different from this case because the tax sharing agreement in *BSD Bancorp* required the prompt or immediate payment of the tax refund to the bank, whereas the TSA in this case gives Bancorp fifteen (15) business days to pay the funds to the Bank. [**Report at p. 26:11-21**]. *See* TSA at § 4(a). This is a distinction without a difference. In both cases, the tax sharing agreement specifically provides that the parent must pay the tax refund to the bank. The fact that the parent holds the refund subject to the specific instruction to pay it to the bank means that the parent holds the funds in

trust under *Western Tie & Timber*, *Libby*, and *Bob Richards*.

The Bankruptcy Court also ruled that the economic reality in *BSD Bancorp* makes it distinguishable from this case. [**Report at p. 26:13-25**]. The phrase "economic reality" in *BSD Bancorp*, however, was used in reference to the regulations and rules governing the banking industry — specifically, the affiliate transaction rules set forth in 12 U.S.C. § 371c(c), as discussed above. Slip Op. at p. 10. Specifically, the district court explained that if the "economic reality of the transaction" was that it "allowed Bancorp to borrow the refund," thus, creating a "debtor-creditor relationship," then the tax sharing agreement would have to comply with "12 U.S.C. § 371c(c)(1)." *Id.* at p. 11. Since the tax sharing agreement in *BSD Bancorp*, like the TSA in this case, failed to supply any collateral to secure such a "debtor-creditor relationship," it could not reasonably be read to create one. *Id.* at pp. 11-12.

The Bankruptcy Court erroneously found that *Lubin* is materially different from this case because the tax sharing agreement in *Lubin* affirmatively established a substantive agency relationship. [**Report at p. 27:3-11**]. But, the TSA here does the same. The TSA expressly provides: "The Bank hereby appoints Parent as its agent and attorney-in-fact to take such action (including the execution of documents) as the Parent may deem appropriate to effect" the filing, prosecution, compromise or settlement of "any claim for refund." TSA at § 5. Extrinsic evidence, ignored by the Bankruptcy Court, further supports the existence of an agency relationship.

The Bankruptcy Court's discussion of the *Lubin* decision also ignores the fact that *Lubin* was also based on the "economic reality of the transaction" between the bank and its holding company. 2011 WL 825751, at *6. The district court in *Lubin* looked outside the tax sharing agreement to determine how the tax refund at issue was generated. *Id.* The district court found that the tax refund was "attributable to the losses sustained by the Bank." Thus, following *Bob Richards*,



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

the *Lubin* court found "that as a matter of law such refunds are the property of the FDIC-R per the terms of the Tax Agreement," which required the parent to pay the refunds to the bank. The Bankruptcy Court fundamentally rejects *Lubin* and *Bob Richards* because the Bankruptcy Court does not believe the economic reality in this case is relevant. [**Report at p. 14:9-20**]. The Bankruptcy Court is incorrect.

10. The Bankruptcy Court erred in finding that the Ninth Circuit's holding in *Foothill Capital Corp. v. Clare's Food Market, Inc. (In re Coupon Clearing Service, Inc.)*, 113 F.3d 1091 (9th Cir. 1997) and the California Court of Appeals' holding in *Lonely Maiden Productions, LLC v. GoldenTree Asset Management, LP*, 135 Cal. Rptr. 3d 69, 201 Cal. App. 4th 368 (Cal. Ct. App. 2011) support its decision not to follow *Bob Richards*. [**Report at pp. 18:25-25:21**].

*Coupon Clearing* is not applicable. It did not involve consolidated tax refunds, affiliated entities, entities subject to banking regulations, or the doctrine of specific trust.

In accordance with supermarket industry practices, customers presented various retailers with manufacturer coupons to receive a discount in the purchase of groceries. *Coupon* Clearing, 113 F.3d at 1095. The retailers forwarded the coupons in bulk to a coupon clearing house (CCS), which organized the coupons and forwarded them to various manufacturers to be redeemed. *Id.* The invoices sent to the manufacturers stated that all rights to the coupon proceeds had been "assigned" by the retailers to CCS and that all payments were to be remitted by the manufacturers to CCS. *Id.*

After CCS filed for bankruptcy, a dispute arose over the coupon proceeds — *i.e.*, amounts due and owing to CCS by various manufacturers. CCS's secured lender claimed a security interest in the coupon proceeds. The retailers, however, argued that CCS was acting as their agent or, alternatively, held the coupon proceeds in trust, which meant that they were not part of CCS's bankruptcy estate. *Id.* at 1099 (recognizing that "[p]roperty held in trust by a debtor for another . . . is





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

not property of the estate" under 11 U.S.C. § 541).

The Ninth Circuit held that the coupon proceeds belonged to the bankrupt CCS and, therefore, were the secured lender's collateral. The Ninth Circuit explained that CCS did not hold the coupon proceeds in trust because "CCS was required to make payments to the ShopRite Retailers on a fixed schedule ***regardless*** of when CCS was paid by the manufacturers." *Coupon Clearing*, 113 F.3d at 1101 (emphasis added). In addition, the payments from the manufacturers were not "segregated" or "traceable" for each retailer, but were commingled in CCS' general operating account. *Id.*

These facts are fundamentally different from those here. As in *Bob Richards*, Bancorp's obligation to "pay[]" the Bank's tax refunds to the Bank does not arise until after Bancorp actually receives the Bank's tax refunds from the IRS. TSA at § 4(a). Upon receipt, as in *Bob Richards*, Bancorp holds the Bank's tax refunds in a specific trust. Although the Ninth Circuit did not analyze the doctrine of specific trust in *Coupon Clearing*, it could not have applied because CCS was obligated to pay the retailers <u>before</u> CCS received any money from the manufacturers. Thus, CCS was a debtor to the retailers. Also here, as in *Bob Richards*, the Bank's tax refunds are readily traceable.[15] The Bankruptcy Court's decision that *Coupon Clearing* somehow overrides *Bob Richards* should be rejected by this Court.

The decision in *Lonely Maiden* also does not support the Bankruptcy Court's findings and conclusions. *Lonely Maiden* did not involve consolidated tax refunds, affiliated entities, entities subject to banking regulations, or the doctrine of specific trust.

In *Lonely Maiden*, Axium, a third party payroll processing company, entered into written service agreements with various film company clients. 201 Cal. App. 4th at 373. The film company clients provided payroll details to Axium, which

---

[15] By agreement of the parties, the Bank's tax refunds were placed in a separate bank account pending the outcome of this litigation.

calculated, among other things, wages and withholdings for cast and crew members. *Id.* Axium invoiced the film company clients for such amounts, and issued payroll checks and paid withholdings to the appropriate entities. *Id.*

Axium defaulted on a loan and its secured lender foreclosed on Axium's bank account, resulting in a transfer of $28 million to Axium's lender. *Id.* The film company clients sued the lender to recover funds they paid to Axium. *Id.* The film makers argued that Axium was acting as their "agent" or, alternatively, that the funds were held in an "expressed trust," which was not subject to the lender's security interest. *Id.* at 378-82.

The court found that Axium was not acting as the film company clients' agent because the written service agreement expressly disclaimed any "agency," "partnership," or "joint venture." *Id.* at 378. Also, the film makers failed to introduce any extrinsic evidence showing otherwise. *Id.*

*Lonely Maiden* is, thus, the opposite of this case — the TSA expressly states that Bancorp is the Bank's "agent." TSA at § 5(d). There is no evidence that the parties' characterization of the relationship as an "agency" is untrue. Thus, the plain language of the TSA, combined with the extrinsic evidence, shows that the parties intended to create an agency relationship.

*Lonely Maiden* did not deal with the doctrine of "specific trust" applied by the Ninth Circuit in *Bob Richards*. Rather, the court in *Lonely Maiden* considered whether the written services agreement created an "expressed trust." The court found that it did not because the written services agreement did not state that Axium was required to pay the cast and crew members out of the amounts paid to Axium by the film company clients. *Lonely Maiden*, 201 Cal. App. 4th at 381. And, there was no evidence that the amounts paid to Axium by the film company clients were placed into separate accounts pending disbursement to the cast and crew members. *Id.* at 382. Rather, all funds paid by the various film company clients were commingled in Axium's general account pending payment. *Id.* Thus,





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

the court held that the funds were Axium's property subject to the lender's security interest.

As in *Bob Richards*, Bancorp's obligation to "pay[]" the Bank's tax refunds to the Bank does not arise until Bancorp actually receives the tax refunds from the IRS. TSA at § 4(a). The obligation to turn the Bank's tax refunds over is not a general payment obligation; it is specific to the tax refunds received from the IRS on behalf of the Bank. *Id.*

Also, as in *Bob Richards*, the Bank's tax refunds are readily traceable because Bancorp did not have its own bank account. The funds at issue were never commingled with other Bancorp funds. The Bankruptcy Court's finding that *Lonely Maiden* somehow overrides *Bob Richards* should be rejected by this Court.

11. The Bankruptcy Court erred in finding that its Report is supported by the decisions in *In re Franklin Savings Corp.*, 159 B.R. 9 (Bankr. D. Kan. 1993), *aff'd*, 182 B.R. 859 (D. Kan. 1995), *In re First Central Financial Corp.*, 269 B.R. 481 (Bankr. E.D.N.Y. 2001), *aff'd*, 377 F.3d 209 (2d Cir. 2004), *In re MCorp Financial, Inc.*, 170 B.R. 899 (S.D. Tex. 1994), *Team Financial Inc. v. FDIC (In re Team Financial Inc.)*, No. 09-5084, 2010 WL 1730681 (Bankr. D. Kan. Apr. 27, 2010) (not a final order), and *In re NetBank, Inc.*, 459 B.R. 801 (Bankr. M.D. Fla. 2010) (appeal pending). [**Report at pp. 19:8-25:28, 41:1-42:3, 60:1-2**].

Unlike this case, none of these decisions involved agreements that were unenforceable under 12 U.S.C. § 1823(e) (as discussed below) for lack of board approval. In addition, in nearly all of these cases, the courts considered extrinsic evidence of the economic reality — *i.e.*, which entity earned the income, paid the taxes, and suffered the loss. Unlike those cases, however, the Bankruptcy Court here completely rejected this extrinsic evidence and refused to consider it.

For example, *Franklin Savings* was not based on the unambiguous terms of a tax sharing agreement, as the Bankruptcy Court found, but on a thorough consideration of the extrinsic evidence. The extrinsic evidence considered by the





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

court in *Franklin Savings* included the impact of a separate "tax forgiveness agreement" between the bank and its parent that was executed on the same day as the tax sharing agreement. 159 B.R. at 14-16, 29-33. The tax sharing agreement obligated the bank to pay its share of the tax liability to the parent. *Id.* at 14. The tax forgiveness agreement then enabled the parent to forgive the bank's obligation to pay the parent under the tax sharing agreement as a means of contributing capital to the bank. *Id.* at 14-15.

The interplay of these two agreements led the court to conclude that there was a debtor-creditor relationship between the bank and its parent since a debt obligation was created under one agreement so that it could be forgiven under the other agreement. In contrast, there is no separate tax forgiveness agreement in this case nor any other logical reason why the parties would have intended to structure their relationship as one of debtor/creditor. In fact, the extrinsic evidence demonstrates that this was not the parties' intent.

The decision in *First Central* also was not based on the unambiguous terms of a tax sharing agreement, as the Bankruptcy Court found, but on the economic reality of the transaction. 269 B.R. at 492-93. Unlike this case and *Bob Richards*, the subsidiary in *First Central* <u>could not</u> have obtained the tax refund in question on its own if it had filed separately because of the alternative minimum tax limitations. *Id.* Thus, *First Central* is completely inapposite. The FDIC-R only claims ownership of tax refunds to which the Bank would be entitled if it filed on a separate basis.

*First Central* also did not involve a federally insured bank subject to 12 U.S.C. § 371c(c) (discussed below), but a subsidiary that was an insurance company. Also, overreaching was not an issue — the court noted that the representative for the subsidiary had made "no allegation" that the parent had "acted unfairly, overreachingly, or unconscionably" by causing the subsidiary to enter into the tax sharing agreement. *Id.* at 500.





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

*Team Financial* also was not based on the unambiguous terms of a tax sharing agreement. The court in *Team Financial* denied a motion for summary judgment and found that the record was unclear as to whether or what portion of the refunds in question were attributable entirely to the subsidiary bank. 2010 WL 1730681, at *3.

The *Team Financial* court has partially vacated its earlier order, stating that its prior order (*i.e.*, the one relied on by the Bankruptcy Court in its Report) was "not a final order," and could change based on additional ***evidence*** that may be admitted later in this proceeding." *Team Fin. Inc. v. FDIC (In re Team Fin. Inc.)*, No. 09-5084, Dkt. No. #65 at 2 (Bankr. D. Kan. June 11, 2010) (emphasis added).

Also, while the court in *Team Financial* discussed 12 U.S.C. § 371c, it only looked at whether the agreement created a "covered transaction" under 12 U.S.C. § 371c(a)(1) due to the size of the transaction[16] not whether the nature of the transaction was an "extension of credit" that implicated 12 U.S.C. § 371c(c). Thus, Team Financial does not support the Bankruptcy Court's conclusion that no extrinsic evidence should be considered by this Court.

The bankruptcy court's decision in *NetBank*, which is now on appeal, is inapposite because the tax sharing agreement in *NetBank* is different from the TSA here. 459 B.R. 801. In *NetBank*, the court found that the bank's right to receive payment from its parent for its tax refunds was not dependent upon the parent first receiving the refund from the IRS. *Id.* at 814. Rather, the court found that the parent was liable to the bank "regardless of whether the consolidated group receive[d] a refund." *Id.* The TSA in this case, however, requires Bancorp to remit the Bank's standalone tax refund under Section 4 of the TSA to the Bank *after* it receives it from the IRS. TSA at § 4(a).

---

[16] 12 U.S.C. § 371c(a)(1) provides that a bank cannot engaged in a "covered transaction" with "any affiliate" if the amount of the transaction exceeds ten percent (10%) of the bank's capital stock and surplus or with "all affiliates" if the amount of the transaction exceeds twenty percent (20%) of the bank's capital stock and surplus. This subsection is different and separate from 12 U.S.C. § 371c(c).



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

Finally, *MCorp* involved a successor bank that had purchased the assets of a failed bank from the FDIC-R. 170 B.R. 899. Based on theories of waiver and estoppel, the court held that the successor bank did not have a property right in a tax refund generated by the loss of the subsidiary bank whose assets had been purchased by the successor bank. *Id.* at 901. The successor bank had withdrawn its claim to the tax refund as part of a settlement with the FDIC-R, but re-asserted the claim a week before the initial cash distribution was scheduled to take place under the debtor's confirmed plan. *Id.* at 900. The court refused to permit the purchaser from doing so, finding that it had abandoned the claim. *Id.* at 902. Here, the FDIC-R is asserting its rights as receiver, and, unlike the claimant in *MCorp*, the FDIC-R has consistently claimed ownership of the Bank's tax refunds from the beginning of the case. Thus, *MCorp* is inapposite and provides no support for the Report.

12. The Bankruptcy Court erred by following a recent decision by a bankruptcy court in the Southern District of Florida — *In re BankUnited Financial Corp.*, 462 B.R. 885 (Bankr. S.D. Fla. 2011) — that is now before the Eleventh Circuit on a direct appeal. [**Report at pp. 18:19-19:10, 23:23-30:23, 41:1, 60:1**]. The *BankUnited* decision was wrongly decided. In particular, the *BankUnited* decision is not helpful because there the court found that it was "not bound by the *Bob Richards* case" since it is a "Ninth Circuit" decision and was applying "California law" on these issues. *Id.* at 901. But here, *Bob Richards* is binding precedent and California law does apply. Thus, the Report, which also disregards Ninth Circuit precedent and California law, should be rejected in its entirety.

Also, the *BankUnited* decision was based on a tax sharing agreement that did not expressly address how the tax refund was to be delivered to the bank from the holding company after the holding company received it from the IRS. *Id.* at 900. The *BankUnited* court thus chose to imply an agreement to reach its debtor/creditor conclusion. The TSA in this case, however, specifically states that Bancorp must pay the Bank's separate basis tax refund to the Bank after receiving it from the IRS.





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

### C. The Bankruptcy Court Erred in Suggesting that *Bob Richards* Is Not Binding Precedent

The Bankruptcy Court also suggests, but stopped short of finding, that the Ninth Circuit's decision in *Bob Richards* is no longer good law. [**Report at p. 40:17-28**].[17] The Trustee argued below that *Bob Richards* is no longer good law. The Bankruptcy Court did not rule on this issue because it mistakenly found that *Bob Richards* only applies "when no tax sharing agreement — express or implied — exists between the parties. [**Report at pp. 39:24-40:5**]. Both the Trustee and the Bankruptcy Court are wrong.

First, the Trustee argues that *Bob Richards* is no longer good law because there is no "federal common law," as decided in *Atherton v. FDIC*, 519 U.S. 213 (1997), and *O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994). *Atherton* and *O'Melveny*, however, addressed specific arguments that a clearly stated rule of state common law was preempted by a rule of federal common law, and those cases rejected that contention.[18] In contrast, *Bob Richards* specifically noted that parties can "adjust among themselves the ultimate tax liability" as a matter of "state corporation law," but found those principles irrelevant because the parties had not done so through a "differing agreement." 473 F.2d at 264-65. Since the parties had not adjusted their common law property rights via a "differing agreement," the Ninth Circuit was faced with the question of who owned the refunds under the state common law of property. *Id.* But the mere fact that the common law rule in *Bob Richards* was elucidated by a federal court does not make it a rule of "federal

---

[17] The Bankruptcy Court recently followed *Bob Richards*, albeit in favor of a debtor. *See Ehrenberg v. Visconti (In re Axium Int'l, Inc.)*, No. 2:08-bk-10277-BB (Bankr. C.D. Cal. Feb. 16, 2012).

[18] *Atherton*, 519 U.S. at 215-231 (rejecting argument that federal statute setting out gross negligence standard for removal of a bank officer supplanted simple negligence standard with respect to state law claims); *O'Melveny*, 519 U.S. at 85-89 (rejecting argument that state law governing imputation of knowledge to a corporation was supplanted by a federal common law rule when a bank was in federal receivership).



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

common law." It is well-established that federal courts have supplemental jurisdiction to decide issues of state law in cases that arise under federal law — *e.g.*, in a bankruptcy case, as in *Bob Richards*. 28 U.S.C. § 1367.

Likewise, the Ninth Circuit's holding that the parent in *Bob Richards* held the refunds in "specific trust" was also grounded in state common law. Although the Ninth Circuit relied on the United States Supreme Court's decision in *Western Tie & Timber*, 196 U.S. at 509, that decision in turn relied on *Libby*, 104 U.S. at 308-09, which was an appeal from a state court decision and was grounded in the common law of specific trust. Moreover, an even earlier decision of the Supreme Court on the issue of specific trust makes clear that the principle applied in *Bob Richards*, that "every person who receives money to be paid to another, or to be applied to a particular purpose . . . is a trustee," comes from the common law. *Taylor v. Benham*, 46 U.S. at 274 (citing *Kane v. Bloodgood*, 7 Johns. Ch. 110 (N.Y. Ch.); *Scott v. Surman*, Willes, 404; *Shakeshaft's Case*, 3 Bro. Ch., 198.).

Second, the Trustee argues that *Bob Richards* presupposes the existence of separate NOLs, which was rejected in *United Dominion Industries v. United States*, 532 U.S. 822, 829-30 (2001). *Bob Richards*, however, does not purport to rely on any concept of "separate" NOLs or which entity "owns" the NOLs. As the Ninth Circuit stated in *In re Feiler*, the issue of whether NOLs are property is a "red herring" because "NOLs are simply an accounting method for figuring [the group's] entitlement to the refund" and the real question is who owns the refund. 218 F.3d 948, 956 (9th Cir. 2000).

Thus, *Bob Richards* determined ownership of the refund among the members of the group on the basis of which entity earned the income upon which taxes were paid, which entity paid the taxes, and which entity suffered the losses that gave rise to the NOLs used to create the refund. 473 F.2d at 265. The property rule applied by the Ninth Circuit in *Bob Richards* is fully consistent with the well-established principle of property law that a business is the owner of personal property arising





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

out of its own efforts. *See, e.g.*, Horace Edwin Smith & George Lawyer, *A Treatise on the Law of Personal Property* § 38 (2d ed. 1908); James Schouler, *A Treatise on the Law of Personal Property* § 30 (2d ed. 1884); John Locke, THE SECOND TREATISE OF CIVIL GOVERNMENT, Chpt. V: *Of Property* (1690). The issue is not which entity owns the NOL, but which entity paid the taxes and had losses that could generate the refund.

Third, the Trustee argues that if *Bob Richards* was applying state law, it is inconsistent with subsequent California decisions on the law of trusts. The common law doctrine of specific trust is fully consistent with more recent decisions regarding the law of trusts under California law. Therefore, *Bob Richards* remains good and binding law in the Ninth Circuit.

### D. The Bankruptcy Court Erred in Finding that the TSA, as Interpreted by the Bankruptcy Court, Is Enforceable Against the FDIC-R as a Matter of Law

Assuming, *arguendo*, that this Court finds that the TSA affected an assignment of the Bank's tax refunds to Bancorp and created a debtor/creditor relationship, which it did not, the TSA is not enforceable against the FDIC-R as a matter of law for the reasons stated below.

#### 1. The Bankruptcy Court Erred in Finding that the TSA, as Interpreted by the Bankruptcy Court, Is Enforceable Under 12 U.S.C. § 1823(e)

An agreement that would diminish or defeat the predecessor bank's interest in a $55 million asset is not enforceable against the FDIC-R unless the bank's board approved the agreement and such approval appears in the minutes of the bank's board of directors. *See* 12 U.S.C. § 1823(e). The TSA, however, was never approved by the Bank's board. The Trustee cannot point to any board minutes where the TSA was ever considered, reviewed, or approved by the Bank's board. In fact, a review of the Bank's board minutes did not disclose any instance where





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

the board approved the TSA. *See* Dkt. No. 79 at p. 1. This is fatal to the Trustee's position, as adopted by the Bankruptcy Court, under the plain language of 12 U.S.C. § 1823(e) and Supreme Court precedent.

The TSA cannot defeat the FDIC-R's interest in the tax refund unless the Trustee proves that the TSA complies with 12 U.S.C. § 1823(e)(1). *See, e.g., FDIC v. Sahni*, 107 F.3d 15, 1997 WL 51454, at *2 (9th Cir. Feb. 5, 1997) (party claiming agreement is enforceable against the FDIC bears the burden of proving agreement complies with 12 U.S.C. § 1823(e)(1)); *Oh v. RTC*, 26 F.3d 131, 1994 WL 249988, at *1 (9th Cir. June 9, 1994) (same); *FDIC v. Oldenburg*, 34 F.3d 1529, 1551 (10th Cir. 1994) (same); *FDIC v. Gulf Life Ins. Co.*, 737 F.2d 1513, 1516 (11th Cir.1984) (same); *FDIC v. Tarkanian*, No. 10cv980, 2012 WL 1327849, *4 (S.D. Cal. Apr. 17, 2012) (same); *Ne. Cmty. Dev. Group v. FDIC*, 948 F. Supp. 1140, 1150 (D.N.H. 1995); *Avirez v. RTC*, 876 F. Supp. 1135, 1142 (C.D. Cal. 1995) (same).[19]

12 U.S.C. § 1823(e)(1) provides, in relevant part:

> No agreement which tends to diminish or defeat the interest of the Corporation [FDIC] in ***any asset*** acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or ***as receiver of any insured depository institution***, shall be valid against the Corporation unless such agreement —
>
> * * *
>
> (C) ***was approved by the board of directors of the depository institution*** or its loan committee, ***which approval shall be reflected in the minutes of said board*** or committee.

12 U.S.C. § 1823(e)(1) (emphasis added).

[19] *Accord McDougald v. FDIC*, 848 F. Supp. 1073, 1078 (D. Mass. 1994); *RTC v. Land Acquisitions, Inc.*, No. 90-1147, 1993 WL 444318, at *6 (D. Kan. Oct. 7, 1993); *New Bank of New England v. Baker*, No. 91-100094, 1993 WL 343671, at *2 (D. Mass. Aug. 26, 1993) (same); *Delta Sav. & Loan Ass'n, Inc. v. A.C.V., Inc.*, 750 F. Supp. 759, 762 (M.D. La. 1990) (same); *FDIC v. Powers*, 576 F. Supp. 1167, 1169 (N.D. Ill. 1983) (same).



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

One purpose of 12 U.S.C. § 1823(e) is to ensure that agreements that could potentially affect the "worth of a bank's assets" are fully disclosed to federal and state bank examiners that "rely on a bank's records." *See W.T. Langley v. FDIC*, 484 U.S. 86, 91 (1987). The second purpose is to ensure that agreements affecting bank assets receive "mature consideration" and approval by the bank's board of directors, in their capacity as the primary fiduciaries for the bank. *Id.* at 92. As the Supreme Court unanimously held in *W.T. Langley*, if an agreement divests a bank of any asset, it must, without exception, satisfy the requirements of 12 U.S.C. § 1823(e) for it to be enforceable against the FDIC. *Id.* at 95; *accord Aurora Shores Homeowners Ass'n v. FDIC*, 2 F. Supp. 2d 975, 979 (N.D. Ohio 1998).

Because the Trustee failed to submit any evidence showing that the TSA was ever considered, reviewed, or approved by the Bank's board, or that such approval appears in the minutes of the Bank's board, the FDIC-R is entitled to judgment as a matter of law. *See W.T. Langley*, 484 U.S. at 91-92.

The Bankruptcy Court, however, wrongfully found that the TSA, as interpreted by the Bankruptcy Court to effect the assignment of the Bank's tax refunds to Bancorp, is enforceable against the FDIC-R under 12 U.S.C. § 1823(e). [**Report at pp. 61:3-63:19**].

a. First, the Bankruptcy Court wrongfully found that the TSA complies with 12 U.S.C. § 1823(e) because the Bank's board approved a policy statement governing Transactions with Affiliates — *i.e.*, the IndyMac Policy. [**Report at p. 62:8-25**]. Specifically, the Bankruptcy Court found that in July of 2003, five and a half months after the Bank's chief financial officer executed the TSA, the Bank's board retroactively "ratified" and "approved" certain "actions" taken by the Bank's "officers" that were within the "scope" of the IndyMac Policy. *See* Dkt. No. 81 at Ex. X & Y. The Bankruptcy Court found that the TSA is referenced in the IndyMac Policy as an affiliate transaction. *Id.* at Ex. Y, p. 36. And, the Bankruptcy Court found that since the Bank's chief financial officer approved the TSA, and this





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

"action[]" was subsequently "approved" by the Bank's board when it approved the IndyMac Policy, the Bank's board implicitly approved the TSA itself. *Id.* at Ex. Y, p. 34. The Bankruptcy Court is wrong.

The approval required under 12 U.S.C. § 1823(e) cannot be delegated. First, the plain language of the statute requires approval of the "agreement" by the bank's "**board of directors**" *and* that such approval of the "agreement" be "reflected in the minutes of said board." 12 U.S.C. § 1823(e)(1) (emphasis added); *see, e.g., RTC v. Townsend Assocs. Ltd. P'ship*, 840 F. Supp. 1127, 1136-37 (E.D. Mich. 1993) (holding agreement approved by the bank's vice-president was not enforceable against the FDIC under 12 U.S.C. § 1823(e)(1) because there was no evidence that the board or loan committee independently considered it); *FDIC v. Eagle Prop., Ltd.*, 664 F. Supp. 1027, 1051 (W.D. Tex. 1985) (discussed below); *FDIC v. Gardner*, 606 F. Supp. 1484, 1487-88 (S.D. Miss. 1985) (holding agreement signed by bank's president and chairman of the board was not enforceable against the FDIC under 12 U.S.C. § 1823(e)(1) because the board's minutes did not reflect approval of the agreement by the board). The Trustee cannot satisfy either of these requirements.

In *Eagle Properties*, a case that is directly on point, the court held that a subordination agreement executed by the bank's president was unenforceable against the FDIC under 12 U.S.C. § 1823(e)(1) even though the bank's board approved a resolution specifically authorizing the president to execute such agreement. 664 F. Supp. at 1051. The court held that the bank board's approval of such resolution did not satisfy 12 U.S.C. § 1823(e)(1) because the statute specifically requires that the "agreement[] must be specifically approved by the board of directors" of the bank. *Id.* Thus, a resolution approving a bank officer's approval of an agreement is insufficient as a matter of law. *Id.*

Second, California law prohibits boards from delegating the performance of statutory obligations absent express statutory authority to do so. *See Wells Fargo*





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

*Bank v. Superior Court*, 53 Cal. 3d 1082, 1095, 811 P.2d 1025 (Cal. 1991) (holding, as a matter of corporate law, a bank's board has no power to delegate the performance of its statutory duties absent express statutory authority permitting such delegation); *Nat'l Auto. & Cas. Ins. Co. v. Payne*, 67 Cal. Rptr., 784, 261 Cal. App. 2d 403 412 (Cal. Ct. App. 1968) (directors "cannot divorce the responsibilities of their office from the duties prescribed by statute.").[20] Thus, the approval of the TSA by the Bank's chief financial officer is meaningless, as is any resolution by the Bank's board delegating the authority to approve the TSA to the Bank's chief financial officer.

Here, there is no evidence in the record that the Bank's board ever saw the TSA, let alone read it or gave it any independent consideration. The IndyMac Policy itself only refers to the general concept of "a Tax Sharing Agreement," and not the subject TSA specifically. *Id.* at Ex. Y, p. 36. The IndyMac Policy states that affiliate transactions involving the payment of "taxes" — *i.e.*, transactions "in which [Bancorp] acts as an agent . . . to the Bank" — are to be governed by "a Tax Sharing Agreement." *Id.* There is nothing in the IndyMac Policy or the Bank's board minutes indicating that the Bank's board ever saw the TSA or was even aware that the TSA existed.

Approval by a delegate of the bank's board, or retroactively approving the approval of such delegate, does not satisfy the plain language, and would completely undermine the purpose, of 11 U.S.C. § 1823(e). *See Eagle Prop.*, 664 F. Supp. at 1051-52. And, this does not constitute the "mature consideration" and approval by the bank's board of directors required by the Supreme Court. *W.T. Langley*, 484 U.S. at 92.

---

[20] *Accord Sargent v. Cent. Nat'l Bank & Trust Co.*, 809 P.2d 1298, 1304 (Okla. 1991) (same as *Wells Fargo*); *McWhorter v. First Interstate Bank of Oregon, N.A.*, 81 Or. App. 132, 135 (Or. Ct. App. 1986) (same as *Wells Fargo*); Magee, *A Treatise on the Law of Nat'l and State Banks* § 89 (3rd ed. 1921) ("The directors cannot delegate to agents any statutory duties imposed upon them by law to perform."). The only permitted delegate under the statute is the Bank's "loan committee." 12 U.S.C. § 1823(e).





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

Moreover, assuming, *arguendo*, that the approval required under 12 U.S.C. § 1823(e) can be delegated to a chief financial officer, which it cannot, the IndyMac Policy specifically prohibits the Bank's chief financial officer from entering into an the agreement that violates 12 U.S.C. § 371c(c), 12 U.S.C. § 371c-1, 12 C.F.R. § 223.3(o), and the Interagency Policy Statement. *See* Dkt. No. 81 at Ex. Y, pp. 36-37.

As explained in Section II.D.2 of this Objection, the TSA, as interpreted by the Bankruptcy Court, violates 12 U.S.C. § 371c(c), 12 U.S.C. § 371c-1, 12 C.F.R. § 223.3(o), and the Interagency Policy Statement. Thus, the Bank's board's retroactive "approval" of actions taken by the Bank's "officers" within the "scope" of the IndyMac Policy could not encompass the approval of a TSA that violates 12 U.S.C. § 371c(c), 12 U.S.C. § 371c-1, 12 C.F.R. § 223.3(o), and the Interagency Policy Statement.

b. Second, the Bankruptcy Court wrongfully found that 12 U.S.C. § 1823(e) does not apply when the Trustee of a bank holding company is attempting to use an agreement to defeat the FDIC-R's interest in the Bank's tax refunds. [**Report at p. 63:1-6**]. Specifically, the Bankruptcy Court erred in finding that because the TSA defeats the Bank's interest in the tax refund, the Bank's tax refunds are not an "asset" under 12 U.S.C. § 1823(e).

The Bankruptcy Court's decision on this point is based on its profound misinterpretation of *Bob Richards*. The Bankruptcy Court held, relying on the language of the TSA, that the Bank's tax refunds are not the Bank's assets because the Bank never owned them in the first instance. [**Report at p. 63:3-6**]. The Bankruptcy Court held that because the Bank did not own the tax refunds, 12 U.S.C. § 1823(e) did not apply to this case.

However, the Bankruptcy Court relied on the language of the TSA to hold that the Bank's tax refunds are Bancorp's property and not the Bank's property. It is well-established that the **very same** agreement that violates 12 U.S.C. § 1823(e)





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

cannot serve as the basis of a determination that the underlying property was not an "asset" acquired by the FDIC-R. *See FDIC v. McFarland*, 33 F.3d 532, 538 (5th Cir. 1994); *FDIC v. Longley I Realty Trust*, 988 F.2d 270, 274 (1st Cir. 1993); *see also Indep. Bankgroup, Inc. v. FDIC*, 217 B.R. 442, 447 (Bankr. D. Vt. 1998) (holding that a bank's interest in its share of a consolidated tax refund is an "asset" under 12 U.S.C. § 1823(e) because it is "sufficiently connected to banking activities."). As the First Circuit explained in *Longley*, "[i]t would render § 1823(e) a nullity" to find that agreements that violate the statute are "valid against the FDIC" so long as the agreements take effect "before" the FDIC takes over. 988 F.2d at 274. The FDIC-R's interest in the Bank's tax refunds cannot be defeated by a TSA that violates 12 U.S.C. § 1823(e).

c. Third, the Bankruptcy Court wrongfully found that the TSA is not an agreement for a "loan" or the sort of "regular banking transaction" to which 12 U.S.C. § 1823(e) applies. [**Report at pp. 63:6-11**]. An agreement that purports to divest a federally insured bank of a $55 million asset is clearly an "agreement" under the plain language of the statute, as strictly construed by the Supreme Court in *W.T. Langley*.

Courts applying 12 U.S.C. § 1823(e) have applied it to all types of assets, not just conventional loans. *See FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 293 (2nd Cir. 2010) (emphasizing Congress knew when passing section 1823(e) that the FDIC as receiver acquires all of a failed bank's rights, not just "traditional banking assets."); *Oldenburg*, 34 F.3d at 1552-1553 (the statute references "any asset" and "does not restrict section 1823(e) to negotiable instruments or other commercial paper"); *Avirez*, 876 F. Supp. at 1141 (holding that the statute applies to any unrecorded agreement which tends to diminish a bank's assets "[w]hether the agreement arises from a lending transaction or some other non-banking transaction").

In fact, *Independent Bankgroup*, which is directly on point, held that tax





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

sharing agreements fall within the scope of the plain language of 12 U.S.C. § 1823(e). 217 B.R. at 447.

The cases relied upon by the Bankruptcy Court are inapposite. In *John v. RTC*, 39 F.3d 773 (7th Cir.1994), the court held that 12 U.S.C. § 1823(e) did not apply to bar a home buyers' claim for money damages against the receiver of the seller/bank for failure to disclose home defects in the sale contract. The court held that 12 U.S.C. § 1823(e) was inapplicable because there was no "asset" held by the bank and "acquired" by the RTC upon receivership that was being diminished or defeated by the buyers' claim. The only conceivable "asset" of the bank was the "money received by [the bank]" in the sale of the home which occurred six years before the RTC became receiver. *Id.* at 776.

Similarly, in *E.I. du Pont de Nemours & Co. v. FDIC*, 32 F.3d 592 (D.C. Cir. 1994), the court held that 12 U.S.C. § 1823(e) did not apply where a plaintiff brought claims for money damages against the bank's receiver for negligence and breach of fiduciary duty. The bank was acting as an escrow agent. The dispute was over the bank's management of funds held in escrow and not over ownership of the funds. The plaintiff sought to introduce evidence that the escrow agreement had been extended and was still in place and, therefore, still imparted duties on the bank at the time of the breach. The court held that 12 U.S.C. § 1823(e) did not bar the plaintiff from introducing this evidence because the claims for money damages did not involve a specific asset of the bank. *Id.* at 597. The statements made in *John* and *E.I. du Pont de Nemours* about the scope of 12 U.S.C. § 1823(e) were dicta. As stated above, courts specifically addressing the question of whether 12 U.S.C. § 1823(e) is limited to conventional loans have rejected a narrow construction of the statute. *See, e.g.*, *Great Am. Ins. Co.*, 607 F.3d 288, 293; *Oldenburg*, 34 F.3d at 1552-1553; *Avirez*, 876 F. Supp. at 1141.

d. Fourth, the Bankruptcy Court wrongfully found that the TSA complies with 12 U.S.C. § 1823(e) because it was submitted to the Bank's regulators for





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

approval and, therefore, was not a secret agreement. [**Report at pp. 63:11-14**]. This argument was specifically rejected by the Supreme Court in *W.T. Langley*. 484 U.S. at 95 (holding agreement "does not meet [the requirements set forth in § 1823(e)] even if the [the regulators] knew [about the agreement].").

Moreover, the Trustee did not proffer any evidence indicating that the Bank's board informed the Bank's regulators that the Bank entered into a TSA that assigned the Bank's interest in future tax refunds to Bancorp. Nor did the Trustee proffer any evidence that the Bank's regulators understood the TSA to assign the Bank's interest in future tax refunds. The fact that the OTS did not object to the TSA strongly suggests that the OTS considered the TSA to comply with federal banking law and OTS policy, including the Interagency Policy Statement (as discussed below).

e. Fifth, the Bankruptcy Court erroneously found that the FDIC-R waived its 12 U.S.C. § 1823(e) argument by "raising new issues for the first time in a reply brief." [**Report at pp. 61:7-62:1, 63:15-19**].

First, this is not true. The FDIC-R specifically raised 12 U.S.C. § 1823(e) in its Answer [Dkt. No. 38] to the Trustee's Complaint, where it asserted: "Plaintiff's claims are barred, in applicable part, ***by 12 U.S.C. § 1823(e)*** or the statute of frauds as applicable to the Tax Sharing Agreement to the extent that it is determined that the Tax Sharing Agreement . . . was not approved by the board of directors of the Bank, which approval must have been reflected in the minutes of said board." *Id.* at p. 15 (emphasis added). The FDIC-R is unaware of any Ninth Circuit case that supports the Bankruptcy Court's finding of waiver.

Moreover, non-compliance with 12 U.S.C. § 1823(e) was the subject of extensive briefing by both the FDIC-R and the Trustee before the Bankruptcy Court. *See* Dkt. No. 38, 50, 72, 81 & 83. Specifically, the Trustee attempted to meet his evidentiary burden by submitting board minutes from a meeting held five (5) months after the TSA was adopted by the Bank. *See* Dkt. No. 81 at p. 2 fn. 2,



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

Exs. X & Y. The Bankruptcy Court permitted the Trustee to submit this evidence *after* the close of briefing *and* included such evidence in its Report. Thus, the Trustee cannot reasonably claim prejudice on this issue.

Second, the Bankruptcy Court's proposed finding of waiver ignores the fact that the Trustee bears the burden of proving compliance with 12 U.S.C. § 1823(e).[21] Compliance with 12 U.S.C. § 1823(e) is part of the Trustee's *prima facie* case of proving the existence of a "differing agreement" that is enforceable against the FDIC-R.

Third, the Local Bankruptcy Rule cited by the Bankruptcy Court does not apply because the Bankruptcy Court's scheduling order specifically permitted the parties to raise "supplemental statements of uncontroverted facts or issues" in reply briefs. *See* Dkt. No. 54. The parties stipulated to this because the bulk of the discovery in this case occurred after the parties moved for summary judgment. It was through discovery that the FDIC-R was able to confirm that the Bank's board never approved the TSA and that such approval did not appear anywhere in the Bank's board minutes.

Fourth, even if the FDIC-R had not specifically raised 12 U.S.C. § 1823(e) before the Bankruptcy Court, the FDIC-R's ability to challenge the legality of the TSA under 12 U.S.C. § 1823(e) cannot be waived. *See City Lincoln-Mercury Co. v. Lindsey*, 52 Cal. 2d 267, 274, 339 P.2d 851 (Cal. 1959) ("A party to an illegal contract cannot ratify it, cannot be estopped from relying on the illegality, and cannot waive his right to urge that defense."); *Beynon v. Garden Grove Med. Group*, 161 Cal. Rptr. 146, 100 Cal. App. 3d 698, 713 (Cal. Ct. App. 1980). A TSA that has the effect of depriving the Bank's receivership estate of a valuable

21 *See, e.g.*, *Sahni*, 107 F.3d 15, 1997 WL 51454, at *2; *Oh v. RTC*, 26 F.3d 131, 1994 WL 249988, at *1; *Oldenburg*, 34 F.3d at 1551; *Gulf Life Ins.*, 737 F.2d at 1516; *Tarkanian*, 2012 WL 1327849, *4; *Ne. Cmty. Dev. Group*, 948 F. Supp. at 1150; *Avirez*, 876 F. Supp. at 1142; *McDougald*, 848 F. Supp. at 1078; *Land Acquisitions*, 1993 WL 444318, at *6; *New Bank of New England*, 1993 WL 343671, at *2; *Delta Sav. & Loan Ass'n*, 750 F. Supp. at 762; *Powers*, 576 F. Supp. at 1169.





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

asset, and one that does not comply with 12 U.S.C. § 1823(e), is illegal and cannot be enforced against the FDIC-R.

Fifth, the Report is not the equivalent of a final judgment and this Court has the discretion to receive new evidence. Fed. R. Bankr. P. 9033(d). Thus, even if the FDIC-R had not specifically raised 11 U.S.C. § 1823(e) in its Answer or Reply Brief, and had first submitted evidence showing the absence of board approval to this Court, this Court could still receive such evidence and should do so here.

Finally, the law allows a party to make additional arguments "to support what has been [that party's] consistent claim." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995). The FDIC-R has consistently claimed that the Bank's tax refunds are the property of the Bank's receivership estate, and that the TSA is illegal and unenforceable against the FDIC-R if it is interpreted to create a debtor/creditor relationship. Thus, even if the FDIC-R had not specifically raised 12 U.S.C. § 1823(e) in its Answer (which it did) and even if the Report were the equivalent of a final judgment (which it is not), the FDIC-R could still raise 12 U.S.C. § 1823(e) as an additional argument in support of these positions before this Court.

2. The Bankruptcy Court Erred in Finding that the TSA, as Interpreted by the Bankruptcy Court, Is Enforceable Under 12 U.S.C. § 371c(c) and 12 U.S.C. § 371c-1

The Bankruptcy Court erred as a matter of law by finding that the TSA supports Bancorp's ownership of the refund and does not violate 12 U.S.C. § 371c(c) and 12 U.S.C. § 371c-1. [**Report at pp. 54:11-58:9**].

a. *The Bankruptcy Court Erred in Finding that Unsecured Extensions of Credit Between Banks and Affiliates Are Legal Under 12 U.S.C. § 371c(c) and 12 U.S.C. § 371c-1*

The Bankruptcy Court's construction of the TSA would give it an illegal effect that would violate 12 U.S.C. § 371c(c), 12 U.S.C. § 371c-1, and 12 C.F.R.

§ 223.3(o).

Section 371c(c) prohibits federally insured banks from making an unsecured "loan" or "extension of credit" to their affiliates (including their holding companies). 12 U.S.C. § 371c(c); *see* 12 U.S.C. § 1468(a) (making 12 U.S.C. § 371c applicable to savings associations).

Section 371c-1 requires that such extension of credit be made on "credit standards" that are "substantially the same" or "at least as favorable" as those prevailing for comparable transactions involving "nonaffiliated companies." 12 U.S.C. § 371c-1(a)(1)(A); *see* 12 U.S.C. § 1468(a) (making 12 U.S.C. § 371c-1 applicable to savings associations).

The term "extension of credit" in 12 U.S.C. § 371c(c) is defined broadly to include the "making or renewal of a loan, the granting of a line of credit, or the extending of credit in any manner whatsoever, including on an intraday basis, to an affiliate . . . includ[ing], without limitation . . . ***[a]ny other similar transaction as a result of which an affiliate becomes obligated to pay money (or its equivalent)***." 12 C.F.R. § 223.3(o) (emphasis added); *see* 12 C.F.R. § 563.41(b) (making 12 C.F.R. § 223.3(o) applicable to savings associations).

According to the Bankruptcy Court, the TSA evidences that Bancorp ***owns*** the Bank's tax refund and ***owes*** an amount equivalent to the refund as a debt to the Bank. Pursuant to 12 C.F.R. § 223.3(o), this interpretation of the TSA means that the Bank extended credit to Bancorp in an amount equal to the refund and that Bancorp is "obligated to pay money (or its equivalent)" to the Bank. 12 C.F.R. § 223.3(o).

If true, the TSA violates Section 371c(c) because the TSA does not provide the requisite collateral. *See BSD Bancorp., Inc. v. FDIC*, No. 93-12207-A11, at pp. 11-12 (S.D. Cal. Feb. 28, 1995) (holding that for a tax sharing agreement between a federally insured bank and its parent to create a "debtor-creditor relationship" the collateral requirements in 12 U.S.C. § 371c(c) must be met). Nor does the TSA

provide for payment of interest to the Bank or payment terms consistent with "ordinary" terms for an extension of credit as required by 12 U.S.C. § 371c-1.

The Bankruptcy Court, however, wrongfully rejected this argument, instead finding that the TSA did not violate 12 U.S.C. § 371c(c) and 12 U.S.C. § 371c-1. [**Report at pp. 54:11-58:9**].

1. First, the Bankruptcy Court erred in finding that the district court's decision in *BSD Bancorp* does not support the proposition that a tax sharing agreement between a federally insured bank and its parent would violate 12 U.S.C. § 371c(c) if it created an unsecured "debtor-credit relationship." [**Report at p. 55:5-7**].

The Bankruptcy Court is wrong. As the district court in *BSD Bancorp* explained:

> [12 U.S.C. § 371c(c)(1)] forbids unsecured loans from a Federal Reserve member bank to its holding company . . . For a debtor-creditor relationship to arise [under the tax sharing agreement] between Bancorp and Bank, then, there would presumably have to be some further agreement through which Bancorp supplied collateral meeting the requirements of § 371c(c)(1).

*Id.*

As in *BSD Bancorp*, there is no "further agreement" here — Bancorp did not provide collateral to the Bank to support the "loan" of the refund from the Bank to Bancorp. The Bankruptcy Court wrongly decided that the TSA created a debtor/creditor relationship.

2. Second, the Bankruptcy Court wrongfully found that the FDIC-R's "initial premise" that the Bank "owned all the tax refunds" is wrong, and that therefore Section 371c has no relevance. [**Report at p. 55:8-20**]. The Report is fundamentally inconsistent with *Bob Richards* and ignores the definition of the term "extension of credit" in 12 C.F.R. § 223.3(o).

First, the Bankruptcy Court wrongly interprets *Bob Richards* to conclude that

the Bank had no ownership interest in the tax refund, and therefore it could not have loaned the refund to its parent. But, under *Bob Richards*, the affiliate that paid the taxes and suffered the loss has a property interest in its share of the refund. 473 F.2d at 265. Accordingly, the Bank did own its share of the refund, and would only be permitted to lend it to Bancorp under 12 U.S.C. § 371c(c) and 12 U.S.C. § 371c-1 if the loan was secured and evidenced an arm's length transaction that included reasonable interest provisions.

Second, the Bankruptcy Court found that the language of the TSA causes the Bank to become Bancorp's creditor for the amount of the refund, specifically focusing on the terms "reimbursement" and "payment," [**Report at p. 20:16-24**], yet it acknowledges that the amount owed to the Bank would be "an amount equal to the amount the Bank Group would have received had it carried back the current losses against the Bank Group's separate taxable income in prior years." [**Report at p. 20:14-16**].

The Bankruptcy Court's analysis misses the relevant question. If the tax refunds are Bancorp's property, as the Bankruptcy Court has ruled, then why is Bancorp obligated to pay the refunds, or their equivalent, to the Bank? The Bankruptcy Court's answer to this question is that Bancorp is required to do so by the TSA. The Bankruptcy Court found that although Bancorp is not returning something to the Bank that it received from the Bank, the TSA nonetheless requires Bancorp to pay the Bank a sum equal to the Bank's tax refunds. [**Report at p. 20:16-24**]. These two thoughts are inconsistent and impossible to reconcile.

The Bankruptcy Court's analysis also conflicts with its finding that the TSA does not constitute an "extension of credit." If, under the TSA, Bancorp is required to "pay" the tax refunds (or their equivalent) to the Bank in a debtor/creditor sense, then the TSA gives rise to a "transaction" under which Bancorp is "obligated to pay money (or its equivalent)" to the Bank. 12 C.F.R. § 223.3(o). The TSA, however, does not provide the required collateral to secure the debtor/creditor relationship or



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

provide for the payment of interest or other terms prevailing for "comparable transactions." *See* 12 U.S.C. § 371c(c)(1); 12 U.S.C. § 371c-1(a)(1)(A). Thus, the TSA, as interpreted by the Bankruptcy Court, is illegal under 12 U.S.C. § 371c(c) and 12 U.S.C. § 371c-1, and is unenforceable against the FDIC-R.

3. Third, the Bankruptcy Court erred in finding that the TSA does not violate 12 U.S.C. § 371c(c) (and implicitly 12 U.S.C. § 371c-1) because the TSA does not include any provisions indicating that the parties would not comply with 12 U.S.C. § 371c(c). [**Report at pp. 57:4-58:8**].

The FDIC-R respectfully submits that the Bankruptcy Court's proposed finding is a *non sequitur*. 12 U.S.C. § 371c(c) requires that an extension of credit from a bank to an affiliate "shall be secured *at the time of the transaction* by collateral." 12 U.S.C. § 371c(c)(1)(A) (emphasis added). Similarly, 12 U.S.C. § 371c-1 requires that a covered transaction be made on terms that would be provided in comparable transactions which would ordinarily include provisions at the inception for the payment of interest at an appropriate rate. *See* Dkt. No. 61 at Ex. C, Smith Tr. 188:1-21.

Thus, if, as the Bankruptcy Court found, the TSA created a debtor/creditor relationship as to all future tax refunds when it was adopted, collateral securing such debtor/creditor relationship and interest and additional payment terms had to be part of the transaction when the parties executed the TSA in order for it to comply with 12 U.S.C. § 371c(c). As the Court in *BSD Bancorp* found, absent a "further agreement through which Bancorp supplied collateral meeting the requirements of § 371c(c)(1)," the TSA cannot lawfully create the debtor/creditor relationship advocated by the Bankruptcy Court. Slip Op. at pp 11-12.

4. Fourth, the Bankruptcy Court erred in finding that the plain meaning of the term "extension of credit" encompasses only a "continuation of an obligation past the point at which it would otherwise be due." [**Report at pp. 55:21-57:3**].

The definition of the term "extension of credit" set forth in 12 C.F.R.





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

§ 223.3(o) is binding on this Court unless the Court determines that the OTS's interpretation of the statute is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984); *see Home Mortg. Bank v. Ryan*, 986 F.2d 372, 376 (10th Cir. 1993).

Congress did not define the term "extension of credit" when it enacted 12 U.S.C. § 371c(c) or 12 U.S.C. § 1468(a), which makes the affiliate transaction rules set forth in 12 U.S.C. § 371c(c) applicable to federal savings banks and their holding companies. Congress gave the OTS the authority to promulgate regulations under the Home Owners' Loan Act. *See, e.g.*, 12 U.S.C. § 1462; 12 U.S.C. § 1462a; 12 U.S.C. § 1463; 12 U.S.C. § 1464; 12 U.S.C. § 1467a.

Consistent with this authority, the OTS promulgated 12 C.F.R. § 563.41(b), which makes the implementing regulations applicable under 12 U.S.C. § 371c(c), including 12 C.F.R. § 223.3(o), applicable to federal savings banks. *See* 12 C.F.R. § 563.4. Thus, the definition of the term "extension of credit" in 12 C.F.R. § 223.3(o) fills a definitional "gap" left by Congress in accordance with "an express delegation of authority to the agency [the OTS] to elucidate a specific provision of the statute [Title 12] by regulation." *Chevron*, 467 U.S. at 843.

The Supreme Court's decision in *Chevron* does not permit the Bankruptcy Court or this Court to ignore 12 C.F.R. § 223.3(o), and adopt a new definition of "extension of credit." The definition adopted by the OTS is consistent with the intent and purpose of the rule governing affiliate transactions between banks and their holding companies, which prevent bank holding companies from causing their subsidiary banks to enter into unfair and abusive loans or extensions of credit. Therefore, under *Chevron*, this definition is binding.[22]

---

[22] Even if *Chevron* did not apply, the Bankruptcy Court's interpretation makes no sense since it would mean that an extension of credit only arises as of the date a loan is past due. Thus, under the Bankruptcy Court's interpretation, if a Bank makes a one year loan of money to its parent on January 1 of a year, such loan only becomes an extension of credit under 12 C.F.R. § 223.3(o) after it is not repaid on January 1 of the following year. That interpretation is plainly inconsistent with the express language and basic underlying purpose of the statute and cannot be correct.





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

b. *The Bankruptcy Court Erred in Finding that the Interagency Policy Statement Is Irrelevant in this Case*

The Bankruptcy Court erroneously found that the Interagency Policy Statement is irrelevant. [**Report at pp. 59:11-61:2**]. The drafters of the TSA were aware of the Interagency Policy Statement and intended to comply with it. *See* Dkt. No. 61 at Ex. C, Smith Tr. 34:18-37:13, 66:16-21, 96:10-12, & 176:9-18; Dkt. No. 43, Frost Decl. at ¶¶ 6-8; Dkt. No. 61 at Ex. A, Frost Tr. 193:19-22.

The Interagency Policy Statement was jointly issued by the OTS and all of the federal agencies that regulated banks and bank holding companies, in 1998.[23] The Interagency Policy Statement provides that when a parent receives its subsidiary's tax refund from a taxing authority, it "obtains these funds as agent." *Id.* at 64759. For this reason, "an organization's tax allocation agreement or other corporate policies should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent." *Id.* The Interagency Policy Statement further provides that when a parent receives tax refunds belonging to its bank subsidiary, the refund must be paid to the bank in a "reasonable period" of time; otherwise, the bank's primary federal regulator may consider the receivable to be an "extension of credit" or "dividend" from the bank to the parent. *Id.* at 64758.

The interpretation of the OTS and the other federal banking agencies as to how 12 U.S.C. § 371c(c) and 12 U.S.C. § 371c-1 apply to tax sharing agreements is not "plainly erroneous or inconsistent with" the broad definition of "extension of credit" found in 12 C.F.R. § 223.3(o) and, therefore, is entitled to deference. *See Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 129 S.Ct. 2458 (2009); *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (holding Secretary of

---

[23] The agencies that are parties to the Interagency Policy Statement are: the Office of the Comptroller of the Currency; the Board of Governors of the Federal Reserve System; the Federal Deposit Insurance Corporation; and the Office of Thrift Supervision.



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

Labor's interpretation of the Secretary's regulations is controlling unless "plainly erroneous or inconsistent with the regulation.").

In *Coeur Alaska*, the Supreme Court held that a federal agency's "reasonable interpretation" of its own regulations, although not entitled to "*Chevron* deference," is entitled to "deference." 129 S.Ct. at 2473. In *Coeur Alaska*, the Supreme Court considered whether a permit issued to a mining company by the Army Corps of Engineers for the discharge of crushed rock and water violated the Clean Water Act. *Id.* at 2463-64. After finding the applicable sections of the Clean Water Act and the relevant regulations promulgated by, *inter alia*, the EPA ambiguous, the Court considered a memorandum adopted by the EPA that addressed the issue. *Id.* at 2470-74. The Supreme Court found that the EPA's conclusions set forth in its memorandum were not "plainly erroneous or inconsistent with the regulations" and, therefore, were entitled to "deference" because "it [the memorandum] interprets the agencies' own regulatory scheme." *Id.* at 2470-73 (citing to *Auer v. Robbins*, 519 U.S. 452 (1997)).

The Bankruptcy Court, however, erroneously found that the Interagency Policy Statement is irrelevant in this case. [**Report at pp. 59:11-61:2**].

1. First, the Bankruptcy Court erred in finding that the Interagency Policy Statement is impermissible parol evidence. [**Report at p. 59:17-23**]. The parol evidence rule does not exclude evidence that shows an agreement is "illegal." Cal. Civ. Pro. Code § 1856(g) (West 2012); *accord Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1291 (9th Cir. 2006) ("Under California law, when . . . illegality is alleged, the parol evidence rule does not apply"); *Homami v. Iranzadi*, 260 Cal. Rptr. 6, 211 Cal. App. 3d 1104, 1112 (Cal. Ct. App. 1989). The Interagency Policy Statement does not contradict the terms of the TSA because it shows that the TSA, as interpreted by the Bankruptcy Court, has no legal effect. *Nagrampa*, 469 F.3d at 1291. Therefore, the Bankruptcy Court was wrong to exclude the Interagency Policy Statement as impermissible parol evidence.



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

2. Second, the Bankruptcy Court erred in finding that the Interagency Policy Statement is non-binding and is not material to the adjudication of the parties' dispute. [**Report at pp. 59:23-60:6**]. The Interagency Policy Statement cannot be ignored. Just like the EPA's memorandum in *Coeur Alaska*, the Interagency Policy Statement interprets the OTS's own regulatory scheme. This means that under the Supreme Court decision in *Coeur Alaska*, the Interagency Policy Statement must be accorded deference unless found to be "plainly erroneous or inconsistent with" 12 C.F.R. § 223.3(o). *Coeur Alaska*, 129 S. Ct. at 2473; *Auer*, 519 U.S. at 461.

A tax sharing agreement that purports "to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent" subject to an unsecured obligation to pay such property to its subsidiary is clearly a "transaction" that results in "an affiliate becom[ing] obligated to pay money (or its equivalent)" to a bank. *See* Interagency Policy Statement at pp. 64758-59; 12 C.F.R. § 223.3(o). The federal banking agencies have explicitly found that bank holding companies cannot legally cause their bank subsidiaries to enter into abusive tax sharing agreements that create unsecured "extensions of credit." If the Bankruptcy Court's construction of the TSA is correct, the TSA is illegal.

3. Third, the Bankruptcy Court erred in finding that the TSA does not incorporate the Interagency Policy Statement. [**Report at p. 60:7-19**]. The FDIC-R respectfully submits that the Bankruptcy Court's finding is incorrect. The TSA itself expressly provides that any provisions of the agreement "that are inconsistent with [rules promulgated by the Office of Thrift Supervision and the Federal Deposit Insurance Corporation] shall be null and void" (TSA at § 7(a)), and the drafters of the TSA were aware of and intended to comply with it. *See* Dkt. No. 61 at Ex. C, Smith Tr. 34:18-37:13, 66:16-21, 96:10-12, & 176:9-18; Dkt. No. 43, Frost Decl. at ¶¶ 6-8; Dkt. No. 61 at Ex. A, Frost Tr. 193:19-22.





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

4. Fourth, the Bankruptcy Court erred in finding that the vesting of ownership of the Bank's tax refunds in Bancorp pursuant to the terms of the TSA does not violate the Interagency Policy Statement. [**Report at pp. 60:20-61:2**]. The Interagency Policy Statements expressly provides:

> Regardless of the treatment of an institution's tax loss for regulatory reporting and supervisory purposes, a parent company that receives a tax refund from a taxing authority obtains these funds as agent for the consolidated group on behalf of the group members. Accordingly, an organization's tax allocation agreement or other corporate policies should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent.

Interagency Policy Statement at 64758-59 (emphasis added).

If the TSA gives the Trustee the right to keep the Bank's tax refunds or creates an unsecured claim for the value of the refunds, then the TSA creates an unsecured "extension of credit" in violation of 12 U.S.C. § 371c(c). The Interagency Policy Statement states what is obvious from the language of 12 U.S.C. § 371c(c) and 12 C.F.R. § 223.3(o).

c. *The Bankruptcy Court Erred in Finding that If the TSA Creates an Illegal Debtor/Creditor Relationship, It Is Still Enforceable Against the FDIC-R*

If the TSA creates an illegal debtor/creditor relationship under which Bancorp owns the Bank's tax refunds and owes them to the Bank, then it is unenforceable as a matter of law. "No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out." *Bassidji v. Goe*, 413 F.3d 928, 938 (9th Cir. 2005); *see Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982); *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 563 (1961).

In *Kaiser Steel* the Supreme Court held that a coal producer could not be





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

compelled to comply with a clause in a collective bargaining agreement that violated federal law. 455 U.S. at 77-82. The union's representative argued that even if the clause violated federal law, the agreement was not void because the "express remedies provided by the Sherman Act are not to be added to by including the avoidance of contracts as a sanction." *Id.* at 81. The Supreme Court disagreed. *Id.* at 82 n. 7.

The Supreme Court explained: "The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract." *Id.* at 77 (quoting *McMullen v. Hoffman*, 174 U.S. 639, 654 (1899)). "Refusing to enforce a promise that is illegal [under federal law] is not providing an additional remedy contrary to the will of Congress" because the "defendant proffering the defense seeks only to be relieved of an illegal obligation and does not ask any affirmative remedy based on [federal law]." *Kaiser Steel*, 455 U.S. at 82 n. 7. For this reason, anyone "sued upon a contract may set up as a defense that it is a violation of the act of Congress, and if found to be so, that fact will constitute a good defense to the action." *Id.*

The Trustee comes before this Court alleging the existence of a tax sharing agreement that violates 12 U.S.C. § 371c(c), 12 U.S.C. § 371c-1, and 12 C.F.R. § 223.3(o), and asks this Court to assist him in carrying out what is essentially an illegal taking. The legal effect of the Trustee's and the Bankruptcy Court's construction of the TSA is that the Bank is forced to transfer the property rights (recognized by the Ninth Circuit in *Bob Richards*) in its own tax refunds to Bancorp subject to Bancorp's unsecured obligation to pay the value of such property to the Bank.

Because the losses of a failed financial institution are borne, in part, by the Deposit Insurance Fund, Congress and the federal banking agencies have articulated a clear policy that bank holdings companies cannot appropriate their subsidiary bank's tax refunds, subject to a debt obligation to pay the refunds to the





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

bank, unless certain statutory requirements are met. *See* 12 U.S.C. § 371c(c); 12 U.S.C. § 371c-1; 12 C.F.R. § 223.3(o); Interagency Policy Statement at 64758-59; *accord BSD Bancorp.*, No. 93-12207-A11, at pp. 11-12. The TSA does not meet these requirements. Thus, the Bankruptcy Court adopts a construction of the TSA that is intrinsically illegal and, therefore, *per se* unenforceable by this Court.[24]

The Bankruptcy Court, however, wrongfully found that the TSA is enforceable even if it violates 12 U.S.C. § 371c(c) and 12 C.F.R. § 223.3(o). [**Report at pp. 58:9-59:10**].

1. First, the Bankruptcy Court erred in finding that an agreement that creates an unsecured extension of credit between a bank and its holding company is not void under 12 U.S.C. § 371c(c) because Title 12 contemplates civil monetary penalties and regulatory action for such violations. [**Report at p. 58:9-25**].

The fact that the Bank's board members may be assessed civil monetary penalties under Title 12 for causing the Bank to enter into a tax sharing agreement that violates 12 U.S.C. § 371c(c), or that the OTS can force the Bank to unwind this transaction under 12 C.F.R. § 563.41(c)(ii), does not render the TSA enforceable. The FDIC-R's defense that the TSA, as interpreted by the Bankruptcy Court, is a violation of an act of Congress constitutes a "good defense" to the Trustee's ownership claim under *Kaiser Steel*. 455 U.S. at 82 n.7. The Supreme Court has ruled on this issue. *Id.*[25]

---

[24] *See Bassidji*, 413 F.3d at 938 ("*Kaiser Steel* prevents courts from enforcing contracts where doing so would make them 'effectively become a party to the allegedly illegal scheme.'"); *accord Costello v. Grundon*, 651 F.3d 614, 624 (7th Cir. 2011) (following *Kaiser* and holding that "a court may not enforce a contract provision which violates federal law"); *Teamsters Local Union 682 v. KCI Constr. Co., Inc.*, 384 F.3d 532, 537 (8th Cir. 2004) (following *Kaiser* and holding that federal courts "must not enforce illegal contracts"); *see also Anderson v. The Int'l Union, United Plant Guard Workers of Am.*, 370 F.3d 542, 554 (6th Cir. 2004) (following *Kaiser* and holding that federal courts may not enforce illegal contracts even if the contract is not intrinsically illegal).

[25] *Accord Costello*, 651 F.3d at 628 (following *Kaiser* and holding that "[n]o private right of action under a statute is necessary to assert a violation of that statute as an affirmative defense."); *Anderson*, 370 F.3d at 55 (following *Kaiser* and





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

2. Second, the Bankruptcy Court erred in finding that the TSA is enforceable even if it violates 12 U.S.C. § 371c(c) because the Bankruptcy Code forbids the FDIC-R from improving its rights. [**Report at p. 59:1-10**].

The Bankruptcy Code does not contain any sections that authorize a trustee to carry out an illegal act because the debtor is in bankruptcy. If the TSA effects an illegal taking or an illegal unsecured extension of credit, this Court cannot aid the Trustee by enforcing the TSA. *See Bassidji*, 413 F.3d at 938 ("*Kaiser Steel* prevents courts from enforcing contracts where doing so would make them 'effectively become a party to the allegedly illegal scheme.'"); *N. Ind. Pub. Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 272-73 (7th Cir. 1986) (recognizing that "where the contract itself is illegal — as it would be if it were . . . a contract to commit a bank robbery" — it would be "governed by *Kaiser Steel*").

3. The Bankruptcy Court Erred in Finding that the Trustee Can Enforce the Terms of the Rejected TSA Under 11 U.S.C. § 365(g)

In addition to being unenforceable under 12 U.S.C. § 1823(e) and 12 U.S.C. § 371c(c), the TSA is unenforceable because the Trustee rejected the TSA under 11 U.S.C. § 365.

The Trustee contends that the TSA is a "differing agreement" that leads to a different result than *Bob Richards*. Here, even if the TSA obligated the Bank to assign its future tax refunds to Bancorp, Bancorp did not have a vested property interest in the Bank's tax refunds on the Petition Date. Therefore, any provision in the TSA that could possibly be considered to have the effect of assigning the Bank's future tax refunds to Bancorp[26] was, at best, a contingent ***contractual*** obligation to assign future refunds. The Trustee's rejection of the TSA, however,

holding that refusing to enforce a contract that is illegal is not providing an additional remedy contrary to the will of Congress).

[26] As stated herein, there is no provision in the TSA that assigns the Bank's tax refunds to Bancorp.





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

eliminated the Trustee's right to enforce it prospectively.

As interpreted by the Bankruptcy Court, the TSA constitutes an executory contract within the meaning of 11 U.S.C. § 365 because material future performance remains due from both parties to the contract. *In re Frontier Props., Inc.*, 979 F.2d 1358, 1364 (9th Cir. 1992). [**Report at p. 45:11-14**]. By operation of law, the Trustee rejected the TSA under 11 U.S.C. § 365(d)(1) because the Trustee failed to assume it within 60 days of the Petition Date. The legal effect of that rejection is that the Trustee is deemed to be in "breach" of the TSA "immediately before the date of the filing of the petition." 11 U.S.C. § 365(g).

The legal effect of a breach arising from rejection under 11 U.S.C. § 365(g) is the same as any breach of contract and is determined under state law — *i.e.*, California law. If the TSA obligated the Bank to assign its tax refunds to Bancorp (which would be required in order for the TSA to be a "differing agreement" under *Bob Richards*), the Trustee's ability to enforce that contractual obligation hinges on whether that obligation had been performed on the Petition Date or whether it remained unperformed and contingent.

If the non-breaching party already has performed under the rejected contract by making an assignment that vests property in the debtor prepetition then, as under California law, a breach arising from rejection could not divest the breaching party of title to that property.[27]

But the result is different with respect to unperformed contractual obligations that have yet to vest title to property in the debtor as of the petition date. Under California law, each party's outstanding contractual obligations are contingent on

[27] *See Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1306-08 (11th Cir. 2007); *Simmons Capital Advisors, Ltd. v. Bachinski (In re Bachinski)*, 393 B.R. 522, 543-45 (Bankr. S.D. Ohio 2008); *Thompson-Mendez v. St. Charles at Olde Court P'ship, LLC (In re Thompson-Mendez)*, 321 B.R. 814, 819 (Bankr. D. Md. 2005). Instead, the non-breaching party holds a prepetition claim for breach of contract against the debtor's bankruptcy estate. *In re Rega Props., Ltd.*, 894 F.2d 1136, 1140 (9th Cir. 1990).





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

the continued material performance of the other party to the executory contract. If one party breaches the contract, the other party is excused from further performance and the breaching party cannot obtain further benefits under the contract by enforcing the other party's outstanding contractual obligations.[28] Because rejection constitutes a "breach" of the contract, this principle also applies when the trustee rejects a contract under 11 U.S.C. § 365.[29]

For two separate reasons (explained below), on the Petition Date, the Bank was not able to make a legally effective assignment of its tax refunds to Bancorp. Therefore, any contractual obligation the Bank had to assign its future tax refunds was unperformed at the time of the Trustee's breach. The most that Bancorp could have possessed was an unvested, contingent ***contractual*** right to receive an assignment under the TSA. And, any such contractual right was rendered unenforceable by the Trustee's rejection and breach of the TSA.

First, on the Petition Date, the Bank could not assign any of the federal tax refunds at issue to Bancorp (including both the 2007 and 2008 refunds) because the IRS had not yet paid the refunds.

It is well-established that until the IRS pays a tax refund, the refund is merely

[28] *See* Cal. Civ. Code § 1439 (West 2012); *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 536 (9th Cir. 2011); *Comedy Club, Inc. v. Improv West Assocs.*, 553 F.3d 1277, 1289 n.12 (9th Cir. 2009); *Cent. Oil Co. of Los Angeles v. S. Ref. Co.*, 97 P. 177, 177 (Cal. 1908); *Wiz Tech., Inc. v. Coopers & Lybrand*, 130 Cal. Rptr. 2d 263, 271, 106 Cal. App. 4th 1, 12 (Cal. Ct. App. 2003); *Filet Menu, Inc. v. C.C.L. & G., Inc.*, 94 Cal. Rptr. 2d 438, 443-44, 79 Cal. App. 4th 852, 860-61 (Cal. Ct. App. 2000); *G. W. Andersen Constr. Co. v. Mars Sales*, 210 Cal. Rptr. 409, 417, 164 Cal. App. 3d 326, 339 (Cal. Ct. App. 1985); *Vineland Homes v. Barish*, 138 Cal. App. 2d 747, 759, 292 P.2d 941, 950 (Cal. Ct. App. 1956); RESTATEMENT (SECOND) OF CONTRACTS § 237 (1981).

[29] *See Pac. Express, Inc. v. Teknekron Infoswitch Corp. (In re Pac. Express, Inc.)*, 780 F.2d 1482, 1486 n.3 (9th Cir. 1986); *Hall v. Perry (In re Cochise College Park, Inc.)*, 703 F.2d 1339, 1352, 1356-57 (9th Cir. 1983); *Danning v. Brunswick Corp.*, 466 F.2d 1010, 1011 n.1 (9th Cir. 1972); *In re Crippin*, 877 F.2d 594, 597 (7th Cir. 1989); *In re Newlin*, 370 B.R. 870, 876 (M.D. Ga. 2007); *Cottman Transmissions, Inc. v. Holland Enters., Inc. (In re Holland Enters., Inc.)*, 25 B.R. 301, 303 (E.D.N.C. 1982); *In re Comdisco, Inc.*, 270 B.R. 909, 911 (Bankr. N.D. Ill. 2001); *see also Mazirow v. Grigsby (In re White Motor Corp.)*, 44 B.R. 563, 570 (N.D. Ohio 1984).



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

an inchoate claim against the government and is subject to the Assignment of Claims Act. *See, e.g.*, *In re Freeman*, 489 F.2d 431, 433 (9th Cir. 1973); *Danning v. Mintz*, 367 F.2d 304-05 (9th Cir. 1966). The Assignment of Claims Act renders a purported assignment "of any part of a claim" or "of an interest in the claim" against the federal government legally ineffective unless, at the time of the purported assignment, the government has: (1) allowed the claim; (2) decided its amount; and (3) issued a warrant for payment of the claim. 31 U.S.C. § 3727(b); *Martin v. Nat'l Surety Co.*, 300 U.S. 588, 597 (1937). Here, none of those prerequisites to a valid assignment of the Bank's tax refund claim (against the IRS) had occurred as of the Petition Date. While an assignment that violates the Assignment of Claims Act can still be effective as between the assignor and the assignee, this can only occur after "the subject matter of the assignment has been ***reduced to possession*** and is ***in the hands of*** the assignor." *Martin*, 300 U.S. at 597 (emphasis added). Until that time, the purported assignee only holds a contingent contractual right that may be enforced in the future, when and if the IRS actually pays the refund.

Here, the IRS had not yet paid any of the refunds at issue as of the Petition Date. Thus, any purported assignment of those tax refunds by the Bank to Bancorp was not effective and all that Bancorp possessed was a contingent, contractual right under the TSA to receive an assignment in the future. And, even if Bancorp had such a contractual right, that right was rendered unenforceable by the Trustee's rejection and breach of the TSA.

Second, on the Petition Date (July 31, 2008), the Bank was not yet capable of assigning its $40,695,713 tax refund arising out of the December 31, 2008 tax year to Bancorp because that tax year did not end until five months later.[30] It is well-

[30] The Bankruptcy Court's finding that the 2008 NOL had vested pre-rejection is pure speculation. The Bankruptcy Court had no evidence before it demonstrating how much of the 2008 NOL was generated prior to the Petition Date. IndyMac Federal Bank, F.S.B., the bridge bank for which the FDIC served as conservator and which for tax purposes is the same entity as IndyMac, F.S.B., and various





BAKER & HOSTETLER LLP ATTORNEYS AT LAW CLEVELAND

established that a taxpayer does not have a vested property right in a tax refund until the end of the tax year in which the NOL that is to be carried back was generated.[31] And, under California law, a purported assignment of a contingent property interest does not take effect until the interest has "ripened into reality."[32] Therefore, the Bank could not have assigned these refunds to Bancorp because the Bank itself did not have a vested, assignable interest in them. On the Petition Date, the most that Bancorp could possibly have possessed under the TSA was a contingent contractual right to receive an assignment in the future. Even if Bancorp had such a contractual right, which it did not, it was rendered unenforceable by the Trustee's breach of the TSA.

The Bankruptcy Court, however, erroneously found that Bancorp had a vested interest in the Bank's tax refunds on the Petition Date and that the Trustee's rejection of the TSA is irrelevant. [**Report at pp. 28:5-39:21, 45:9-52:19**].

a. The Bankruptcy Court erroneously found that the only effect of the Trustee's breach arising from his rejection of the TSA under 11 U.S.C. § 365 was that it gave the Bank a prepetition claim for breach of contract against the debtor's estate. [**Report at pp. 45:9-47:13**].

A prepetition claim for breach of contract is one consequence of rejection,

---

subsidiaries of the Bank continued to operate after the Petition Date, despite the closure of IndyMac Bank, F.S.B. The possibility existed that these operations could have generated sufficient profits that could have reduced the 2008 NOL. This further demonstrates why the 2008 refund could not have vested until after the Trustee rejected the TSA. At the very least, the District Court should require further testimony to determine what the evidence in fact shows in this regard and how much of the 2008 NOL was generated prior to the Petition Date.

[31] *See United States v. White*, 365 B.R. 457, 460 (M.D. Pa. 2007); *In re Glenn*, 207 B.R. 418, 420-21 (E.D. Pa.1997); *Official Comm. of Unsecured Creditors of Tousa, Inc. v. Citigroup N. Am., Inc. (In re TOUSA, Inc.)*, 406 B.R. 421, 432-33 (Bankr. S.D. Fla. 2009); *In re Beaucage*, 334 B.R. 353, 357 (Bankr. D. Mass. 2005); *In re Stienes*, 285 B.R. 360, 362 (Bankr. D.N.J. 2002); *Brandt v. Fleet Capital Corp. (In re TMCI Elec.)*, 279 B.R. 552, 559-561 (Bankr. N.D. Cal. 1999); *In re Conti*, 50 B.R. 142, 148 (Bankr. E.D. Va. 1985).

[32] *See Pierce v. Robinson*, 13 Cal. 116, 123 (Cal. 1859); *accord, e.g., H. S. Mann Corp. v. Moody*, 144 Cal. App. 2d 310, 318-19, 301 P.2d 28, 34 (Cal. Ct. App. 1956).





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

but it is not the ***only*** possible consequence. The decisions relied on by the Bankruptcy Court specifically differentiate between property that has already been transferred pursuant to prepetition performance under the rejected contract (which property is not divested) and outstanding, contingent contractual rights such as the right to a future assignment of property (which are rendered unenforceable by the rejection).[33]

b. The Bankruptcy Court erroneously found that the Bank never had a property interest to assign. [**Report at pp. 39:22-43:2**]. As already discussed, *Bob Richards* is not based on "quasi-contract," but on a rule of ownership that makes the Bank the initial owner of its refund because the Bank's earning history created those refunds. Therefore, in order to be a "differing agreement" under *Bob Richards*, the TSA would have to "transfer" or "assign" the Bank's refunds to Bancorp. 473 F.2d at 264-65. The Ninth Circuit would not have described the agreement necessary to change the result in *Bob Richards* as a "differing agreement" if the Court had not determined, as a matter of property law, that the subsidiary owned its own refund in the first instance. If the TSA obligated the Bank to make such a transfer or assignment to Bancorp, the critical question under 11 U.S.C. § 365 is whether that contractual obligation had already been performed. As discussed, any such obligation could not and had not been performed, and was rendered unenforceable by the Trustee's rejection of the TSA.

c. The Bankruptcy Court erroneously found that Bancorp had a vested interest in the Bank's tax refunds on the Petition Date, which could not be divested

---

[33] *See Thompkins*, 476 F.3d at 1307-08 (noting that "rejection differently affects the unperformed portions of an executory agreement and those provisions of the agreement that, by their nature, are fully executed" and stating that, while debtor was not divested of copyrights for which the "transfer…was fully executed" on the petition date, the rejection "released [the counterparty] from any outstanding obligation to perform under the Agreement — *i.e.*, to convey any as-yet unrealized 'benefit' to [the debtor]"); *Simmons Capital Advisors, Ltd. v. Bachinski (In re Bachinski)*, 393 B.R. 522, 543-45 (Bankr. S.D. Ohio 2008) ("rejection…does not unwind transactions that already have been consummated — or void property rights that already have been obtained — under the contract prior to rejection").



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

by the Trustee's rejection of the TSA. [**Report at pp. 28:5-36:19, 46:24-47:3, 47:14-18**]. Any purported assignment of the Bank's tax refunds to Bancorp, however, could not have been vested on the Petition Date because the Bank did not have a vested, assignable right to the tax refunds in question on the Petition Date.

The Bankruptcy Court erroneously relied on *Segal v. Rochelle*, 382 U.S. 375 (1966), and *In re Flying J, Inc.*, No. 08-13384, 2009 WL 5215000, at *2-4 (Bankr. D. Del. Dec. 28, 2009), to conclude that Bancorp had a vested property interest in the tax refunds on the Petition Date. However, neither of these decisions supports the Bankruptcy Court's proposed finding on this issue because neither decision dealt with the effects of rejection under 11 U.S.C. § 365.

The issue in *Segal* did not involve the assignment of a tax refund under a contract. There was no executory contract at issue in *Segal*. The dispute in *Segal* was between an individual debtor and the trustee of the debtor's bankruptcy estate. The issue was whether the individual debtor's ***own*** tax refund was prepetition property of the debtor's bankruptcy estate or instead was postpetition property that did not come into the estate and belonged to the debtor. 382 U.S. at 377. The debtor contended that its tax refund did not become part of its bankruptcy estate because the tax year did not close (and the refund was not paid) until postpetition. *Id.*

The Supreme Court disagreed and held that even though the refund was not payable on the petition date (and might not have ever been payable because the debtor could have earned additional, postpetition income), that simply meant the refund was contingent on the petition date. *Id.* at 380. The mere fact that the refund was contingent on the petition date did not prevent the debtor's contingent property interest in that refund from becoming part of the debtor's bankruptcy estate because the refund that was ultimately paid postpetition was "sufficiently rooted in the pre-bankruptcy past" — *i.e.*, the refund resulted from a prepetition loss offsetting prepetition income. 382 U.S. at 378-81. But *Segal* only held that the

debtor's contingent property interest in the refund became property of the estate, not that the debtor had a contingent contractual claim to a future assignment from a third party pursuant to an executory contract.

*Flying J* is also inapposite because it did not deal with the effects of 11 U.S.C. § 365. There was no executory contract in *Flying J*. In *Flying J*, the dispute was between the debtor-in-possession and the IRS. The issue was whether the IRS could set off a prepetition debt owed by the debtor to the IRS against a refund payable to the debtor postpetition. 2009 WL 5215000, at *1. The debtor argued that setoff was inappropriate under 11 U.S.C. § 553 because both debts — *i.e.*, the refund debt owed by the IRS to the debtor and the prepetition debt owed by the debtor to the IRS — did not "arise" prepetition as required by 11 U.S.C. § 553(a), since the refund did not vest until the close of the tax year, which occurred postpetition. *Id.* at *1-2.

The *Flying J* court disagreed. Relying on *Segal*, the *Flying J* court held that the debtor's tax refund, although not payable until postpetition, was sufficiently rooted in the pre-bankruptcy past for the debtor's contingent claim to the refund to become prepetition property of the debtor's bankruptcy estate. 2009 WL 5215000, at *3-4. The reason the refund was deemed to be rooted in the pre-bankruptcy past was because all the income tax payments and losses that produced the refund had occurred as of the petition date. Because the refund was considered prepetition property of the estate, the *Flying J* court held that it would be anomalous to hold that the claim did not "arise" prepetition and, therefore, was not eligible for setoff under 11 U.S.C. § 553. *Id.* So, as in *Segal*, the issue in *Flying J* came down to whether or not the property became property of the bankruptcy estate because the debtor's property interest was contingent on the petition date. Neither case held that the contingent property interest became vested as of the filing date simply because the debtor filed bankruptcy. The contingent property interest held by the debtor on the petition date came into the bankruptcy estate <u>as a contingent interest</u>





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

and only became vested at the close of the tax year, which occurred postpetition.

In contrast to *Segal* and *Flying J*, which dealt with the issue of whether the debtor's own tax refunds would become property of the debtor's bankruptcy estate, numerous decisions have held that a debtor's contingent rights under an executory contract are different and that a debtor's contingent rights under a rejected contract never become part of the debtor's bankruptcy estate.[34] When a debtor rejects an executory contract, the debtor breaches the contract and the debtor's contingent rights under that contact become unenforceable "immediately ***before***" the petition date. Thus, the debtor has no continuing rights under that contract that can come into the estate on the petition date.

Here, the Bankruptcy Court failed to explain how these decisions (including binding decisions by the Ninth Circuit that are subsequent to *Segal*)[35] make any sense in light of its holding that property vests in the debtor on the petition date even though the interest under the executory contract was contingent on and prior to the petition date.

d. The Bankruptcy Court erroneously found that Bancorp had a vested property interest in the Bank's tax refunds on the Petition Date, and therefore that the Trustee was not seeking to obtain further benefits (*i.e.*, performance from the Bank) under the rejected TSA. [**Report at pp. 47:14-48:28**].

A trustee in bankruptcy cannot obtain any further benefits under a contract that he rejected.[36] As discussed above, Bancorp did not have a vested property

---

[34] *See Hall v. Perry (In re Cochise College Park, Inc.)*, 703 F.2d 1339, 1352, 1356-57 (9th Cir. 1983) ("executory contract of the bankrupt vests in the trustee, if at all, only if the trustee affirms the contract"); *accord Pac. Express, Inc. v. Teknekron Infoswitch Corp. (In re Pac. Express, Inc.)*, 780 F.2d 1482, 1486 n.3 (9th Cir. 1986); *In re Gravure Paper & Bd. Corp.*, 234 F.2d 928, 930, 932 (3d Cir. 1956); *Palmer v. Palmer*, 104 F.2d 161, 163 (2d Cir. 1939), *cert. denied*, 308 U.S. 590 (1939); *Green v. Finnigan Realty Co.*, 70 F.2d 465, 466-67 (5th Cir. 1934); *In re Ortiz*, 400 B.R. 755, 763 (C.D. Cal. 2009); *Am. Healthcare Corp. v. Beiersdorf, Inc.*, No. 05-1735, 2006 WL 753001, at *2-3 (D.P.R. Mar. 23, 2006).

[35] *See, e.g.*, *Cochise College Park*, 703 F.2d at 1352, 1356-57; *Pac. Express*, 780 F.2d at 1486 n.3.

[36] *See* cases cited *supra* at Footnote 29 of this Objection.

interest in the refunds as of the Petition Date. By seeking to enforce Bancorp's alleged contingent contractual right to take an assignment of the Bank's tax refunds once paid by the IRS, the Trustee is trying to avail himself of further benefits under the rejected TSA. The Trustee does not have the right to do so.

4. The Bankruptcy Court Erred in Finding that the TSA, as Interpreted by the Bankruptcy Court, Is Enforceable Under California Law

The Bankruptcy Court wrongfully found that the TSA, as interpreted by the Bankruptcy Court to effect an assignment, is enforceable under California law. [**Report at pp. 64:3-65:5**]. That is, for the TSA to have created a debtor/creditor relationship, it would have to effect an assignment of the Bank's tax refunds to Bancorp. *Bob Richards* requires this in order to be a "differing agreement." 473 F.2d at 264-65. The TSA, however, does not create an assignment of the Bank's tax refunds that is enforceable under California law.

Under California law, an assignment is not effective unless two requirements are met. First, there is an ***expressed*** manifestation of an ***intention*** to transfer property to another. *See Cockerell v. Title Ins. & Trust Co.*, 42 Cal. 2d 284, 291, 267 P.2d 16 (Cal. 1954); *Cobb v. S.F. Residential Rent Stabilization & Arbitration Bd.*, 119 Cal. Rptr. 2d 741, 98 Cal. App. 4th 345, 352 (Cal. Ct. App. 2002); *Neptune Soc'y Corp. v. Longanecker*, 240 Cal. Rptr. 117, 194 Cal. App. 3d 1233, 1242 (Cal. Ct. App. 1987). Second, such transfer must be supported by valid consideration. *See* Cal. Civ. Code § 1550; *Steiner v. Thexton*, 48 Cal. 4th 411, 420-21, 226 P.3d 359 (Cal. 2010).

The TSA is devoid of any language evidencing an intent to assign the Bank's future tax refunds to Bancorp. And, there is no other evidence of any such intent. The TSA also does not indicate that anything of value was provided to the Bank in consideration for the Bank's tax refunds. Accordingly, the TSA is unenforceable under California law to effect an assignment of the Bank's tax refunds to Bancorp.

a. The Bankruptcy Court erred in finding that the absence of express language in the TSA purporting to assign the Bank's tax refunds to Bancorp is irrelevant because the Bank did not own the tax refunds. [**Report at pp. 64:17-65:5**].

The Bankruptcy Court's analysis is wrong under controlling Ninth Circuit precedent. *Bob Richards*, 473 F.2d at 264-65. The TSA contains no language of assignment and no statement of the consideration paid by Bancorp to the Bank. Bancorp introduced no evidence to prove that the parties intended to assign the Bank's tax refunds to Bancorp. Thus, if Bancorp relies solely on the TSA to prove the assignment, the assignment is invalid under California law. *See Cockerell*, 42 Cal. 2d at 291; *Cobb*, 98 Cal. App. 4th at 352; *Neptune Soc'y Corp.*, 194 Cal. App. 3d at 1242.

b. The Bankruptcy Court erred in finding that the alleged assignment of all of the Bank's future tax refunds was supported by valid consideration because, under the TSA, the Bank "received a significant potential unsecured contractual claim against Bancorp." [**Report at p. 64:12-16**]. But this does not constitute consideration.

First, consideration does not exist when a party is promising to do what the party is already bound to do. *See Baker v. City of Pomona*, No. CV-92-5649, 1993 U.S. Dist. LEXIS 19548 (C.D. Cal. Aug. 4, 1993) (finding no consideration because "[i]n the agreement, the City promised to cover fire captains and battalion chiefs under the Act, a duty already owed by law"); *Garcia v. World Sav., FSB*, 107 Cal. Rprt. 3d 683, 183 Cal. App. 4th 1031, 1040 (Cal. Ct. App. 2010) (finding no consideration because "appellants promised nothing more than respondent was due under the original loan agreement — monthly payments, plus interest and late fees").[37] But, under *Bob Richards*, Bancorp was already bound to pay the Bank its

[37] *Accord O'Byrne v. Santa Monica-UCLA Med. Ctr.*, 114 Cal. Rptr. 2d 575, 94 Cal. App. 4th 797, 808 (Cal. Ct. App. 2001) ("A statutory or legal obligation to perform an act may not constitute consideration for a contract."); *Grant v.*





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

tax refunds upon receipt of the refund from the IRS. Providing the Bank with an unsecured claim for such refunds does not, as a matter of law, constitute consideration because Bancorp had a pre-existing duty to convey the refunds to the Bank.

Second, as discussed above, it is illegal for the Bank to give up its tax refunds in exchange for an unsecured contractual claim against Bancorp. *See* 12 U.S.C. § 371c(c); 12 C.F.R. § 223.3(o); Interagency Policy Statement. The Bankruptcy Court's finding that the unsecured claim was consideration violates section 1607 of the California Civil Code, which requires consideration to be "lawful" within the meaning of Section 1667. Cal. Civ. Code § 1607. Section 1667 of the California Civil Code further provides that consideration is not lawful if it is "contrary to an express provision of law" or "contrary to the policy of express law, though not expressly prohibited." Cal. Civ. Code § 1667.

If any part of the consideration is unlawful, the entire contract is void. Cal. Civ. Code § 1608; *see Hyon v. Selten*, 60 Cal. Rptr. 896, 152 Cal. App. 4th 463, 468, 471 (Cal. Ct. App. 2007); *County of Amador v. City of Plymouth*, 57 Cal. Rptr. 3d 704, 149 Cal. App. 4th 1089, 1114 (Cal. Ct. App. 2007); *Russell v. Soldinger*, 131 Cal. Rptr. 145, 59 Cal. App. 3d 633, 641 (Cal. Ct. App. 1976); 1 Witkin, SUMMARY 10th (2005) *Contracts*, § 419, p. 460.

Therefore, the Bankruptcy Court erred by finding that the consideration provided to the Bank in exchange for the assignment of its interests in its tax refunds was an unsecured claim. This does not constitute legal consideration under California law, and therefore renders the TSA void under California law if it is interpreted to effect an assignment of the tax refunds.

---

*Aerodraulics Co.*, 91 Cal. App.2d 68, 75, 204 P.2d 683 (Cal. Ct. App. 1949) (holding no consideration can be found when a party to an agreement "mere[ly] promise[s] to perform that which the promisor is already legally bound to do."); *see also* 1 Witkin, SUMMARY 10th (2005) *Contracts*, § 218, p. 251 ("Under the definition of consideration. . . doing or promising to do what one is already legally bound to do cannot be consideration for a promise").

c. The Bankruptcy Court erred in finding that the TSA is presumptive evidence of consideration and that the TSA itself provides material benefits by streamlining the costs of tax administration. [**Report at p. 64:3-12**]. The Trustee submitted no evidence to support the conclusion that this constituted the "consideration" paid by Bancorp to the Bank in exchange for the refunds.

Although a written instrument is *presumptive* evidence of consideration under section 1614 of the California Civil Code, the presumption is rebuttable. Cal. Civ. Code § 1614; *Star Pac. Inv., Inc. v. Oro Hills Ranch, Inc.*, 176 Cal. Rptr. 546, 121 Cal. App. 3d 447, 456 (Cal. Ct. App. 1981) (*citing* Cal. Civ. Code § 1615); *see also* 1 Witkin, SUMMARY 10th (2005) *Contracts*, § 206, p. 241; 31 CAL. JUR. 3d *Evidence* §§ 144, 381. Section 1614 of the California Civil Code merely relieves the party producing a written document of the need to make the *initial* showing of consideration. *Rancho Santa Fe Pharmacy, Inc. v. Seyfert*, 268 Cal. Rptr. 505, 219 Cal. App. 3d 875, 883 (Cal. Ct. App. 1990).

Here, the presumption has been rebutted. The TSA does not state that Bancorp has paid any consideration to the Bank in exchange for the tax refunds. And, the Trustee submitted no extrinsic evidence that Bancorp provided any lawful consideration to the Bank in exchange for the Bank's tax refunds.

The Bank was the party that paid all of the taxes. The Group filed consolidated returns, instead of multiple individual returns, because of elections the Group had made under the Internal Revenue Code. The existence of the TSA has nothing to do with these elections. Both the Bank and Bancorp were obligated under their existing elections to file consolidated returns. The Bankruptcy Court made a specific finding to this effect. [**Report at p. 48:15-17**]. In sum, the Bank received no consideration for the alleged assignment of the Bank's future tax refunds to Bancorp.

5. The Bankruptcy Court Erred in Finding that the TSA, as Interpreted by the Bankruptcy Court, Does Not Constitute Gross Overreaching and Is Enforceable

If the Bankruptcy Court is right — that no member of the Group owned any part of the tax refund until the Bank and Bancorp entered into the TSA and created a "business relationship" allowing Bancorp to take the entire refund — then the TSA cannot be enforced against the FDIC-R because it would constitute gross overreaching by a parent over its subsidiary.

A parent corporation has a duty to deal fairly with its wholly-owned subsidiaries. *See Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 522 (1941); *W. Pac. R.R. Corp. v. W. Pac. R. Co.*, 197 F.2d 994, 1004 (9th Cir. 1952) ("A parent company is not acting in the best interests of its subsidiary when it seeks to appropriate to itself an advantage which the tax laws give the subsidiary.").

For this reason, the Ninth Circuit held in *Bob Richards* that a common parent of a group of taxpayers cannot take ownership of 100% of a tax refund paid to the consolidated group when the parent paid none of the taxes being refunded and did not suffer the loss that gave rise to the right to receive it. The Bankruptcy Court's proposed finding that the TSA creates a debtor/creditor relationship is incorrect and stems from the Bankruptcy Court's misinterpretation of *Bob Richards* as a quasi-contract case, as opposed to a case founded in the common law of property. However, even if the *Bob Richards* case were a quasi-contract case, *Bob Richards* would not permit the enforcement of an express contract that allows the parent to take the entire refund for no consideration. 473 F.2d at 264 n.4 & n.5.[38] Thus, if

[38] *Accord Spears v. FDIC (In re First Penn Corp.)*, No. 84-0509 (Bankr. W.D. Okla. July 18, 1986); *W. Pac. R.R.*, 197 F.2d at 1000-01; *Meyerson v. El Paso Natural Gas Co.*, 246 A.2d 789, 792 (Del Ch. 1967); *see also Lincoln Sav. & Loan Ass'n v. Wall*, 743 F. Supp. 901, 909-910 (D.D.C. 1990) (holding company's "contention that the lack of formal rules or regulations" meant it was permissible for holding company to use tax sharing agreement to strip its subsidiary bank of money was "tantamount to arguing that theft is licensed in the absence of a rule against the precise method utilized to deprive rightful owners of their property").





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

the Bankruptcy Court's construction is correct, the TSA constitutes precisely the type of overreaching and unjust enrichment forbidden by the Ninth Circuit and the cases cited above, making it unenforceable against the FDIC-R.

The Bankruptcy Court wrongfully found that the TSA, as interpreted by the Bankruptcy Court to have affected the assignment of the Bank's tax refunds to Bancorp, does not constitute gross overreaching. [**Report at p. 65:23-28**].

a. First, the Bankruptcy Court wrongfully concluded that the agreement in the case at bar is "very analogous" to the tax sharing agreement that was addressed in the Second Circuit's decision in *In re First Central Financial Corp.*, 377 F.3d 209 (2d Cir. 2004). [**Report at p. 65:6-15**].

*First Central* did not involve a separate basis tax refund like the tax refund in *Bob Richards* and in this case. *See In re First Cent. Fin. Corp.*, 269 B.R. 481, 492 (Bankr. E.D.N.Y. 2001). The insurance company subsidiary could not have obtained the refund on its own because of the alternative minimum tax limitations. *Id.* at 492. This makes *First Central* factually distinguishable and completely inapposite. Also, the subsidiary in *First Central* never alleged that the tax sharing agreement was the product of "overreaching" or "breach of fiduciary duty," as has been alleged here. *Id.* at 501. And, the parties in *First Central* were not financial institutions and therefore were not subject to 12 U.S.C. § 371c(c), 12 U.S.C. § 371c-1, and the Interagency Policy Statement.

b. Second, the Bankruptcy Court erred in finding that the FDIC-R cannot resort to "unjust enrichment, unfairness, or similar equitable concepts" under California law. [**Report at p. 65:16-19**].

The cases cited by the Bankruptcy Court stand for the proposition that a party cannot have a *claim* for unjust enrichment when the parties' rights are set forth in a written contract. *See Total Coverage, Inc. v. Cendant Settlement Servs. Group, Inc.*, 252 Fed. Appx. 123, 125-26 (9th Cir. July 3, 2007); *Hedging Concepts, Inc. v. First Alliance Mortgage Co.*, 49 Cal. Rptr. 2d 191, 41 Cal. App. 4th 1410, 1419





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

(Cal Ct. App. 1996). The FDIC, however, is not asserting a *claim* for unjust enrichment. The FDIC-R contends that the TSA, as interpreted by the Bankruptcy Court, constitutes gross overreaching. The remedy sought is not a claim. Rather, the FDIC-R contends that the Bankruptcy Court's interpretation of the TSA is erroneous and respectfully requests that this Court refuse to enforce the TSA in a manner that deprives the Bank, and thus the FDIC-R, of its property.

c. Third, the Bankruptcy Court erred in finding that the FDIC-R's position runs afoul of the principle that courts cannot rewrite contracts to avoid harsh results. [**Report at p. 65:19-23**]. The FDIC-R is not asking this Court to re-write the TSA. The FDIC-R is asking this Court to reject the Bankruptcy Court's addition of terms or unstated concepts to the TSA that effect a transfer of the Bank's tax refunds to Bancorp or permit Bancorp to keep the Bank's tax refunds. There is no such language in the TSA.

d. Fourth, the Bankruptcy Court erred in finding that there is "nothing inequitable, unjust, or overreaching, or otherwise unfair" about taking the Bank's tax refunds and using them to pay Bancorp's creditors since the FDIC-R will receive "proportional distributions on account of whatever unsecured claim the Bank would have enjoyed under the TSA." [**Report at p. 65:23-28**].

The second paragraph of the TSA specifically states that its intent is for the Bank to "receive payments as if it were filing income tax returns separate from and excluding Parent [Bancorp]." If the Bank had filed tax returns separate from and excluding Bancorp, it would not end up with an unsecured claim against Bancorp but would clearly and indisputably all of the tax refund. The Bankruptcy Court ignores the stated intent of the TSA and erroneously found that Bancorp can take the Bank's tax refunds.

The principle of equitable distribution at the heart of the bankruptcy process does not justify an illegal taking. The tax refund belongs to the FDIC-R, and must be marshaled and liquidated to pay the creditors of the failed bank. *See* 12 U.S.C.





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

§ 1821(d)(2). The TSA does not cause an assignment of the Bank's tax refunds to Bancorp, and is not enforceable contract under California law.

6. The Bankruptcy Court Erred in Adopting a Commercially Unreasonable Construction of the TSA

The Bankruptcy Court's construction of the TSA as constituting a "differing agreement" is commercially unreasonable and must be rejected. [**Report at pp. 18:14-25:28**].

Courts are required to give a contract an interpretation which will make it "reasonable" if it can be done without violating the intention of the parties.[39] Similarly, a court "shall avoid an interpretation which will make a contract extraordinary, harsh, unjust, and inequitable or which would result in an absurdity." *Howe*, 112 Cal. App. 3d at 627; *see also Citizens*, 117 Cal. App. 4th at 1077; *Harris*, 205 Cal.App.2d at 584.

No bank board would knowingly approve a tax sharing agreement that would subject the board members to civil monetary penalties. *See* 12 U.S.C. § 504; 12 U.S.C. § 1813(u); 12 U.S.C. § 1818(i). Assuming, *arguendo*, that the Bank's board gave the TSA mature consideration and actually approved it, which it did not, the Bank's board members could be assessed with civil monetary penalties if they had knowingly approved a tax sharing agreement that caused all the Bank's future tax refunds to become Bancorp's property. *See* 12 U.S.C. §§ 504, 1813(u) & 1818(i). More importantly, no bank board would approve a transfer of the bank's property for no consideration. Given the risk of monetary penalties and the lack of consideration, it would make no sense for the Bank's board to have approved the tax sharing agreement the Bankruptcy Court seeks to impose. This Court should not adopt an illogical and inequitable construction of an agreement that, on its face,

---

39 *See* Cal. Civ. Code § 1643; *Citizens for Goleta Valley v. HT Santa Barbara*, 12 Cal. Rptr. 3d 249, 251, 117 Cal. App. 4th 1073, 1076 (Cal. Ct. App. 2004); *Howe v. Amer. Baptist Homes of the West, Inc.*, 169 Cal. Rptr. 418, 112 Cal. App. 3d 622, 626-27 (Cal. Ct. App. 1980); *Harris v. Klure*, 23 Cal. Rptr. 313, 205 Cal. App. 2d 574, 578 (Cal. Ct. App. 1962).





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

does not evidence any intent to cause the Bank's tax refunds to belong to Bancorp.

7. The Bankruptcy Court Erred in Adopting a Construction of the TSA that Renders the TSA Illegal

The Bankruptcy Court erred in adopting a construction of the TSA that renders the TSA illegal. [**Report at pp. 18:14-25:28**].

California law mandates that a contract receive "an interpretation as will make it lawful, operative . . . and capable of being carried into effect, if it can be done without violating the intention of the parties."[40] California courts must not only give the contract a legal interpretation, but also presume the parties had all applicable law in mind when entering into the contract. *See Edwards,* 189 P.3d at 296-297 (*citing Torrence v. Workers' Comp. Appeals Bd.*, 32 Cal. 3d 371, 378, 650 P.2d 1162, 1165 (Cal. 1982)).

If the TSA has the effect of causing the Bank's tax refunds to be owed to the Bank on an unsecured basis, the TSA violates 12 U.S.C. § 371c(c) and, therefore, is illegal. When the parties drafted the TSA, they were aware of the restrictions in the affiliate transaction rules and fully intended to comply with them. *See* Dkt. No. 61 at Ex. C, Smith Tr. 34:5-37:13, 66:16-21, & 96:10-12; Dkt. No. 43, Frost Decl. at ¶¶ 6-8; Dkt. No. 61 at Ex. A, Frost Tr. 193:19-22. The TSA itself expressly states: "Any provisions of this Agreement that are inconsistent with [rules promulgated by the Office of Thrift Supervision and the Federal Deposit Insurance Corporation] shall be null and void." TSA at § 7(a). The Report, however, recommends that this Court adopt a construction of the TSA that violates federal law and is contrary to the parties' intent. The Report must be rejected.

---

[40] Cal. Civ. Code § 1643; *see* Cal. Civ. Code § 3541; *Edwards II v. Arthur Anderson LLP*, 44 Cal. 4th 937, 953, 189 P.3d 285, 296 (Cal. 2008); *Entremont v. Whitsell*, 13 Cal. 2d 290, 89 P.2d 392, 395 (Cal. 1939); *Strong v. Theis*, 232 Cal. Rptr. 272, 187 Cal. App. 3d 913, 919-920 (Cal. Ct. App. 1986).

**E. The Bankruptcy Court Erred in Finding that the TSA Is Inconsistent with an Agency Relationship**

The undisputed evidence shows that the TSA creates and is wholly consistent with a common law agency relationship. Therefore, Bancorp was a common law agent for the Bank and, as such, received the tax refunds as the Bank's agent and not as the Bank's debtor. Receipt of the Bank's tax refunds as a common law agent has the same effect as receipt of the refunds as a trustee of a specific trust under 11 U.S.C. § 541(b)(1) & (d). *See United States v. Galindo*, 871 F.2d 99, 101 (9th Cir. 1989).

California statutorily defines an agent as "one who represents another, called the principal, in dealings with third persons." Cal. Civ. Code § 2295; *Michelson, M.D. v. Hamada, M.D.*, 36 Cal. Rptr. 2d 343, 29 Cal. App. 4th 1566, 1579 (Cal. Ct. App. 1994). Agency has also been defined as "the fiduciary relation which results from [1] the manifestation of consent by one person to another that the other shall [2] act on his behalf and [3] subject to his control, and [4] consent by the other so to act." *Grace Line, Inc. v. Todd Shipyards Corp.*, 500 F.2d 361, 373 (9th Cir. 1974) (citing RESTATEMENT (SECOND) OF AGENCY § 1 (1957)).

No particular words are necessary; the relationship is created by "conduct by each party manifesting acceptance of a relationship whereby one of them is to perform work for the other under the latter's direction." *Malloy v. Fong*, 37 Cal. 2d 356, 372, 232 P.2d 241 (Cal. 1951). It is well established that a "corporation may become the agent of [its] subsidiary." RESTATEMENT (SECOND) OF AGENCY § 14M, cmt. a.

Under California law, "control" is an essential element of any agency relationship. *See In re Coupon Clearing Serv., Inc.*, 113 F.3d 1091, 1099 (9th Cir. 1997). However, while "[a] principal's right to control the agent is a constant across relationships of agency . . . the content or specific meaning of the right varies." *Smith v. Shewry*, 93 Cal. Rptr. 3d 436, 443, 173 Cal. App. 4th 1163, 1173





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

(Cal. Ct. App. 2009); *accord Borders Online, LLC v. State Bd. of Equalization*, 29 Cal. Rptr. 3d 176, 184, 129 Cal. App. 4th 1179, 1191 (Cal. Ct. App. 2005). In the context of affiliated corporations, "control" exists when an affiliate agrees to effectuate the terms of a written policy for the benefit of another affiliate. *See Borders Online*, 129 Cal. App. 4th at 1191

For example, in *Borders Online*, the court analyzed the issue of control in the context of an agency relationship between two subsidiaries that were wholly owned by the same parent and that were controlled by essentially the same board members. 129 Cal. App. 4th at 1185. On the question of "control," the court found that subsidiary "A" had control over subsidiary "B" because subsidiary "B" was "effectuating" subsidiary "A's" written policies. *Id.* at 1191. This alone was sufficient to show "control" as between affiliated entities controlled by the same individuals. *Id.*

In contrast, in *Coupon Clearing*, the Ninth Circuit analyzed the question of agency within the context of non-related parties. 113 F.3d 1091. In analyzing the issue of "control" in this context, the Ninth Circuit found that the right to require performance under a contract is not sufficient to establish control and, thus, an agency. *Id.* at 1100. Therefore, in the context of a contractual agreement between non-affiliated parties, the standard for "control" is higher.

In the context of consolidated tax groups, a common law agency arises when affiliated entities consent to permit a common parent to act on behalf of the group for tax matters and the parent agrees to so act. *See Claybrook v. United States*, No. 10-734T, at p. 17 (Fed. Cl. Apr. 18, 2012). The tax regulations permit a "common parent" to act as "the sole agent" for a consolidated group. 26 C.F.R. § 1.1502-77. The tax regulations themselves do not create a common law agency. *See, e.g.*, *Jump v. Manchester Life & Cas. Mgmt. Corp.*, 579 F.2d 449, 452 (8th Cir. 1978). However, as the Court of Federal Claims recently found, when affiliated entities mutually agree to permit the parent to act "as the 'agent *for the group*' [under]

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

Treas. Reg. § 1.1502-77," an agency arises under "under basic principles of agency." *Claybrook*, No. 10-734T, p. 17 (citing RESTATEMENT (THIRD) OF AGENCY § 8.05, Rep. Note 6 (2006) and stating, "when acting for a principal, an agent does 'not use property of the principal *for the agent's own purposes* or those of a third party.'") (emphasis in original).

Here, the TSA expressly characterizes the relationship between the Bank and Bancorp as one of "agency." TSA at § 5(d). *See Lonely Maiden*, 201 Cal. App. 4th at 378 (holding parties' characterization of relationship in written agreement relevant to agency determination). The Bank consented to Bancorp acting as the Bank's agent in dealings with the IRS under 26 C.F.R. § 1.1502-77, and Bancorp agreed to so act. TSA at § 5(d); *see Claybrook*, No. 10-734T at p. 17. And, Bancorp actually represented the Bank in dealings with the IRS and other taxing authorities. Dkt. No. 32, Tomlinson Decl. at Exs. 10-27; *see Claybrook*, No. 10-734T at p. 17.

It is undisputed that under the TSA neither the Bank nor Bancorp intended for Bancorp to hold a beneficial interest in the Bank's tax refunds. *See* Dkt. No. 61 at Ex. C, Smith Tr. 173:3-190:5; Dkt. No. 43, Frost Decl. at ¶¶ 6-8. The parties understood that Bancorp had no right to use the Bank's tax refunds for any purpose other than to pay them to the Bank after receiving them from the IRS. *See* TSA at § 4(a); *accord* Dkt. No. 43, Frost Decl. at ¶ 8; *see* Dkt. No. 61 at Ex. C, Smith Tr. 181:4-188:22. The testimony of the Bank's and Bancorp's Senior Vice President and Tax Director and the Bank's and Bancorp's outside legal counsel that handled bank regulatory matters on these issues is undisputed.

Further, unlike *Coupon Clearing*, but like *Borders Online*, both the Bank and Bancorp were controlled by the same individuals. All of Bancorp's ten directors (and officers) also served as directors or were officers of the Bank. The Bank had three more directors who served on the Bank's board, but who did not serve on Bancorp's board. The same people who controlled Bancorp comprised a majority





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

of the Bank's board and, thus, controlled the Bank as well. Therefore, as in *Borders Online*, Bancorp's agreement to effectuate the terms and policies set forth in the TSA shows "control" by the Bank as between the affiliated entities — Bancorp and the Bank. 129 Cal. App. 4th at 1191. Accordingly, the FDIC-R has proven all of the indicia of an agency relationship under California law.

The Bankruptcy Court, however, found that the relationship between the Bank and Bancorp could not be an agency, as a matter of law, because the TSA uses the terms "reimbursement" and "payment." [**Report at pp. 19:6-22:6**]. According to the Bankruptcy Court, these terms are inconsistent with the existence of an agency relationship. The Bankruptcy Court is wrong.

1. First, as discussed above in Section II.B.7 of this Objection, the words "payment" and "reimbursement" are consistent with an agency relationship and, therefore, do not have a magical debtor/creditor meaning as the Bankruptcy Court found. [**Report at pp. 19:6-22:6**]. *See, e.g., Lubin v. FDIC*, No. 1:10-CV-00874-RWS, 2011 WL 825751, at *6 (N.D. Ga. Mar. 2, 2011); *BSD Bancorp., Inc. v. FDIC*, No. 93-12207-A11, at pp. 10-11 (S.D. Cal. Feb. 28, 1995). Moreover, the Bankruptcy Court fails to explain how it can rule based on the unambiguous terms of the TSA and yet ignore the statement of "agency," as well as the statement of intent, in the TSA. TSA at p. 1 & § 5(d). The words "payment" and "reimbursement," when used in an agreement that purports to create an agency, are consistent with an agency relationship.

2. Second, the Bankruptcy Court, relying on the parol evidence rule, erred in refusing to consider any extrinsic evidence on the question of agency. [**Report at pp. 11:1-14:8**]. While the parties' characterization of their relationship is relevant to the agency inquiry, California courts repeatedly have held that courts must also consider whether the conduct of the parties manifests an agency





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

relationship.[41]

For example, in *Pistone*, the court of appeals reversed the trial court for granting summary judgment on the question of agency based solely on the unambiguous terms of a contract. 228 Cal. App. 3d. at 679. The court of appeals found that "fundamentally" the provisions in a contract, "while relevant" can never be "determinative" of the "existence or absence of agency." *Id.* at 680.

In fact, parties are permitted under California law to introduce evidence that "contradicts 'clear' contract language" and show the existence of an agency through extrinsic evidence in <u>all</u> circumstances. *Id.* at 681. This is because the question of agency is a question of fact. As in *Pistone,* the FDIC-R is entitled to show the existence of an agency relationship through extrinsic evidence. The Bankruptcy Court erred in refusing to admit Mr. Smith's and Mr. Frost's testimony on this point. This testimony, if properly admitted, shows that the FDIC-R is entitled to summary judgment on the issue of common law agency under California law.

### F. The Bankruptcy Court Erred in Failing to Recognize a Resulting Trust in Favor of the Bank's Receivership Estate

Assuming, *arguendo*, that this Court finds that the TSA creates a debtor/creditor relationship under which Bancorp holds title to the Bank's tax refunds and that no common law agency relationship existed between the Bank and Bancorp, the undisputed evidence would still support the recognition of a resulting

---

[41] *See Petrol Corp. v. Chartrand*, 93 Cal. App. 2d 635, 640, 209 P.2d 674 (Cal. Ct. App. 1949) ("It cannot be said as a matter of law, from a consideration of the provisions of the contract, that the relationship of principal and agent did not exist."); *Pistone v. Superior Court of Contra Costa County*, 279 Cal. Rptr. 173, 228 Cal. App. 3d 672, 680-81 (Cal. Ct. App. 1991) (discussed below); *Kuchta v. Allied Builders Corp.*, 98 Cal. Rptr. 588, 21 Cal. App. 3d 541, 547-548 (Cal. Ct. App. 1971) (finding agency relationship despite express agency disclaimer in agreement); *Nichols v. Arthur Murray, Inc.*, 56 Cal. Rptr. 728, 248 Cal. App. 2d 610, 613, 616 (Cal. Ct. App. 1967) (rejecting argument that language of agreement expressed intent to not form agency agreement, in light of conduct of the parties); *accord* RESTATEMENT (THIRD) OF AGENCY § 1.02 ("An agency relationship arises only when the elements stated in § 1.01 are present. Whether a relationship is characterized as agency in an agreement between the parties . . . is not controlling.").



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

trust in favor of the Bank's receivership estate under California law.

A resulting trust is an "intention-enforcing trust" that arises notwithstanding the terms of a written agreement. *Fidelity Nat'l Title Ins. Co. v. Schroeder*, 101 Cal. Rptr. 3d 854, 863-64, 179 Cal. App. 4th 834, 847-848 (Cal. Ct. App. 2009); *Calistoga Civic Club v. City of Calistoga*, 191 Cal. Rptr. 517, 143 Cal. App. 3d 111, 117 (Cal. Ct. App. 1983). The trust arises by operation of law from a transfer of property under circumstances showing that the transferee was not intended to take a beneficial interest in the property. Rather, the one who holds the property has an obligation to convey it to the beneficial owner.[42] The trustee of a resulting trust has no duties to perform, no trust to administer and no purpose to carry out except the single task of holding onto or conveying the property to the beneficiary. *Fidelity*, 179 Cal. App. 4th at 848; *Marriage of Ruelas*, 154 Cal. App. 4th at 342; *Estate of Yool*, 151 Cal. App. 4th at 874.

A resulting trust is effective even when the holder of the legal title is in bankruptcy. *Aikin v. Neilson (In re Cedar Funding, Inc.)*, No. 09-4311 RMW (N.D. Cal. Mar. 31, 2012); *Golden Mortg. Fund #14 v. Kennedy (In re Golden Triangle Capital, Inc.)*, 171 B.R. 79, 82 (B.A.P. 9th Cir. 1994). A resulting trust is a "creature of equity" and "need not be evidenced by writing or even by an express declaration." *Calistoga*, 143 Cal. App. 3d at 117-118. And, a resulting trust can arise even if the transferring instrument purports to make an absolute transfer.[43]

For instance, in *Golden Triangle*, a lender that had sent funds to a loan servicing agent, with the intention that the servicing agent would forward the funds to a borrower, sought a declaratory judgment that the funds were held in a

---

42 *Fidelity*, 179 Cal. App. 4th at 847-848; *Hernandez v. Ruelas (In re Marriage of Ruelas)*, 64 Cal. Rptr. 3d 600, 602, 154 Cal. App. 4th 339, 342 (Cal. Ct. App. 2007); *Starita v. Yool (In re Estate of Yool)*, 60 Cal. Rptr. 3d 526, 531, 151 Cal. App. 4th 867, 874 (Cal. Ct. App. 2007); 13 Witkin, SUMMARY 10th (2005), *Trusts*, § 311, p. 885.

43 *See Hansen v. Bear Film Co.*, 28 Cal. 2d 154, 174, 168 P.2d 946, 959 (Cal. 1946); *Marriage of Ruelas*, 154 Cal. App. 4th at 341-343; 2 Witkin, CAL. EVID. 4th (2000) *Docu Evid*, § 109, p. 227.





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

"resulting trust." 171 B.R. at 80. The receiver for the servicing agent put the servicer into bankruptcy *after* the servicer received the funds but *before* the funds were given to the borrower. *Id.* at 80-81. The bankruptcy trustee claimed that the funds were part of the servicer's bankruptcy estate. *Id.* at 81. The bankruptcy court agreed and granted summary judgment in favor of the trustee. *Id.*

The bankruptcy appellate panel for the Ninth Circuit, however, reversed the bankruptcy court. *Id.* at 84. After reviewing the elements of a "resulting trust" under California law, the bankruptcy appellate panel held that the funds were not part of the servicer's bankruptcy estate because there was never any intent that the servicer would have a "beneficial interest" in the funds. *Id.* at 82-84. Rather, the debtor-servicer was "only a conduit for the funds." *Id.* at 83. "[E]xcept for its nominal fee, the debtor never had rights in the funds; and the parties never intended [for the lender] to enter into a creditor relationship with [the servicer]." *Id.* Thus, the bankruptcy court committed reversible error in holding that the funds were part of the servicer's bankruptcy estate. *Id.* at 84.

Similarly, in *Cedar Funding*, individual investors provided funds to Cedar Funding (CFI) to make real estate loans. Case No. 09-4311, Slip Op. at p. 2. Each loan was secured by a deed of trust in favor of CFI. CFI investors were told they acquired fractional interests in a note held by CFI and the deed of trust securing the note's repayment. *Id.* After an investigation into CFI and its owner, CFI executed assignments of deeds of trust to the investors, reflecting their fractionalized interests. *Id.* at p. 3. CFI subsequently filed for bankruptcy, and the trustee sought to avoid the liens recorded in favor of the investors. *Id.* The investors argued the lien transfers could not be avoided because CFI held the liens in a resulting trust. *Id.* at p. 7.

The Northern District of California reversed the bankruptcy court's grant of summary judgment and held there was a genuine issue of material fact regarding the type of relationship intended by the parties. *Id.* at p. 10. Particularly, language





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

in the loan service agreement described CFI as an "agent" and described CFI "retaining custody" of the note and deed of trust. *Id.* at p. 8. This language suggested that CFI was intended to temporarily maintain an interest until the requisite documents were properly recorded in the investor's names. *Id.* The court further noted that the record supported a finding that CFI was intended to be a mere "conduit" for funds supplied by investors, not their debtor. *Id.* at p. 9.

Here, as in *Golden Triangle,* the undisputed evidence shows that neither the Bank nor Bancorp intended for Bancorp to hold a "beneficial interest" in the Bank's tax refunds. *See* Dkt. No. 61 at Ex. C, Smith Tr. 173:3-190:5; Dkt. No. 43, Frost Decl. at ¶¶ 6-8. Rather, as set forth in the TSA, Bancorp was to receive the Bank's tax refunds in its capacity as the Bank's "agent" and then "pay[]" the refunds to the Bank. *See* TSA at §§ 4(a) & 5(d). There was no intent that Bancorp would have the right to use the Bank's tax refunds for any purpose other than paying them to the Bank. *See* TSA at § 4(a); *accord* Dkt. No. 43, Frost Decl. at ¶ 8; *see* Dkt. No. 61 at Ex. C, Smith Tr. 181:4-188:22. The relationship contemplated by both parties was that Bancorp would be a mere "conduit" for refunds paid by the IRS and other taxing authorities.

In rejecting the FDIC-R's argument under 11 U.S.C. § 365(c)(2),[44] the Bankruptcy Court found that the "primary purpose" of the TSA was to "create a business relationship that governs the filing of consolidated tax returns and allocates tax liabilities and responsibilities among the IndyMac group's members," not to create a "debtor-creditor" relationship. [**Report at pp. 51:24-52:5**]. The FDIC-R introduced evidence (which the Bankruptcy Court did not actually consider) that the parties never intended to create a "debtor-creditor" relationship under which the Bank's tax refunds would be Bancorp's property. *See* Dkt. No. 61

[44] The FDIC-R argued that the TSA, as interpreted by the Bankruptcy Court to create a debtor/creditor relationship, could not be assumed or enforced by the Trustee pursuant 11 U.S.C. § 365(c)(2).

at Ex. C, Smith Tr. 173:3-190:5; Dkt. No. 43, Frost Decl. at ¶¶ 6, 8. The Bankruptcy Court's finding (based entirely on the terms of the TSA) that creation of a "debtor-creditor" relationship was not the purpose of the TSA supports the recognition of a resulting trust to enforce the actual intent of the parties.

The Bankruptcy Court, however, wrongfully concluded that the FDIC-R failed to submit any evidence to support its resulting trust theory and therefore, refused to recognize a resulting trust in favor of the FDIC-R. [**Report at pp. 43:23-45:8**].

1. The Bankruptcy Court erred in finding that the FDIC-R did not submit any "admissible" evidence on the issue of intent. [**Report at p. 44:15-22**]. The TSA itself contains a statement of intent (which is directly contrary to the Report), and the Bankruptcy Court refused to consider other evidence citing the parol evidence rule. [**Report at pp. 11:1-14:8**].

A resulting trust, however, enforces the intention of the parties notwithstanding the terms of a written agreement and, therefore, is normally proven by extrinsic evidence of intent and circumstances surrounding a transfer of property. *Cedar Funding*, Case No. 09-4311, Slip. Op. at pp. 7-9 (considering letters accompanying the written agreement and the declaration of one of the investors asserting a resulting trust); *Hansen*, 28 Cal. 2d. at 173-174 (finding "ample evidence" supporting a resulting trust on common stock, noting proof of resulting trust "may be indirect, consisting of acts, conduct and circumstances").[45]

---

[45] *Marriage of Ruelas*, 154 Cal. App. 4th at 342-343 (affirming resulting trust on real property, despite title in the resulting trustee's name, after considering testimony of intent); *Martin v. Kehl*, 193 Cal. Rptr. 312, 145 Cal. App. 3d 228, 238-239 (Cal. Ct. App. 1983) (same); *Kaneda v. Kaneda*, 45 Cal. Rptr. 437, 235 Cal. App. 2d 404, 423 (Cal. Ct. App. 1965) (same); *Jones v. Gore*, 141 Cal. App. 2d 667, 673, 297 P.2d 474 (Cal. Ct. App. 1956) (same); *accord Mancuso v. United Bank of Pueblo*, 818 P.2d 732, 739-740 (Colo. 1991) (reversing the trial and appellate courts, holding evidence of "all the attendant facts and circumstances including statements made by the parties contemporaneously with the transaction" could support finding that half of joint bank account was held in resulting trust ); *Bassett v. Bassett*, 798 P.2d 160, 164 (N.M. 1990) (affirming finding of resulting trust on land despite title clearly in another's name, noting "there is no bar to the introduction of parol testimony in order to prove the [resulting] trust asserted





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

If parol evidence was inadmissible, "then no trust could ever be established if its provisions were contrary to the terms of a writing. Such a doctrine, which would do away with resulting and constructive trusts, is not the law." *Jones*, 141 Cal. App. 2d at 673. Thus, the Bankruptcy Court's exclusion of all extrinsic evidence supporting the imposition of a resulting trust is clear error.

2. The Bankruptcy Court erred in finding, without explanation, that the evidence submitted by the FDIC-R was not "clear and convincing." [**Report at p. 45:5-8**]. No evidence could be more clear and convincing than the testimony of the former Senior Vice President and Tax Director of both the Bank and Bancorp and the testimony of the outside legal counsel to both the Bank and Bancorp on bank regulatory matters. Mr. Smith prepared the TSA in consultation with Mr. Frost. Both witnesses, Mr. Frost and Mr. Smith, served both Bancorp and the Bank simultaneously. The Trustee did not offer any contradictory evidence on this issue. Thus, there is no genuine issue of material fact. The FDIC-R is entitled to judgment as a matter of law on this issue.

**G. The Bankruptcy Court Erred in Applying the Parol Evidence Rule to Exclude the Consideration of Extrinsic Evidence**

The Bankruptcy Court erred in finding evidence submitted by the FDIC-R — mainly the testimony of Mr. Frost, who helped prepare and implement the TSA for the Bank and Bancorp — inadmissible under the parol evidence rule. [**Report at pp. 11:1-13:6**]. The Bankruptcy Court is wrong.

here"); *Univ. State Bank v. Blevins, Jr.* 605 P.2d 91, 94 (Kan. 1980) (affirming finding of resulting trust, considering testimony regarding discussions prior to taking title of the subject property and evidence of subsequent conduct of parties); *See, e.g.*, 60 CAL. JUR. 3d *Trusts* § 408 ("Parol evidence is also admissible to prove a trust arising by operation of law such as a resulting trust."); 76 AM. JUR. 2d *Trusts* § 638 ("Indeed, it is the nature of resulting trusts that they are normally established by parol evidence."); RESTATEMENT (THIRD) OF TRUST § 7 cmt. A ("resulting trust for the payor of the purchase price is recognized only after any relevant circumstances, written and oral statements, associated agreements or understandings, and other admissible parol evidence have been considered in an effort to ascertain and give effect to any discernible, actual intentions").





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

1. First, the parol evidence rule does not exclude "evidence of the circumstances under which the agreement was made or to which it relates."[46] As the California Supreme Court explained: "The exclusion of parol evidence regarding such circumstances merely because the words do not appear ambiguous to the reader can easily lead to the attribution to a written instrument of a meaning that was never intended." *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 39, 442 P.2d 641, 645 (Cal. 1968); *see* Cal. Civ. Code § 1636 ("A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.").

The testimony of Mr. Smith and Mr. Frost shows the circumstances surrounding the execution of the TSA, including the parties' intent to comply with banking regulations that specifically prohibit a bank from entering into a tax sharing agreement that would cause the bank's tax refunds to become the parent's property. *See* Dkt. No. 61 at Ex. C, Smith Tr. 34:18-37:13, 66:16-21, & 96:10-21; Dkt. No. 43, Frost Decl. at ¶¶ 6-8; Dkt. No. 61 at Ex. A, Frost Tr. 193:19-22. This testimony, which is undisputed, shows that the parties to the TSA used the word "payment" in the trustee/beneficiary or agent/principal sense and not in a debtor/creditor sense.

This evidence must be considered so that the Court can be placed in the same position as the parties whose language it is to interpret. Cal. Civ. Pro. Code § 1860. The Bankruptcy Court's refusal to heed the California Supreme Court's warnings against excluding such evidence has led to a Report that urges this Court to interpret the TSA in a manner contrary to the meanings given to the TSA by the

---

[46] Cal. Civ. Pro. Code § 1856(g); *accord* Cal. Civ. Code § 1647; Cal. Civ. Pro. Code § 1860; *Garcia v. Truck Ins. Exch.*, 36 Cal. 3d 426, 437, 682 P.2d 1100, 1104-05 (Cal. 1984); *S. Pac. Transp. Co. v. Santa Fe Pac. Pipelines, Inc.*, 88 Cal. Rptr. 2d 777, 74 Cal. App. 4th 1232, 1243 (Cal. Ct. App. 1999); *Morey v. Vannucci*, 75 Cal. Rptr. 2d 573, 64 Cal. App. 4th 904, 913-14 (Cal. Ct. App. 1998).



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

Bank and Bancorp. *See Pac. Gas*, 442 P.2d at 645. The Bankruptcy Court erred in finding that the parol evidence rule bars the admissibility of Mr. Smith's and Mr. Frost's testimony. [**Report at pp. 11:1-13:6**].

2. Second, the parol evidence rule does not exclude evidence showing the meaning of the words used in a written agreement. "[E]xtrinsic evidence may be considered . . . not to show that 'the parties meant something other than what they said' but to show 'what they meant by what they said.'" *Beneficial Fire & Cas. Ins. Co. v. Kurt Hitke & Co.*, 46 Cal. 2d 517, 524, 297 P.2d 428, 431 (Cal. 1956).[47] Such evidence does not "alter" or "vary" the terms of an agreement, but shows the meaning given to the terms of the written agreement.

As the California Supreme Court explained in *Pacific Gas*: "A rule that would limit the determination of the meaning of a written instrument to its four-corners merely because it seems to the court to be clear and unambiguous, would *either deny the relevance of the intention of the parties or presuppose a degree of verbal precision and stability our language has not attained*." 442 P.2d at 644 (emphasis added). The California Supreme Court further explained that it is legal error to determine "contractual obligations" based on the use of "certain ***magic words***" rather than the "intention of the parties." *Id.* (emphasis added). This is because words are not "absolute and constant referents" like "a symbol of algebra or chemistry." *Id.* Rather, the meaning of words varies based on "verbal context and surrounding circumstances." *Id.*

---

47 *See Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1223 (9th Cir. 2008); *Garcia*, 682 P.2d at 1104; *Delta Dynamics, Inc. v. Arioto*, 69 Cal. 2d 525, 528, 446 P.2d 785, 787 (Cal. 1968); *Pac. Gas*, 442 P.2d at 644-46; *Archiega v. Dolores Press, Inc.*, 121 Cal. Rptr. 3d 654, 661, 192 Cal. App. 4th 567, 575 (Cal. Ct. App. 2011); *Wolf v. Superior Court*, 8 Cal. Rptr. 3d 649, 655-56, 114 Cal. App. 4th 1343, 1351 (Cal. Ct. App. 2004); *S. Pac. Transp. Co. v. Sante Fe Pac. Pipelines, Inc.*, 88 Cal. Rptr. 2d 777, 74 Cal. App. 4th 1232, 1241 (Cal. Ct. App. 1999); *Morey*, 64 Cal. App. 4th at 912 n.4; *Hayter Trucking, Inc. v. Shell W. E&P, Inc.*, 22 Cal. Rptr. 2d 229, 18 Cal. App. 4th 1, 15 (Cal. Ct. App. 4d 1993); *Heston v. Farmers Ins. Group*, 206 Cal. Rptr. 585, 160 Cal. App. 3d 402, 412 (Cal. Ct. App. 1984); *Geffen v. Moss*, 125 Cal. Rptr. 687, 53 Cal. App. 3d 215, 223 (Cal. Ct. App. 1975).





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

The FDIC-R does not seek to introduce any evidence that is inconsistent with the TSA. The flaw in the Bankruptcy Court's Report is the assumption that the terms "payment" and "reimbursement" are only consistent with a debtor/creditor relationship. The Bankruptcy Court, thus, assigns "magical" debtor/creditor significance to these words. The words "payment" and "reimbursement" are consistent with a trust or agency relationship. These words do not have a fixed and absolute debtor/creditor meaning. In order to explain what the parties meant by the words used in the TSA, the FDIC-R provided the testimony of parties that created and implemented the TSA. This testimony offered by the FDIC-R shows that the parties to the TSA used the word "payment" in the trustee/beneficiary or agent/principal sense and not in a debtor/creditor sense. The Bankruptcy Court erred in finding that the parol evidence rule bars such testimony. [**Report at pp. 11:1-13:6**].

3. Third, as explained above, the words "payment" and "reimbursement" are consistent with a trust or agency relationship. Thus, even *without* provisionally considering extrinsic evidence, the TSA is reasonably susceptible to the FDIC-R's construction on its face, which makes extrinsic evidence relevant as a matter of law. *Pac. Gas*, 442 P.2d at 646 (holding trial court committed reversible error in excluding extrinsic evidence because contract was reasonably susceptible to contended meaning on its face); *see Delta Dynamics*, 446 P.2d at 787 (same); *Beneficial*, 297 P.2d at 431-432 (same). The Bankruptcy Court erred in finding that the parol evidence rule bars the admissibility of Mr. Smith's and Mr. Frost's testimony. [**Report at pp. 11:1-13:6**].

4. Fourth, the provisional consideration of the extrinsic evidence offered by the FDIC-R shows that the TSA is reasonably susceptible to the FDIC-R's construction.[48] Thus, the Bankruptcy Court erred in refusing to consider the

[48] *Pac. Gas*, 442 P.2d at 645-46; *accord Halicki*, 547 F.3d at 1223; *Garcia*, 682 P.2d at 1104; *Delta Dynamics*, 446 P.2d at 787; *Archiega*, 192 Cal. App. 4th at 575-76; *Wolf*, 114 Cal. App. 4th at 1354-55; *S. Pac. Transp.*, 74 Cal. App. 4th at





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

evidence.

For example, in *Wolf*, the trial court committed reversible error when it held the term "gross receipts" in a contract unambiguously meant "cash" only as opposed to also including in-kind consideration. 114 Cal. App. 4th at 1350-51. After reading an extrinsic declaration (on the trade use of the term at issue), the trial court commented at oral argument: "So where we are here is that personally I think 'gross receipts,' as the parties wrote it in paragraph 21, means 'money.' But if I have to consider that [extrinsic] declaration, you [the *plaintiff*] win the summary judgment." *Id.* at 1355. The trial court went on to grant summary judgment in favor of the *defendant* claiming that the contract was clear and unambiguous. *Id.* at 1349. The Court of Appeals reversed the trial court. *Id.* at 1350-51.

The Court of Appeals explained: "[I]t is reversible error for a trial court to refuse to consider . . . extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face." *Id.* at 1351. Rather, the trial court is required to "provisionally" receive all credible extrinsic evidence. *Id.* And, if such evidence shows that the language in the agreement is "reasonably susceptible" to the interpretation urged, then it must be admitted. *Id.* Thus, in *Wolf*, because the extrinsic evidence showed that the contract was "reasonably susceptible" to the plaintiff's interpretation, the trial court was not justified in excluding it. *Id.*

The testimony of Mr. Smith and Mr. Frost shows that the TSA is reasonably susceptible to the FDIC-R's construction. As in *Wolf*, the extrinsic evidence in this case is inconsistent with the way the Bankruptcy Court interprets the TSA. This, however, is not a legal basis to exclude the testimony of Mr. Smith and Mr. Frost. The Bankruptcy Court erred in finding that the parol evidence rule bars the admissibility of Mr. Smith's and Mr. Frost's testimony. [**Report at pp. 11:1-13:6**].

---

1241-42; *Morey*, 64 Cal. App. 4th at 912 n.4; *Hayter Trucking*, 18 Cal. App. 4th at 17; *Heston*, 160 Cal. App. 3d at 412-414; *Geffen*, 53 Cal. App. 3d at 223.



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

5. Fifth, the TSA must be interpreted within the banking/regulatory context in which it was drafted. The parol evidence rule exempts extrinsic evidence of "usage of trade" to supplement or explain the terms of the agreement of the parties. Cal. Civ. Pro. Code § 1856(c). California courts consistently allow the admission of extrinsic evidence on trade usage to explain the meaning of words in a contract, no matter how clear the written contract appears to the judge.[49]

For example, in *Southern Pacific*, the court of appeals reversed the lower court's refusal to consider extrinsic evidence regarding whether the language in the agreement suggested a mutual intent about a specific methodology for arriving at a rent increase. 74 Cal. App. 4th at 1241. The court of appeals emphasized that parties are presumed to contract pursuant to the "fixed and established usage and custom of the trade or industry." *Id.* at 1244. Particularly, the lower court erred in refusing to admit testimony of the expert appraiser regarding industry practice for establishing rental rates. *Id.* The lower court erred in assuming it had a "clean slate on which to script the methodology for establishing a rent increase" without considering the extrinsic evidence such as trade usage. *Id.* at 1240, 1244.

Here, the terms in the TSA, including the terms "payment" and "reimbursement," must be interpreted within the banking/regulatory context in which the TSA was drafted. Federally insured banks do not just give away their tax refunds. Nor are they permitted to do so. As is evident from the face of the TSA, and the Frost Declaration, the parties were aware of the Interagency Policy Statement and the affiliate transaction rules. *See* TSA at § 7(a); Dkt. No. 43, Frost Decl. at ¶¶ 6-8; *see also* Dkt. No. 81 at Ex. Y, pp. 36-40. If the TSA was intended to create a debtor/creditor relationship, trade and industry practice shows that the

---

[49] *See Adobe Sys. Inc. v. One Stop Micro, Inc.*, 84 F. Supp. 2d 1086, 1091-1092 (N.D. Cal. 2000); *Beneficial Fire & Cas. Ins.*, 46 Cal. 2d at 525-527; *Ermolieff v. R.K.O. Radio Pictures*, 19 Cal. 2d 543, 550, 122 P.2d 3 (Cal. 1942); *Wolf*, 114 Cal. App. 4th at 1357; *S. Pacific*, 74 Cal. App. 4th at 1244; *Rainier Credit Co. v. W. Alliance Corp.*, 217 Cal. Rptr. 291, 171 Cal. App. 3d 255, 262 (Cal. Ct. App. 1985).



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

TSA would clearly spell this out and include the requisite collateral and other requirements set forth in 12 U.S.C. § 371c(c).

Viewed in this context, the term "payment" in Section 4 of the TSA is used by the parties in the trustee/beneficiary or agent/principal sense and not in a debtor/creditor sense. As in *Southern Pacific*, it would be clear error for this Court to refuse to consider extrinsic evidence regarding trade usage in interpreting the terms of the TSA as the Bankruptcy Court recommends. [**Report at pp. 11:1-13:6**].

**H. <u>The Bankruptcy Court Erred in Excluding Evidence Regarding the Economic Reality of the Tax Refunds on Relevance Grounds</u>**

The Bankruptcy Court incorrectly found that all evidence regarding the economic reality of the tax refunds is irrelevant and, therefore, inadmissible. [**Report at pp. 11:4-14:20**].

Evidence regarding the economics of the tax refunds — to whose "earnings history" the tax refunds are attributable (as discussed in detail in Section I.C.1 of this Objection) — is *per se* relevant under *Bob Richards*. 473 F.2d at 265; *accord Lubin*, 2011 WL 825751, at *5-6; *BSD Bancorp.*, No. 93-12207-A11, at 9-11.

The case law upon which the Bankruptcy Court relies supports this view. The key to understanding cases like *Franklin Savings* and *First Central* is that the economic reality was different than in *Bob Richards*. The refusal to consider the economics of the tax refunds in this case is inconsistent with *Bob Richards* and every other case addressing the ownership of tax refunds (with the exception of *BankUnited*, which did not follow *Bob Richards*).

The Bankruptcy Court's refusal to admit the evidence offered by the FDIC-R regarding the economics of the tax refunds in dispute is clear error. [**Report at pp. 13:7-14:20**].

1. The Bankruptcy Court erred in refusing to admit evidence offered by the FDIC-R regarding the Bank's earnings and loss history — specifically, the





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

Wasserman Declaration — on relevance grounds. [**Report at p. 14:9-20**].

The only way for this Court to know whether the tax refunds in this case are due entirely to the "earnings history" of the Bank, and thus the Bank's property under *Bob Richards*, is to consider evidence regarding the Group's tax and accounting records. These documents show that the entire $55 million is a refund of taxes paid by the Bank directly to the IRS based on the Bank's income. And, these documents show that the Bank's massive losses in 2007 and 2008 alone are sufficient to offset all of the Bank's income in the prior tax years, thus, resulting in the refund of $55 million in taxes paid by the Bank. This extrinsic evidence shows that the refund in dispute is the Bank's property because, as in *Bob Richards*, the Bank created it. 473 F.2d at 265.

The Declaration of Mr. Stephan Wasserman, a certified public accountant, summarizes these facts based on his review of the tax records filed by the Trustee, *see* Dkt. No. 32 at Exs. 10-28, and other tax and accounting records maintained by the Bank and Bancorp in the ordinary course of business. The FDIC was not a party to the creation of these records and, thus, had to employ an accountant to review and interpret them for this litigation, just as the Trustee did. The Bankruptcy Court's determination that these facts have no bearing on the resolution of this dispute and are irrelevant is clearly wrong.[50]

2. The Bankruptcy Court erred in finding that the Declaration of Mr. William Castleberry, a practicing tax attorney and professor at NYU, is impermissible parol evidence and expert testimony about legal issues. [**Report at**

---

[50] The Trustee also argued that the Wasserman Declaration is improper "new evidence" submitted via a reply brief. [**Report at p. 14:13-14**]. The Bankruptcy Court does not express a view on this issue. The Trustee's position on this issue has no merit because, as previously discussed, the Bankruptcy Court's scheduling order specifically permitted the parties to raise "supplemental statements of uncontroverted facts or issues" in reply briefs. *See* Dkt. No. 54. The Wasserman Declaration simply summarizes evidence that was already in the record in a coherent and logical fashion so that the Court can easily see that the entire tax refund in this case is a refund of taxes paid by the Bank on the Bank's own income. This evidence is not disputed by either party.

**pp. 13:26-14:8**].

First, the Castleberry Declaration is not parol evidence because it does not "contradict" the terms of the TSA. Cal. Civ. Pro. Code § 1856(a). This declaration is offered as expert testimony to explain the mathematical calculations performed under the TSA. This Declaration does not vary or contradict the terms of the TSA. Thus, the parol evidence rule does not apply.

Second, the Castleberry Declaration is permissible expert testimony because it embraces a <u>factual</u> question. *See* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."); *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016-17 (9th Cir. 2004) (expert testimony "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact"). The Castleberry Declaration provides expert testimony about how mathematic calculations of tax liability (including negative tax liability resulting in a refund) would be performed under the TSA and shows why, mathematically, the TSA requires Bancorp to "pay[]" the Bank the same amount as if Bancorp had filed separate tax returns and no tax sharing agreement was in place. *See* Dkt. No. 73, Castleberry Decl. at ¶¶ 32-33, 37.

This declaration is not proffered to supply any particular legal definition of what constitutes a "differing agreement." This Court could determine that the TSA is not a "differing agreement" if it requires Bancorp to pay the Bank's separate basis tax refunds to the Bank. This declaration shows that the TSA does, ***in fact***, require Bancorp to pay the Bank's separate basis tax refunds to the Bank — *i.e.*, the amount due to the Bank is not materially different than the amount the Bank would have received if it had filed separately and no TSA had been in place. Therefore, the TSA produces a result that is mathematically no different than under *Bob Richards*.[51]

[51] The Trustee also argued that the Castleberry Declaration is improper "new evidence" submitted via a reply brief. [**Report at p. 13:12**]. The Bankruptcy Court does not express a view on this issue. The Trustee's position on this issue has no



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

Moreover, even if a complex mathematical calculation becomes a mixed question of law and fact simply because it arises out of the provisions of a contract, that alone does not mean it should be excluded. The Ninth Circuit has held that expert testimony on a legal issue is not necessarily inappropriate with respect to "highly complex and technical matters," especially when the proceeding is a "bench trial, where there [is] no danger that a jury might give too much credence to a legal expert." *Flores v. Arizona*, 516 F.3d 1140, 1166 (9th Cir. 2008). In this case, the Court determines questions of law and fact, and the calculation of consolidated tax liability is a highly complex and technical matter. Therefore, this Court should admit the Castleberry Declaration to aid the Court in evaluating the mathematical consequences of the calculations under *Bob Richards* and the TSA.

## III. CONCLUSION

Nearly every finding in the Bankruptcy Court's Report, which adopts nearly verbatim a proposed report drafted by the Trustee, is inconsistent with federal and state law. The Report should be rejected by this Court.

---

merit because the Bankruptcy Court's scheduling order specifically permitted the parties to raise "supplemental statements of uncontroverted facts or issues" in reply briefs. *See* Dkt. No. 54.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND

Dated: April 26, 2012

Federal Deposit Insurance Corporation
Legal Division
Kathryn R. Norcross, Senior Counsel
B. Amon James, Counsel

and

BAKER & HOSTETLER LLP

and

NOSSAMAN LLP

*/s/ John W. Kim*
JOHN W. KIM

Attorneys for the Federal Deposit Insurance Corporation, in its capacity as Receiver of IndyMac Bank, F.S.B. and in its capacity as Receiver of IndyMac Federal Bank, F.S.B.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
CLEVELAND